DAJ

FILED

NOVEMBER 20, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| FIRST CONSULTING GROUP, INC. and FCG CSI, INC., | ) ) ) | **07 C 6577** |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. _____ |
| IMPACT ADVISORS, LLC, ANDREW SMITH, PETER SMITH, and MELANIE SWENSON, | ) ) ) ) ) | **Jury Trial Demanded** JUDGE ZAGEL MAGISTRATE JUDGE KEYS |
| Defendants. | ) ) ) | |

## COMPLAINT

Plaintiffs First Consulting Group, Inc. and FCG CSI, Inc. (collectively, "FCG"), for their Complaint against Andrew M. Smith, Peter C. Smith, and Melanie Swenson (collectively, "Individual Defendants"), and Impact Advisors, LLC ("Impact Advisors") (collectively with Individual Defendants, "Defendants") state as follows:

## I.  OVERVIEW

1.    The Individual Defendants are former FCG executives who agreed for a limited period of time following their terminations from FCG not to solicit FCG employees and FCG clients.  As described more fully below, the Individual Defendants have breached their contractual obligations by (1) directly and indirectly soliciting and hiring during the prohibited period numerous FCG employees to work for Impact Advisors, a new entity recently formed by the Individual Defendants to compete against FCG, and (2) directly and indirectly soliciting and providing services during the prohibited period to known FCG clients.  FCG seeks damages and injunctive relief against Defendants based upon its claims for breach of contract, tortious interference with contract and tortious interference with prospective economic advantage.

## II.   <u>THE PARTIES</u>

2.        Plaintiff First Consulting Group, Inc. ("FCG, Inc.") is a Delaware corporation with its principal place of business in Long Beach, California.

3.        Plaintiff FCG CSI, Inc. ("FCG CSI") is a Delaware corporation with its principal place of business in Long Beach, California. FCG CSI is a wholly-owned operating subsidiary of FCG, Inc. FCG CSI does business as First Consulting Group, and FCG CSI and FCG, Inc. are consolidated entities for financial reporting purposes.

4.        Upon information and belief, defendant Impact Advisors, LLC ("Impact Advisors") is an Illinois limited liability company with its principal place of business in Illinois.

5.        Upon information and belief, defendant Andrew M. Smith ("Andrew Smith") is a resident of Naperville, Illinois.

6.        Upon information and belief, defendant Peter C. Smith ("Peter Smith") is a resident of Chicago, Illinois. Andrew Smith and Peter Smith (collectively, the "Smiths") are brothers.

7.        Upon information and belief, defendant Melanie Swenson ("Swenson") is a resident of Montana.

## III.   <u>JURISDICTION AND VENUE</u>

8.        This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

9.     This Court has personal jurisdiction over defendant Impact Advisors because, upon information and belief, Impact Advisors is incorporated in Illinois and has its principal place of business in Illinois.

10.     This Court has personal jurisdiction over defendant Peter Smith because, upon information and belief, Peter Smith resides in Illinois.

11.     This Court has personal jurisdiction over defendant Andrew Smith because, upon information and belief, Andrew Smith resides in Illinois.

12.     Swenson is subject to the personal jurisdiction of the Illinois courts under the Illinois long-arm jurisdiction statute, 735 ILCS 5/2-209 because, upon information and belief, Swenson transacted business and committed acts herein complained of within Illinois. Accordingly, this Court has personal jurisdiction over Swenson pursuant to Fed. R. Civ. P. 4.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) (3) because every Defendant is subject to personal jurisdiction in this district and pursuant to 28 U.S.C. § 1391(a) (2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## IV.  FACTUAL ALLEGATIONS

### A.     The Individual Defendants' Employment at FCG And Their Post-Separation Obligations

14.     FCG provides consulting, software development, system integration, outsourcing and applied research services to healthcare, pharmaceutical and other life sciences organizations. Each of the Individual Defendants served as a Vice-President with FCG, and each agreed to certain contractual obligations that would apply after leaving FCG ("post-separation obligations"), as follows.

3

15.     Defendant Peter Smith joined FCG on June 16, 1986.  He became a Vice President of FCG on June 1, 2000.  In connection with his role as Vice President, Peter Smith executed a Vice President Agreement on or about December 31, 2000 ("Peter Smith Vice President Agreement," attached hereto as Exhibit A).  The Peter Smith Vice President Agreement bars Peter Smith, for a one-year period following his separation from FCG, from directly or indirectly:  (i) soliciting, diverting, or taking away any "Known FCG Client"; (ii) providing any services to any Known FCG Client; and (iii) soliciting, diverting, or taking away any employee of FCG:

> 7.     Non-Competition and Non-Solicitation.  In addition to any non-competition and non-solicitation provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:
>
> (a)     No Solicitation of Known FCG Clients.  Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client.  For purposes of these restrictions, "Known FCG Client" shall be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.
>
> (b)     No Solicitation of Employees.  Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

Peter Smith Vice President Agreement (Ex. A) at ¶ 7.

16.     Defendant Andrew Smith joined FCG on June 10, 1991.  He became a Vice President of FCG on July 1, 2003.  In connection with his role as Vice President, Andrew Smith executed a Vice President Agreement on or about July 1, 2003 ("Andrew Smith Vice

President Agreement," attached hereto as Exhibit B; the Peter Smith Vice President Agreement

and Andrew Smith Vice President Agreement are referred to collectively as the "Smith Vice

President Agreements").  The Andrew Smith Vice President Agreement bars Andrew Smith, for

a one-year period following his separation from FCG, from directly or indirectly:  (i) soliciting,

diverting, or taking away any "Known FCG Client"; (ii) providing any services to any Known

FCG Client; and (iii) soliciting, diverting, or taking away any employee of FCG:

> 7.      Non-Competition and Non-Solicitation.  In addition to any
> non-competition and non-solicitation provisions provided
> under Participant's employee agreement with any FCG Company,
> Participant hereby agrees to the following restrictions for one year
> following separation of Participant's employment with FCG,
> regardless of the reasons for such separation of employment:
>
> (a)      No Solicitation of Known FCG Clients.  Participant
> hereby agrees that, without the prior written consent of FCG,
> Participant (i) shall not provide any services, directly or indirectly,
> and whether as an employee, consultant, independent contractor or
> otherwise, to or on behalf of any Known FCG Client, and (ii) shall
> not, directly or indirectly, solicit, divert or take away any Known
> FCG Client.  For purposes of these restrictions, "Known FCG
> Client" shall be any past, present or prospective FCG client that
> Participant provided services for, participated in preparation or
> delivery of any oral or written proposal for or otherwise had
> contact with during the last 18 months while at FCG.
>
> (b)      No Solicitation of Employees.  Participant agrees to
> not, directly or indirectly, solicit, divert or take away any employee
> of FCG.

Andrew Smith Vice President Agreement (Ex. B) at ¶ 7.

> 17.     Defendant Swenson joined FCG on July 29, 1996.  She became a Vice

President of FCG on January 1, 2005.  In connection with her role as Vice President, Swenson

executed a Vice President Agreement on or about March 6, 2006 ("Swenson Vice President

Agreement," attached hereto as Exhibit C).  The Swenson Vice President Agreement bars

Swenson, for a one-year period following her separation from FCG, from directly or indirectly:

(i) soliciting, diverting, or taking away any "Known FCG Client"; (ii) providing any services to

any Known FCG Client; and (iii) soliciting, diverting, or taking away any employee of FCG:

> 7.     Non-Competition and Non-Solicitation.  In addition to any
> non-competition and non-solicitation provisions provided under
> Participant's employee agreement with any FCG Company,
> Participant hereby agrees to the following restrictions for one year
> following separation of Participant's employment with FCG,
> regardless of the reasons for such separation of employment:
>
> (a)     No Solicitation of Known FCG Clients.  Participant
> hereby agrees that, without the prior written consent of FCG,
> Participant (i) shall not provide any services, directly or indirectly,
> and whether as an employee, consultant, independent contractor or
> otherwise, to or on behalf of any Known FCG Client, and (ii) shall
> not, directly or indirectly, solicit, divert or take away any Known
> FCG Client.  For purposes of these restrictions, "Known FCG
> Client" shall be any past, present or prospective FCG client that
> Participant provided services for, participated in preparation or
> delivery of any oral or written proposal for or otherwise had
> contact with during the last 18 months while at FCG.
>
> (b)     No Solicitation of Employees.  Participant agrees to
> not, directly or indirectly, solicit, divert or take away any employee
> of FCG.

Swenson Vice President Agreement (Ex. C) at ¶ 7.

> **B.     The Individual Defendants Resign As Vice Presidents From FCG And
> Expressly Reaffirm Their Non-Solicitation Obligations**

18.     In February 2007, the Smiths resigned from their Vice President positions

with FCG.  In connection with their resignations, the Smiths executed transition agreements with

FCG, pursuant to which FCG employed the Smiths as members of FCG's temporary per diem

staffing program and governed the Smiths' transition activities.  ("Peter Smith Transition

Agreement," attached hereto as Exhibit D, and "Andrew Smith Transition Agreement," attached

hereto as Exhibit E; the Peter Smith Transition Agreement and the Andrew Smith Transition

Agreement are referred to collectively as the "Smith Transition Agreements").  The Smith

Transition Agreements each expressly reaffirm the terms of the Smith Vice President

Agreements. *See* Peter Smith Transition Agreement (Ex. D) at 2; Andrew Smith Transition

Agreement (Ex. E) at 2  In addition, the Smith Transition Agreements each provide that the one-

year periods set forth in the Smith Vice President Agreements, during which the Smiths are

barred from soliciting FCG's clients and employees, and from providing services to its clients,

shall end on February 7, 2008, unless the Smiths' per diem statuses are extended to include

additional assignments beyond the transitional activities described therein, in which case the

prohibited periods are extended. *See* Peter Smith Transition Agreement (Ex. D) at 2; Andrew

Smith Transition Agreement (Ex. E) at 2.

      19.     Andrew Smith completed his transition services to FCG on or about

March 2, 2007 and ceased having any business relationship with FCG at that time.

      20.     Peter Smith completed his transition services to FCG on or about May 31,

2007 and ceased having any business relationship with FCG at that time.

      21.     In April 2007, Swenson resigned from her Vice President position at FCG.

In connection with her resignation, Swenson executed an agreement with FCG, which made

Swenson a temporary employee of FCG and governed her transition activities ("Swenson

Transition Agreement," attached hereto as Exhibit F; the Peter Smith Transition Agreement, the

Andrew Smith Transition Agreement, and the Swenson Transition Agreement are referred to

collectively as the "Transition Agreements").  Like the Vice President Agreement she had

previously signed, the Swenson Transition Agreement provided that Swenson would not:

> … directly or indirectly, solicit, divert or take away any employee
> of FCG for a period of one year following separation of my
> employment with FCG.  In the event that FCG is proposing my
> services for a specific project and I have knowledge of the contents
> of such proposal or that such proposal is being made, I will not
> participate in a competitive proposal for the specific project.

*See*  Swenson Transition Agreement (Ex. F) ¶ 5.

22.    Swenson completed her transition services to FCG on or about May 22, 2007, and ceased having any business relationship with FCG at that time.

**C.    After Resigning As Vice Presidents Of FCG, Defendants Peter Smith And Andrew Smith Form Impact Advisors To Compete With FCG, And Solicit And Hire Swenson**

23.    Following their resignations as Vice Presidents of FCG, Peter Smith and Andrew Smith founded Impact Advisors to compete directly against FCG.  According to its website, Impact Advisors provides "high value advisory and technology consulting services to the health care provider industry."  *See* Impact Advisors web site, http://www.impact-advisors.com (last visited Nov. 15, 2007).  To market Impact Advisors' expertise, the website specifically touts the Smiths' recent Vice President positions at FCG:

> Prior to founding Impact Advisors, Andrew was a Vice President with First Consulting Group and managed the Midwest region.  In that role he was responsible for the delivery of services and relationship development of First Consulting Group's largest region.  Andrew also led First Consulting Group's Information Services (IS) Assessment Service offering and is a frequent presenter on the subject of information technology benchmarking.
>
> …
>
> Prior to founding Impact Advisors, Peter was a Vice President of First Consulting Group with national responsibility for managing the Advisory Services Practice within the Health Delivery Services Division.  This Practice focused on core consulting services and specialized in IT Assessments, IT Strategic Planning, Clinical Consulting and Process Redesign, System Selections, Vendor Contract Negotiation, Pre-implementation Planning and Digital Imaging.  Peter was part of the Health Delivery Leadership Team and a member of the Operating Committee which defined and executed overall division strategy.

*Id.* at "Our Leaders."

24.    Impact Advisors' website similarly touts its consultants' years of experience in the healthcare IT marketplace, emphasizing that "[w]e have helped over twenty

clients in the past three years with the development of IT operational Assessments and IT Strategic Plans, and we have assisted the majority of these clients with the implementation of these plans. *Id.* at "About Us."

25.     Impact Advisors' website identifies the Smiths as the firm's only Managing Partners. Aside from the Smiths, the website identifies only two other partners, both of whom are non-managing partners, and no other employees. *Id.* at "Our Leaders."

26.     Significantly, Swenson is one of the two non-managing partners identified on Impact Advisor's website. Like the website biographies of the Smiths, Swenson's biography similarly highlights her work at FCG:

> Prior to joining Impact Advisors, Melanie was Vice President of the Epic Implementation Practice for First Consulting Group…. Melanie also served clients as a project/program manager, specializing in project management for multi-hospital, multi-application implementations, including academic medical centers, community hospitals, and large integrated delivery networks.

*Id.* Thus, in violation of their obligations under their respective agreements, it appears on information and belief that the Smiths improperly solicited Swenson to join their new firm, Impact Advisors.

27.     The website identifies the remaining non-managing partner of Impact Advisors to be Todd Hollowell, another former FCG employee. Unlike Swenson, however, Hollowell was not working for FCG at the time he joined Impact Advisors. Nevertheless, the website biography of Hollowell touts his professional experience at FCG. *Id.*

### D.     The Individual Defendants Solicit And Hire Numerous FCG Employees In Violation Of Their Post-Separation Obligations

28.     After Swenson joined Impact Advisors, all three Individual Defendants began to actively solicit, divert, and take away employees from FCG, in violation of their Vice

President Agreements and Transition Agreements.  The Individual Defendants have focused their improper solicitation efforts on FCG consultants with whom they had developed professional relationships at FCG.  As a result, Impact Advisors wrongfully took, and FCG lost, the value of these consultants' experience, expertise and client relationships.  FCG's consulting business activities were damaged as a result of Defendants' actions.

### a.    Stephen Egli

29.    The first FCG employee who the Individual Defendants improperly solicited to work for Impact Advisors in violation of their agreements was Stephen Egli.  Egli was an FCG employee from approximately January 27, 1997 to August 11, 2007.  Upon information and belief, Egli left FCG's employ in August 2007 as a result of improper solicitations by the Individual Defendants to join Impact Advisors, where he worked and continues to work following his separation from FCG.

30.    Prior to leaving FCG's employ, Egli served as an Implementation Senior Manager in FCG's Epic Implementation Practice.  Egli reported to Swenson in that practice before Swenson left FCG.  Egli had also been coached by Swenson in FCG's consultant coaching program, beginning in 2006, until Swenson left FCG.

31.    After the Individual Defendants improperly poached Egli, FCG lost and continues to lose the revenues and profits it reasonably expected to realize from Egli's continued employment with FCG.

### b.    Roberta Riddle

32.    The second FCG employee who the Individual Defendants solicited to work for Impact Advisors in violation of their agreements was Roberta Riddle.  Riddle was an FCG employee from approximately March 2, 1998 to August 18, 2007.  Upon information and

belief, Riddle left FCG's employ in August 2007 as a result of improper solicitations by the Individual Defendants to join Impact Advisors, where she worked and continues to work following her separation from FCG.

33.    Prior to leaving FCG's employ, Riddle served as a Master III – Implementation in FCG's Epic Implementation Practice. Riddle reported to Swenson in that practice before Swenson left FCG. Riddle also had been coached by Swenson in FCG's consultant coaching program from approximately 1999 until Swenson left FCG.

34.    After the Individual Defendants improperly poached Riddle, FCG lost and continues to lose the revenues and profits it reasonably expected to realize from Riddle's continued employment with FCG.

### c.    Sue Kitchen

35.    Third, the Individual Defendants solicited Sue Kitchen to work for Impact Advisors in violation of their agreements. Kitchen, an FCG employee since approximately April 1, 1996, is an Implementation Senior Manager in FCG's Epic Implementation Practice. Kitchen reported to Swenson in that practice before Swenson left FCG.

36.    On October 24, 2007, Kitchen received a voice mail message on her cellular telephone from Hollowell. Hollowell said:

> Hi, Sue. This is Todd Hollowell. I am a partner at Impact Advisors. Actually, Melanie Swenson is one of my peers, along with Andy Smith and Pete Smith. We've started this new healthcare IT consulting group doing very similar work to what you're doing there at FCG and ***Melanie thought it would be great if I reached out and chatted with you about some opportunities we have and to see if you have any interest in potentially talking to us about those opportunities.*** A lot of Epic work around Clin Doc and HIM have come up and we'd love to run a couple things by you and just let you know what we're up to and see if there may be a fit for us to even work together, whether it be now or down the road.

11

37.     Upon information and belief, Swenson instructed Hollowell to contact Sue Kitchen to solicit her interest in joining Impact Advisors.  Upon information and belief, Swenson gave Hollowell the instruction to contact Kitchen – even though Swenson personally knew Kitchen, and Hollowell did not – because Swenson did not want to be caught violating the non-solicitation obligations.  Notwithstanding her subterfuge, Swenson's direction to Hollowell violates the terms of her agreements with FCG.  While Kitchen remains employed at FCG, the solicitation of Kitchen constitutes a breach of the Individual Defendants' non-solicitation agreements.

**d.     William Faust**

38.     Fourth, the Individual Defendants solicited William Faust to work for Impact Advisors in violation of their agreements.  Faust was an FCG employee from approximately January 21, 2002 to October 25, 2007.  Upon information and belief, Faust left FCG's employ in October 2007 as a result of improper solicitations by the Individual Defendants to join Impact Advisors, where he worked and continues to work following his separation from FCG.

39.     Prior to leaving FCG's employ, Faust served as an Implementation Manager in FCG's Epic Implementation Practice.  Faust reported to Swenson in that practice before Swenson left FCG.  Faust also worked extensively with Andrew Smith while at FCG.

40.     After the Defendants improperly poached Faust, FCG lost and continues to lose the revenues and profits it reasonably expected to realize from Faust's continued employment with FCG.

e.    **Pamela Baylor**

41.    Fifth, the Individual Defendants solicited Pamela Baylor to work for Impact Advisors in violation of their agreements.  Baylor was an FCG employee from approximately April 5, 2004 to November 10, 2007.  Upon information and belief, Baylor left FCG's employ in November 2007 as a result of improper solicitations by the Individual Defendants to join Impact Advisors, where she worked and continues to work following her separation from FCG.

42.    Prior to leaving FCG's employ, Baylor served as an Implementation Manager in FCG's Epic Implementation Practice.  Baylor reported to Swenson in that practice before Swenson left FCG.

43.    After the Individual Defendants improperly poached Baylor, FCG lost and continues to lose the revenues and profits it reasonably expected to realize from Baylor's continued employment with FCG.

E.    **The Individual Defendants Solicit And Provide Services To Known FCG Clients**

44.    Upon information and belief, each of the Individual Defendants, in violation of their respective Vice President Agreements and Transition Agreements, directly or indirectly has solicited entities that are Known FCG Clients under the terms of their respective Vice President Agreements to hire Impact Advisors to provide consulting services.

45.    Upon information and belief, some of entities solicited by the Individual Defendants in violation of their Vice President Agreements and Transition Agreements have hired Impact Advisors to provide consulting services.

46.    Upon information and belief, Impact Advisors has placed consultants, including some of the improperly poached FCG employees, with entities that are Known FCG

Clients under the terms of the Individual Defendants' Vice President Agreements. These Impact

Advisors consultants are now providing services that FCG would be providing but for the

Individual Defendants' violations of their respective Vice President Agreements and Transition

Agreements.

47.     As a result of all of these activities, FCG has been damaged.

48.     FCG demands a trial by jury.

## CLAIM I

## <u>BREACH OF CONTRACT</u>
### (Against Peter Smith)

49.     Paragraphs 1 through 48 are hereby fully incorporated by reference, as if

fully set forth herein.

50.     FCG entered into valid and enforceable agreements with Peter Smith

which expressly prohibited him from directly or indirectly:  (i) soliciting, diverting, or taking

away any employee of FCG; (ii) soliciting, diverting, or taking away any Known FCG Client;

and (iii) providing any services to any Known FCG Client.  Those agreements are memorialized

in the Peter Smith Vice President Agreement and the Peter Smith Transition Agreement.

51.     Peter Smith has breached his Vice President Agreement and Transition

Agreement by directly and/or indirectly soliciting, diverting, and/or taking away one or more

FCG employees.

52.     Peter Smith has also breached his Vice President Agreement and

Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking away one

or more Known FCG Clients, and by directly and/or indirectly providing services to one or more

Known FCG Clients.

14

53.     As a direct and proximate result of Peter Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, damages.

54.     As a further direct and proximate result of Peter Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, the loss of its employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  In order for FCG to derive the negotiated-for protection intended by the language of the Peter Smith Vice President Agreement and Peter Smith Transition Agreement, Peter Smith must be enjoined from his conduct in breach of such agreements.

55.     FCG has performed all of its obligations under the Peter Smith Vice President Agreement and the Peter Smith Transition Agreement.

## CLAIM II

### BREACH OF CONTRACT
#### (Against Andrew Smith)

56.     Paragraphs 1 through 55 are hereby fully incorporated by reference, as if fully set forth herein.

57.     FCG entered into valid and enforceable agreements with Andrew Smith which expressly prohibited him from directly or indirectly:  (i) soliciting, diverting, or taking away any employee of FCG; (ii) soliciting, diverting, or taking away any Known FCG Client; and (iii) providing any services to any Known FCG Client.  Those agreements are memorialized in the Andrew Smith Vice President Agreement and the Andrew Smith Transition Agreement.

58.     Andrew Smith has breached his Vice President Agreement and Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking away one or more FCG employees.

59.     Andrew Smith has also breached his Vice President Agreement and Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking away one or more Known FCG Clients, and by directly and/or indirectly providing services to one or more Known FCG Clients.

60.     As a direct and proximate result of Andrew Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, damages.

61.     As a further direct and proximate result of Andrew Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, the loss of its employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  In order for FCG to derive the negotiated-for protection intended by the language of the Andrew Smith Vice President Agreement and Andrew Smith Transition Agreement, Andrew Smith must be enjoined from his conduct in breach of such agreements.

62.     FCG has performed all of its obligations under the Andrew Smith Vice President Agreement and the Andrew Smith Transition Agreement.

## CLAIM III

### BREACH OF CONTRACT
**(Against Melanie Swenson)**

63.     Paragraphs 1 through 62 are hereby fully incorporated by reference, as if fully set forth herein.

64.     FCG entered into valid and enforceable agreements with Melanie Swenson which expressly prohibited her from directly or indirectly:  (i) soliciting, diverting, or taking away any employee of FCG; (ii) soliciting, diverting, or taking away any Known FCG Client; and (iii) providing any services to any Known FCG Client.  Those agreements are memorialized in the Swenson Vice President Agreement and the Swenson Transition Agreement.

65.     Melanie Swenson has breached her Vice President Agreement and Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking one or more FCG employees.

66.     Melanie Swenson has also breached her Vice President Agreement and Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking away one or more Known FCG Clients, and by directly and/or indirectly providing services to one or more Known FCG Clients.

67.     As a direct and proximate result of Melanie Swenson's breaches of her Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, damages.

68.     As a further direct and proximate result of Melanie Swenson's breaches of her Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, the loss of its employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm

for which FCG has no adequate remedy at law. In order for FCG to derive the negotiated-for protection intended by the language of the Melanie Swenson Vice President Agreement and Melanie Swenson Transition Agreement, Melanie Swenson must be enjoined from her conduct in breach of such agreements.

69.    FCG has performed all of its obligations under the Swenson Vice President Agreement and the Swenson Transition Agreement.

## CLAIM IV

### TORTIOUS INTERFERENCE WITH CONTRACT
(Against Impact Advisors)

70.    Paragraphs 1 through 69 are hereby fully incorporated by reference, as if fully set forth herein.

71.    The Individual Defendants' Vice President and Transition Agreements are valid and enforceable contracts.

72.    Impact Advisors was at all relevant times aware of the Individual Defendants' Vice President and Transition Agreements, and of the Individual Defendants' post-separation obligations to FCG that are imposed by those agreements.

73.    Impact Advisors intentionally and without justification induced the Individual Defendants to breach their employee non-solicitation obligations to FCG by encouraging the Individual Defendants to solicit FCG employees and to offer FCG employees employment opportunities at Impact Advisors.

74.    Impact Advisors intentionally and without justification induced the Individual Defendants to breach their client non-solicitation obligations to FCG by encouraging the Individual Defendants to solicit Known FCG Clients and to provide services to Known FCG Clients.

75.    As a direct and proximate result of Impact Advisors' conduct, FCG has suffered, and will continue to suffer, damages.

76.    As a further direct and proximate result of Impact Advisors' conduct, FCG has suffered, and will continue to suffer, the loss of its improperly poached employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients. Such damages constitute irreparable harm for which FCG has no adequate remedy at law. Accordingly, Impact Advisors must be enjoined from further interference with the Individual Defendants' non-solicitation obligations to FCG.

## CLAIM V

### TORTIOUS INTERFERENCE WITH
### <u>PROSPECTIVE ECONOMIC ADVANTAGE</u>
### (Against Impact Advisors)

77.    Paragraphs 1 through 76 are hereby fully incorporated by reference, as if fully set forth herein.

78.    FCG had a reasonable expectancy of continuing, free from employment solicitations by the Individual Defendants, its valid employment relationships with Stephen Egli, Roberta Riddle, William Faust, and Pamela Baylor, and of realizing economic advantages therefrom.

79.    FCG had a reasonable expectancy of continuing its relations with certain clients, and of realizing economic advantages therefrom.

80.    Impact Advisors was at all relevant times aware of FCG's expectancies.

81.    Impact Advisors intentionally and without justification interfered with such expectancies by inducing the Individual Defendants to solicit and hire Egli, Riddle, Faust,

and Baylor on behalf of Impact Advisors, and by inducing the Individual Defendants to solicit and to provide services to Known FCG Clients.

82.    Impact Advisors' interference induced or caused the termination of FCG's expectancies of continuing certain employment relationships and of continuing its relations with certain clients.

83.    As a direct and proximate result of Impact Advisors' conduct, FCG has suffered, and will continue to suffer, damages.

84.    As a further direct and proximate result of Impact Advisors' conduct, FCG has suffered, and will continue to suffer, the loss of its improperly poached employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  Accordingly, Impact Advisors must be enjoined from further interference with FCG's expectancies of prospective economic advantage.

## PRAYER FOR RELIEF

WHEREFORE, FCG respectfully requests that the Court enter a judgment in its favor and against Defendants as follows:

A.    Enjoining each Individual Defendant from his or her breaches of contract;

B.    For compensatory damages in excess of $75,000 against Defendants, exclusive of interests and costs;

C.    Extending the employee non-solicitation and client non-solicitation provisions of each Individual Defendant's Vice President and Termination Agreements for an additional period of time equivalent to the period of time during which the Individual Defendant has been in breach;

       D.     Enjoining Impact Advisors from further intentional interference with FCG's contracts and prospective economic advantage;

       E.     For punitive damages against Impact Advisors, in amounts to be determined at trial;

       F.     For attorneys' fees, costs, and expenses;

       G.     For prejudgment interest; and

       H.     For such other and further relief as the Court deems just and proper.


Dated:  November 20, 2007


                        _____/s/ Timothy B. Hardwicke_____
                        One of the Attorneys for Plaintiffs
                        First Consulting Group, Inc. and FCG CSI, Inc.


                        Timothy B. Hardwicke (#6201352)
                        Hudson T. Hollister (#6286422)
                        LATHAM & WATKINS LLP
                        Sears Tower, Suite 5800
                        233 South Wacker Drive
                        Chicago, Illinois 60606
                        (312) 876-7700