**Exhibits**

**07 C 6577**

Exhibit A    Peter Smith Vice President Agreement
Exhibit B    Andrew Smith Vice President Agreement
Exhibit C    Swenson Vice President Agreement
Exhibit D    Peter Smith Transition agreement
Exhibit E    Andrew Smith Transition Agreement
Exhibit F    Swenson Transition Agreement

**JUDGE ZAGEL**
**MAGISTRATE JUDGE KEYS**

Exhibit A    Peter Smith Vice President Agreement

## VICE PRESIDENT AGREEMENT

This Vice President Agreement (the "**Agreement**") is entered into as of December 31, 2000, between First Consulting Group, Inc. ("**FCG**") and Peter C Smith ("**Participant**").

WHEREAS, Participant is a Vice President with FCG CSI, Inc., a subsidiary of FCG;

WHEREAS, in connection with Participant's position as Vice President of FCG, Participant is required to agree to certain matters, and is entitled to certain benefits, all as set forth in this Agreement; and

WHEREAS, the parties to this Agreement believe it to be in the best interests of FCG and Participant to enter into this Agreement and to fulfill each party's respective obligations and covenants hereunder;

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  **Confidentiality.** Participant agrees that Participant will not, during or after Participant's employment, disclose or use the confidential proprietary information of either FCG or any FCG subsidiary or affiliate (each, along with FCG, an "**FCG Company**"), or of any third party to which any FCG Company is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or other entity for any reason or purpose whatsoever. Participant further agrees not to make use of any confidential proprietary information for Participant's own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of Participant's employment.

2.  **Limitations.** The restrictions set forth in Section 1 shall not apply to the following: (a) any information that, at the time of disclosure, is then publicly known, provided that Participant was not responsible, directly or indirectly, for permitting such information to become publicly known without the consent of its owner(s); (b) any information that is received by Participant from a third party outside of Participant's employment relationship with any FCG Company and that was disclosed to Participant without any confidentiality obligation or any known breach of a confidentiality obligation by such third party; (c) use of such information in the scope and course of Participant's duties for the FCG Companies; or (d) any information that may be required by law or an order of any court or agency of competent jurisdiction to be disclosed. In the case of subclause (d) above, Participant agrees to notify FCG in advance if Participant is required by law or court order to disclose any such information, and Participant shall cooperate with any efforts that FCG may take to limit the disclosure of such information or seek confidential treatment over the disclosure of such information.

3.  **Proprietary Matter.** Participant shall not, during the term of Participant's employment with any FCG Company, take, use or permit to be used by any person, firm, corporation or other entity (other than the FCG Companies) notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer programs, data, documentation or other materials of any nature relating to any matter within the scope of business of the FCG Companies or concerning any of their dealings, clients, personnel or affairs.

Participant further agrees that Participant shall not, after termination of Participant's employment with the FCG Companies, use or permit to be used any such notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer programs, data, documentation or other materials. Participant agrees that all of the foregoing matter shall be and remain the sole and exclusive property of the FCG Companies and that immediately upon the termination of Participant's employment, Participant shall deliver all of the foregoing, as well as any copies Participant may have or may have made thereof, to FCG.

     **4.    Employer's Right of Invention.** Participant agrees that any inventions or improvements (including, but not limited to, machinery, tools, devices, computer programs, works of authorship, documentation, or processes) that Participant may make, invent, acquire, or suggest, whether patented or unpatented, and copyrightable material made or conceived by Participant, solely or jointly, during Participant's employment with the FCG Companies relating generally to any matter or thing connected in any way with or relating to the work carried on by any FCG Company, or resulting in any way from the use of premises, property or resources owned, leased or contracted for by the FCG Companies (referred to herein as "Developments"), shall (a) be the sole and absolute property of FCG, its assigns and/or its successors without further compensation to me, and (b) be promptly disclosed, along with all materials and data pertaining thereto, to FCG.

     **5.    Limitation on Assignment.** Any provision in this Agreement requiring Participant to assign rights in any invention does not apply to any invention (a) which was made, invented or acquired by Participant prior to the commencement of Participant's employment with any FCG Company, or (b) where assignment to FCG is prohibited by law.

     **6.    Grant of Assistance.** Participant agrees, at the request and cost of FCG, to make all reasonable efforts to secure, continue or renew, and/or assist in the securing, continuation, or renewal, of legal protection for a Development in the form of letters patent, copyright or other analogous protection, and to assign to FCG all rights, title and interest in such patent applications, patents, copyrights, or other protection. If FCG is unable, after reasonable effort, to secure Participant's signature on any applications for the stated protections, whether due to Participant's physical or mental incapacity, or for any other reason, Participant hereby irrevocably designates and appoints FCG, by its duly authorized officers and/or agents, as Participant's agent and attorney-in-fact, to act for and in Participant's behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights or other analogous protections thereupon with the same legal force and effect as if executed by Participant.

     **7.    Non-Competition and Non-Solicitation.** In addition to any non-competition and non-solicitation provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:

     **(a)    No Solicitation of Known FCG Clients.** Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client. For purposes of these restrictions, a "**Known FCG Client**" shall be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

(b)     **No Solicitation of Employees.**  Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

(c)     **Modification of Provisions.**  If any non-competition or non-solicitation provision in this Agreement is held to be unreasonable, arbitrary or against public policy, the provision shall be deemed modified as required to be reasonable, non-arbitrary and not against public policy, and may be enforced against Participant as so modified.

8.     **Rescission of Restricted Stock Agreement.**  The parties agree and acknowledge that the [not applicable] dated [not applicable] (the "**RSA**") is hereby rescinded and terminated.  If, in connection with this Agreement, Participant has entered into an Affirmation Agreement with FCG, then the parties agree and acknowledge that all shares of FCG common stock previously subject to the RSA shall be subject to the terms of **Exhibit A** attached hereto and incorporated herein by this reference.

9.     **Governing Law and Disputes.**

(a)     **Governing Law and Interpretation.**  This Agreement shall be interpreted and enforced in accordance with the internal laws of Illinois.  The provisions of this Agreement shall be interpreted in accordance with their plain meaning.  No provision of this Agreement shall be interpreted against a party as a consequence of that party having drafted said provision.

(b)     **Jury Trial Waivers.**  TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED-FOR CONSIDERATION, EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATING TO THIS AGREEMENT.  EACH PARTY HEREBY EXPRESSLY ACKNOWLEDGES THE INCLUSION OF THIS JURY TRIAL WAIVER BY ITS OR HIS INITIALS SET FORTH BELOW.

"Participant"                          FCG

_____          _____
Initials                               Initials

(c)     **Specific Performance.**  Participant acknowledges that the breach of any non-competition or non-solicitation provision contained in this Agreement will result in immediate and irreparable damage to FCG and that money damages alone would be inadequate to compensate FCG.  Therefore, Participant agrees that in the event of a breach or threatened breach of any of such provisions, FCG may, in addition to other remedies, immediately obtain and enforce injunctive relief, including but not limited to obtaining and enforcing a temporary restraining order, without bond, prohibiting the breach of such provision(s) and compelling performance hereunder, consent to which is hereby specifically given by Participant.

(d)     **Severability.**  Should any provision or portion of this Agreement be held unenforceable or invalid for any reason, the remaining provisions and portions of this Agreement shall be unaffected by such holding.

10.    **General Provisions.**

(a)    **Amendments and Waivers.** No amendment or waiver of any provision of this Agreement shall be effective unless and until an instrument reflecting the amendment or waiver has been executed by the party or parties charged with such amendment or waiver.

(b)    **Notices.** Any notices to be given hereunder shall be deemed given upon personal delivery or three business days after mailing, if mailed by certified mail, return receipt requested, postage prepaid. Notices to FCG shall be addressed to First Consulting Group, Inc., 111 West Ocean Boulevard, Suite 1000, Long Beach, California 90802, Attention: Corporate Secretary or to any subsequent address of FCG's headquarters which Participant could be reasonably expected to be aware of. Notices to Participant shall be addressed to Participant at his or her last known address shown on the books and records of FCG. Either party may change his or its address for notices by giving notice of change of address in accordance herewith.

(c)    **Entire Agreement.** This Agreement, along with any employee agreement signed by Participant with FCG or any subsidiary, represents the entire agreement, arrangement and understanding of the parties with respect to the matters specifically set forth herein, and supercede and terminate any prior agreement, arrangement or understanding.

(d)    **Not an Employment Agreement.** This Agreement is not an agreement to employ Participant for any fixed or indeterminate period of time. Unless Participant has a separate written employment agreement specifying otherwise, Participant is an at-will employee and either FCG or Participant may terminate Participant's employment at any time with or without cause, and without any advance notice.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first set forth above.

PARTICIPANT

Signed: _____
Peter C Smith

FIRST CONSULTING GROUP, INC.

By: _____
Robert R Holmen
Vice President, General Counsel

Exhibit A

## Stock Provisions

Participant and FCG have entered into the following agreements:

1.      Secured Promissory Note dated [not applicable] (the "**Secured Note**"); and

2.      Loan and Pledge Agreement dated [not applicable] (the "**Loan Agreement**").

Pursuant to that certain Affirmation Agreement of even date herewith, Participant has affirmed the continuing enforceability of the Secured Note and Loan Agreement.  The parties hereto agree and acknowledge that the stock purchase by Participant pursuant to the Secured Note and Loan Agreement (the "**FCG Stock**") shall be subject to the following terms and conditions.

**A.      Secured Note Repayment Obligation.**  The parties agree that Participant shall, each year while any amounts remain due under the Secured Note, pay the greater of the following two amounts in repayment of amounts owed under the Secured Note:  (i) one-half of the after-tax amount of Participant's quarterly or annual bonuses awarded under the bonus plan generally available to similarly situated vice presidents of FCG (but specifically not including any discretionary bonuses that may be awarded from time to time), and (ii) ten percent (10%) of the original principal balance of the Promissory Note.

**B.      Repurchase Right.**

1.      **FCG Repurchase.**  Participant acknowledges and agrees that FCG shall have the right, but not the obligation, to repurchase from Participant all or part of the FCG Stock purchased by Participant prior to FCG's initial public offering on February 13, 1998 (the "**Repurchase Right**").  Such Repurchase Right shall lapse in accordance with the following table, based on the number of Service Years (as defined in subclause 2 below) that Participant has served as a vice president of FCG:

| Service Years | % of Shares Available for Repurchase Right | % of Shares Not Subject to Repurchase Right |
|---|---|---|
| 0 to 2 | 100% | None |
| 3 | 70% | 30% |
| 4 | 60% | 40% |
| 5 | 50% | 50% |
| 6 | 40% | 60% |
| 7 or more | 0% | 100% |

2.      **Service Year.**  "Service Year" shall mean a calendar year of service (or in the case of the calendar year in which Participant becomes a vice president of FCG, the remaining portion of such year from the time Participant becomes a vice president) in which Participant completes at least 1,000  hours of continuous service (to be interpreted in the same fashion as the term "hours of service" is determined under the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder) as a vice president of FCG.  In addition, the following interpretations shall apply:

(a)    The FCG Board of Directors (the "**Board**"), in its sole discretion, may determine that a Board approved part-time schedule be deemed a Service Year notwithstanding that Participant does not provide 1,000 hours of continuous service.

(b)    To the extent Participant maintains a continuing relationship with FCG (as determined by the Board in the Board's sole discretion), but does not complete at least 1,000 hours of continuous service during a calendar year, then such Participant shall be credited with a fractional Service Year, such fraction having a numerator equaling the number of hours of continuous service performed by Participant during the relevant calendar year and a denominator equaling 1,000.

(c)    If a break in service occurs, the Board, in its sole discretion, may grant credit for prior Service Years and/or establish a different vesting schedule.

3.    **Additional Lapse or Termination of Repurchase Right.**  In addition to the lapse of FCG's Repurchase Right under subclause (1) above, the following shall apply to the Repurchase Right:

(a)    The Repurchase Right shall lapse so that the first-purchased shares of FCG Stock are the first to shares to no longer be subject to the Repurchase Right. For example, if Participant purchased 10,000 shares of FCG Stock on January 1, 1996, and 15,000 shares on July 1, 1996, and had 5 years of service, FCG's Repurchase Right would lapse with respect to all 10,000 shares purchased on January 1, 1996, and with respect to 2,500 shares purchased on July 1, 1996, with the remaining 12,500 shares purchased July 1, 1996 remaining subject to the Repurchase Right.

(b)    To the extent the Repurchase Right does not terminate or lapse pursuant to another provision of this Section 3, the Repurchase Right shall terminate in its entirety at the later of (A) the end of the calendar year in which Participant attains age 59, and (B) the date that Participant has owned such shares of FCG Stock for at least three years, so long as Participant is serving as a vice president of FCG at such time.

(c)    In the event of the death or permanent disability of Participant while serving as a vice president of FCG, FCG's Repurchase Right shall at that time terminate regardless of Participant's number of Service Years.  Participant shall be deemed to be permanently disabled when a medical doctor, reasonably acceptable to FCG, certifies in writing that Participant is permanently disabled and unable to carry on his or her normal duties at FCG.

(d)    In the event of a "Change in Control," FCG's Repurchase Right shall terminate in its entirety if Participant's employment with FCG is separated based on a "Voluntary Termination with Good Reason" or an "Involuntary Termination without Cause," as each of the foregoing terms in quotation marks is defined in **Section D** below.

4.    **Calculation of Repurchase Amount in Certain Circumstances.** If any payment of benefit received or to be received by Participant under this Transition Agreement would result in all or a portion of such payment to be subject to the excise tax on "golden parachute payments" under Section 4999 of the Code, then Participant's payment shall be either (i) the full payment or (ii) such lesser amount which would result in no portion of the payment being subject to excise tax under Section 4999 of the Code, whichever of the foregoing amounts, taking into account the applicable Federal, state and local employment taxes, income taxes and the excise tax imposed by Section 4999 of the Code, results in the receipt by Participant on an after-tax basis of the greatest amount of the payment notwithstanding that all or some portion of the payment may be taxable under Section 4999 of the Code.

5.    **Sale and Purchase of Shares Subject to FCG's Repurchase Right.**

(a)    Upon separation of Participant's employment from FCG for any reason (excluding death, permanent disability or Change in Control), FCG may, but is not required to, purchase all or any portion of Participant's FCG Stock which remains subject to the Repurchase Right at the price Participant paid for the shares of FCG Stock plus the Growth Factor (as defined in subclause (ii) below) from the date Participant purchased the FCG Stock, compounded quarterly. The decision whether to exercise FCG's Repurchase Right shall be made by FCG in its sole discretion, and in all events must be communicated to Participant within sixty (60) days following Participant's separation of employment.

(b)    "**Growth Factor**" shall mean (A) for quarters ended on or before June 30, 2000, the rate set forth in **Section C** below and (B) for quarters ending after July 1, 2000, the average interest rate FCG pays to a commercial lending institution in a calendar quarter or, if FCG has no borrowings for a particular quarter, then the prime rate on the first day of the quarter, as announced in the Wall Street Journal or if the Wall Street Journal discontinues such announcements, then the reference lending rate as announced by Bank of America. The Growth Factor for all shares shall commence accruing on the later of (X) January 1, 1994 or (Y) the date that the shares were purchased from FCG.

(c)    FCG Stock which remains subject to FCG's Repurchase Right may not be sold by Participant to anyone other than FCG under any circumstances unless and until FCG waives (in writing) its Repurchase Right or the sixty (60)-day period set forth in subclause (i) above lapses without FCG having properly notified Participant.

6.    **Cost Basis of Certain Shares of FCG Stock.** The Growth Factor for shares purchased prior to December 31, 1993 shall commence accruing on January 1, 1994. All FCG Stock purchased by a Participant on or before December 31, 1993 shall be deemed to have a cost basis of $1.765 per share for purposes of FCG's Repurchase Right.

7.    **Legends.** In addition to any other legends required by FCG, Participant acknowledges and agrees that certificates for shares of FCG Stock subject to this Section 3 shall bear the following legend:

- 7 -

"The sale, transfer, assignment or hypothecation of the shares represented by this certificate are subject to substantial restrictions as set forth in that certain Affirmation Agreement and any amendments thereto ("Agreement") dated [not applicable], between the Issuer of these shares and the owner of these shares. All of the provisions of said Agreement are incorporated herein by this reference."

C.     **Growth Factor.**

| Year | Quarter | Rate (Annual) |
|------|---------|---------------|
| 1994 | First   | 6.52%         |
|      | Second  | 7.40          |
|      | Third   | 8.00          |
|      | Fourth  | 7.75          |
| 1995 | First   | 8.50          |
|      | Second  | 9.00          |
|      | Third   | 9.00          |
|      | Fourth  | 8.75          |
| 1996 | First   | 8.50          |
|      | Second  | 8.25          |
|      | Third   | 8.25          |
|      | Fourth  | 8.25          |
| 1997 | First   | 9.00          |
|      | Second  | 9.00          |
|      | Third   | 9.00          |
|      | Fourth  | 9.00          |
| 1998 | First   | 8.50          |
|      | Second  | 8.50          |
|      | Third   | 8.50          |
|      | Fourth  | 8.25          |
| 1999 | First   | 7.75          |
|      | Second  | 7.75          |
|      | Third   | 8.00          |
|      | Fourth  | 8.25          |
| 2000 | First   | 8.25          |
|      | Second  | 9.00          |
|      | Third   | 9.00          |

D.     **Certain Definitions.**

1.     **Change in Control.**  A "**Change in Control**" shall mean:  (i) a dissolution, liquidation, or sale of all or substantially all of the assets of FCG; (ii) a merger or consolidation in which FCG is not the surviving corporation; (iii) a reverse merger in which FCG is the surviving corporation but the shares of FCG Stock outstanding immediately preceding the merger are converted by virtue of the merger into other property, whether in the form of securities, cash or otherwise; or (iv) the individuals who, as of the date of this Agreement, are members of the Board (the "**Incumbent Board**"), cease for any reason to constitute at least 50% of the Board, provided, however, that if the election, or nomination for election, by FCG's stockholders of any new director was approved by a vote of at least 50% of the Incumbent Board, such new director shall, for purposes of this subsection 11(a), be considered as a member of the Incumbent Board.

- 8 -

2.    **Voluntary Termination with Good Reason.**  The term "**Voluntary Termination with Good Reason**" means (i) the Participant's resignation, with Good Reason, as an employee of FCG within one month prior to a Change in Control or (ii) the Participant's resignation, with Good Reason, as an employee of the surviving or acquiring corporation within thirty-six (36) months after a Change in Control.  "**Good Reason**" means any of the following:

(a)    reduction by more than 5% of the Participant's rate of compensation as in effect one month prior to the Change in Control;

(b)    failure to provide a package of welfare benefit plans which, taken as a whole, provide substantially similar benefits to those in which the Participant was entitled to participate one month prior to the Change in Control (except that employee contributions may be raised to the extent of any cost increases imposed by third parties);

(c)    to the extent Participant's regular place of performing services for FCG is an office owned or leased by FCG, if Participant is required to either (A) relocate to an FCG office that is more than thirty-five (35) miles from the Participant's FCG office one month prior to the Change in Control, or (B) permanently change Participant's regular place of performing services from an FCG office to client locations greater than fifty (50) miles from Participant's FCG office as of one month prior to the Change in Control, in each case unless Participant accepts such relocation opportunity, and for purposes of this subclause (3), a Participant shall be deemed to have a "regular place of performing services" in an FCG office if Participant is required or expected to spend at least two days per week on average over the prior six month period in that specific FCG office; or

(d)    material breach by FCG or any successor to FCG of any of the material provisions of this Agreement.

3.    **Involuntary Termination without Cause.**  Under this Agreement, the term "**Involuntary Termination without Cause**" means (i) the involuntary termination, without Cause, of the Participant's employment by FCG within one month prior to a Change in Control or (ii) the involuntary termination, without Cause, of the Participant's employment with the surviving or acquiring corporation within thirty-six (36) months after a Change in Control.  "**Cause**" means any of the following:

(a)    Participant's theft, dishonesty, or falsification of FCG documents or records;

(b)    Participant's intentional improper use or disclosure of FCG's confidential or proprietary information;

(c)    Participant's intentional failure to perform any reasonable assigned duties after written notice from FCG of, and a reasonable opportunity to cure, such failure; or

(d)    Participant's conviction (including any plea of guilty or nolo contendere) of any criminal act that is a felony or involves moral turpitude.

Exhibit B        Andrew Smith Vice President Agreement

## VICE PRESIDENT AGREEMENT

This Vice President Agreement (the "**Agreement**") is entered into as of July 1, 2003, between First Consulting Group, Inc. ("**FCG**") and Andrew M Smith ("**Participant**").

WHEREAS, Participant is a Vice President with First Consulting Group, a subsidiary of FCG, Inc.;

WHEREAS, in connection with Participant's position as Vice President of FCG, Participant is required to agree to certain matters, and is entitled to certain benefits, all as set forth in this Agreement; and

WHEREAS, the parties to this Agreement believe it to be in the best interests of FCG and Participant to enter into this Agreement and to fulfill each party's respective obligations and covenants hereunder;

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     **Confidentiality.**  Participant agrees that Participant will not, during or after Participant's employment, disclose or use the confidential proprietary information of either FCG or any FCG subsidiary or affiliate (each, along with FCG, an "**FCG Company**"), or of any third party to which any FCG Company is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or other entity for any reason or purpose whatsoever. Participant further agrees not to make use of any confidential proprietary information for Participant's own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of Participant's employment.

2.     **Limitations.**  The restrictions set forth in Section 1 shall not apply to the following:  (a) any information that, at the time of disclosure, is then publicly known, provided that Participant was not responsible, directly or indirectly, for permitting such information to become publicly known without the consent of its owner(s); (b) any information that is received by Participant from a third party outside of Participant's employment relationship with any FCG Company and that was disclosed to Participant without any confidentiality obligation or any known breach of a confidentiality obligation by such third party; (c) use of such information in the scope and course of Participant's duties for the FCG Companies; or (d) any information that may be required by law or an order of any court or agency of competent jurisdiction to be disclosed.  In the case of subclause (d) above, Participant agrees to notify FCG in advance if Participant is required by law or court order to disclose any such information, and Participant shall cooperate with any efforts that FCG may take to limit the disclosure of such information or seek confidential treatment over the disclosure of such information.

3.     **Proprietary Matter.**  Participant shall not, during the term of Participant's employment with any FCG Company, take, use or permit to be used by any person, firm, corporation or other entity (other than the FCG Companies) notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer

programs, data, documentation or other materials of any nature relating to any matter within the scope of business of the FCG Companies or concerning any of their dealings, clients, personnel or affairs. Participant further agrees that Participant shall not, after termination of Participant's employment with the FCG Companies, use or permit to be used any such notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer programs, data, documentation or other materials. Participant agrees that all of the foregoing matter shall be and remain the sole and exclusive property of the FCG Companies and that immediately upon the termination of Participant's employment, Participant shall deliver all of the foregoing, as well as any copies Participant may have or may have made thereof, to FCG.

4.    **Employer's Right of Invention.** Participant agrees that any inventions or improvements (including, but not limited to, machinery, tools, devices, computer programs, works of authorship, documentation, or processes) that Participant may make, invent, acquire, or suggest, whether patented or unpatented, and copyrightable material made or conceived by Participant, solely or jointly, during Participant's employment with the FCG Companies relating generally to any matter or thing connected in any way with or relating to the work carried on by any FCG Company, or resulting in any way from the use of premises, property or resources owned, leased or contracted for by the FCG Companies (referred to herein as "Developments"), shall (a) be the sole and absolute property of FCG, its assigns and/or its successors without further compensation to me, and (b) be promptly disclosed, along with all materials and data pertaining thereto, to FCG.

5.    **Limitation on Assignment.** Any provision in this Agreement requiring Participant to assign rights in any invention does not apply to any invention (a) which was made, invented or acquired by Participant prior to the commencement of Participant's employment with any FCG Company, or (b) where assignment to FCG is prohibited by law.

6.    **Grant of Assistance.** Participant agrees, at the request and cost of FCG, to make all reasonable efforts to secure, continue or renew, and/or assist in the securing, continuation, or renewal, of legal protection for a Development in the form of letters patent, copyright or other analogous protection, and to assign to FCG all rights, title and interest in such patent applications, patents, copyrights, or other protection. If FCG is unable, after reasonable effort, to secure Participant's signature on any applications for the stated protections, whether due to Participant's physical or mental incapacity, or for any other reason, Participant hereby irrevocably designates and appoints FCG, by its duly authorized officers and/or agents, as Participant's agent and attorney-in-fact, to act for and in Participant's behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights or other analogous protections thereupon with the same legal force and effect as if executed by Participant.

7.    **Non-Competition and Non-Solicitation.** In addition to any non-competition and non-solicitation  provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:

(a)    **No Solicitation of Known FCG Clients.** Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client. For purposes of these restrictions, a **"Known FCG Client"** shall

be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

**(b)    No Solicitation of Employees.**  Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

**(c)    Modification of Provisions.**  If any non-competition or non-solicitation provision in this Agreement is held to be unreasonable, arbitrary or against public policy, the provision shall be deemed modified as required to be reasonable, non-arbitrary and not against public policy, and may be enforced against Participant as so modified.

8.    **Governing Law and Disputes.**

**(a)    Governing Law and Interpretation.**  This Agreement shall be interpreted and enforced in accordance with the internal laws of Illinois.  The provisions of this Agreement shall be interpreted in accordance with their plain meaning.  No provision of this Agreement shall be interpreted against a party as a consequence of that party having drafted said provision.

**(b)    Jury Trial Waivers.**  TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED-FOR CONSIDERATION, EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATING TO THIS AGREEMENT.  EACH PARTY HEREBY EXPRESSLY ACKNOWLEDGES THE INCLUSION OF THIS JURY TRIAL WAIVER BY ITS OR HIS INITIALS SET FORTH BELOW.

"Participant"                                    FCG

_____            _____
Initials                                          Initials

**(c)    Specific Performance.**  Participant acknowledges that the breach of any non-competition or non-solicitation provision contained in this Agreement will result in immediate and irreparable damage to FCG and that money damages alone would be inadequate to compensate FCG.  Therefore, Participant agrees that in the event of a breach or threatened breach of any of such provisions, FCG may, in addition to other remedies, immediately obtain and enforce injunctive relief, including but not limited to obtaining and enforcing a temporary restraining order, without bond, prohibiting the breach of such provision(s) and compelling performance hereunder, consent to which is hereby specifically given by Participant.

**(d)    Severability.**  Should any provision or portion of this Agreement be held unenforceable or invalid for any reason, the remaining provisions and portions of this Agreement shall be unaffected by such holding.

9.    **General Provisions.**

**(a)    Amendments and Waivers.**  No amendment or waiver of any provision of this Agreement shall be effective unless and until an instrument reflecting the amendment or waiver has been executed by the party or parties charged with such amendment or waiver.

3

(b)    **Notices.**  Any notices to be given hereunder shall be deemed given upon personal delivery or three business days after mailing, if mailed by certified mail, return receipt requested, postage prepaid.  Notices to FCG shall be addressed to First Consulting Group, Inc., 111 West Ocean Boulevard, Suite 1000, Long Beach, California 90802, Attention: Corporate Secretary or to any subsequent address of FCG's headquarters which Participant could be reasonably expected to be aware of.  Notices to Participant shall be addressed to Participant at his or her last known address shown on the books and records of FCG.  Either party may change his or its address for notices by giving notice of change of address in accordance herewith.

(c)    **Entire Agreement.**  This Agreement, along with any employee agreement signed by Participant with FCG or any subsidiary, represents the entire agreement, arrangement and understanding of the parties with respect to the matters specifically set forth herein, and supercede and terminate any prior agreement, arrangement or understanding.

(d)    **Not an Employment Agreement.**  This Agreement is not an agreement to employ Participant for any fixed or indeterminate period of time. Unless Participant has a separate written employment agreement specifying otherwise, Participant is an at-will employee and either FCG or Participant may terminate Participant's employment at any time with or without cause, and without any advance notice.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first set forth above.

PARTICIPANT                                    FIRST CONSULTING GROUP, INC.


Signed: _____          By: _____
        Andrew M Smith                            Michael Zuercher
                                                  Vice President, General Counsel

4

Exhibit C     Swenson Vice President Agreement

VICE PRESIDENT AGREEMENT

This Vice President Agreement (the "**Agreement**") is entered into as of March 6, 2006, between First Consulting Group, Inc. ("**FCG**") and Melanie Swenson ("**Participant**").

WHEREAS, Participant is a Vice President with FCG CSI, Inc. dba First Consulting Group, a subsidiary of FCG;

WHEREAS, in connection with Participant's position as Vice President of FCG, Participant is required to agree to certain matters, and is entitled to certain benefits, all as set forth in this Agreement; and

WHEREAS, the parties to this Agreement believe it to be in the best interests of FCG and Participant to enter into this Agreement and to fulfill each party's respective obligations and covenants hereunder;

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     **Confidentiality.** Participant agrees that Participant will not, during or after Participant's employment, disclose or use the confidential proprietary information of either FCG or any FCG subsidiary or affiliate (each, along with FCG, an "**FCG Company**"), or of any third party to which any FCG Company is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or other entity for any reason or purpose whatsoever. Participant further agrees not to make use of any confidential proprietary information for Participant's own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of Participant's employment.

2.     **Limitations.** The restrictions set forth in Section 1 shall not apply to the following:  (a) any information that, at the time of disclosure, is then publicly known, provided that Participant was not responsible, directly or indirectly, for permitting such information to become publicly known without the consent of its owner(s); (b) any information that is received by Participant from a third party outside of Participant's employment relationship with any FCG Company and that was disclosed to Participant without any confidentiality obligation or any known breach of a confidentiality obligation by such third party; (c) use of such information in the scope and course of Participant's duties for the FCG Companies; or (d) any information that may be required by law or an order of any court or agency of competent jurisdiction to be disclosed.  In the case of subclause (d) above, Participant agrees to notify FCG in advance if Participant is required by law or court order to disclose any such information, and Participant shall cooperate with any efforts that FCG may take to limit the disclosure of such information or seek confidential treatment over the disclosure of such information.

3.     **Proprietary Matter.** Participant shall not, during the term of Participant's employment with any FCG Company, take, use or permit to be used by any person, firm, corporation or other entity (other than the FCG Companies) notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer programs, data, documentation or other materials of any nature relating to any matter within the scope of business of the FCG Companies or concerning any

of their dealings, clients, personnel or affairs. Participant further agrees that Participant shall not, after termination of Participant's employment with the FCG Companies, use or permit to be used any such notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer programs, data, documentation or other materials. Participant agrees that all of the foregoing matter shall be and remain the sole and exclusive property of the FCG Companies and that immediately upon the termination of Participant's employment, Participant shall deliver all of the foregoing, as well as any copies Participant may have or may have made thereof, to FCG.

**4.    Employer's Right of Invention.**  Participant agrees that any inventions or improvements (including, but not limited to, machinery, tools, devices, computer programs, works of authorship, documentation, or processes) that Participant may make, invent, acquire, or suggest, whether patented or unpatented, and copyrightable material made or conceived by Participant, solely or jointly, during Participant's employment with the FCG Companies relating generally to any matter or thing connected in any way with or relating to the work carried on by any FCG Company, or resulting in any way from the use of premises, property or resources owned, leased or contracted for by the FCG Companies (referred to herein as "Developments"), shall (a) be the sole and absolute property of FCG, its assigns and/or its successors without further compensation to me, and (b) be promptly disclosed, along with all materials and data pertaining thereto, to FCG.

**5.    Limitation on Assignment.**  Any provision in this Agreement requiring Participant to assign rights in any invention does not apply to any invention (a) which was made, invented or acquired by Participant prior to the commencement of Participant's employment with any FCG Company, or (b) where assignment to FCG is prohibited by law.

**6.    Grant of Assistance.**  Participant agrees, at the request and cost of FCG, to make all reasonable efforts to secure, continue or renew, and/or assist in the securing, continuation, or renewal, of legal protection for a Development in the form of letters patent, copyright or other analogous protection, and to assign to FCG all rights, title and interest in such patent applications, patents, copyrights, or other protection. If FCG is unable, after reasonable effort, to secure Participant's signature on any applications for the stated protections, whether due to Participant's physical or mental incapacity, or for any other reason, Participant hereby irrevocably designates and appoints FCG, by its duly authorized officers and/or agents, as Participant's agent and attorney-in-fact, to act for and in Participant's behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights or other analogous protections thereupon with the same legal force and effect as if executed by Participant.

**7.    Non-Competition and Non-Solicitation.**  In addition to any non-competition and non-solicitation provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:

**(a)    No Solicitation of Known FCG Clients.**  Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client. For purposes of these restrictions, a "**Known FCG Client**" shall be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

**(b)    No Solicitation of Employees.**  Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

(c)    **Modification of Provisions.**  If any non-competition or non-solicitation provision in this Agreement is held to be unreasonable, arbitrary or against public policy, the provision shall be deemed modified as required to be reasonable, non-arbitrary and not against public policy, and may be enforced against Participant as so modified.

8.    **Governing Law and Disputes.**

(a)    **Governing Law and Interpretation.**  This Agreement shall be interpreted and enforced in accordance with the internal laws of Montana.  The provisions of this Agreement shall be interpreted in accordance with their plain meaning.  No provision of this Agreement shall be interpreted against a party as a consequence of that party having drafted said provision.

(b)    **Jury Trial Waivers.**  TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED-FOR CONSIDERATION, EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH PARTY HEREBY EXPRESSLY ACKNOWLEDGES THE INCLUSION OF THIS JURY TRIAL WAIVER BY ITS OR HIS INITIALS SET FORTH BELOW.

"Participant"                                FCG

_____            _____
Initials                                         Initials

(c)    **Specific Performance.**  Participant acknowledges that the breach of any non-competition or non-solicitation provision contained in this Agreement will result in immediate and irreparable damage to FCG and that money damages alone would be inadequate to compensate FCG. Therefore, Participant agrees that in the event of a breach or threatened breach of any of such provisions, FCG may, in addition to other remedies, immediately obtain and enforce injunctive relief, including but not limited to obtaining and enforcing a temporary restraining order, without bond, prohibiting the breach of such provision(s) and compelling performance hereunder, consent to which is hereby specifically given by Participant.

(d)    **Severability.**  Should any provision or portion of this Agreement be held unenforceable or invalid for any reason, the remaining provisions and portions of this Agreement shall be unaffected by such holding.

9.    **General Provisions.**

(a)    **Amendments and Waivers.**  No amendment or waiver of any provision of this Agreement shall be effective unless and until an instrument reflecting the amendment or waiver has been executed by the party or parties charged with such amendment or waiver.

(b)    **Notices.**  Any notices to be given hereunder shall be deemed given upon personal delivery or three business days after mailing, if mailed by certified mail, return receipt requested, postage prepaid. Notices to FCG shall be addressed to First Consulting Group, Inc., 111 West Ocean Boulevard, Suite 1000, Long Beach, California 90802, Attention: Corporate Secretary or to any subsequent address of FCG's headquarters which Participant could be reasonably expected to be aware of. Notices to Participant shall be addressed to Participant at his or her last known address shown on the books and

records of FCG. Either party may change his or its address for notices by giving notice of change of address in accordance herewith.

(c)     **Entire Agreement.** This Agreement, along with any employee agreement signed by Participant with FCG or any subsidiary, represents the entire agreement, arrangement and understanding of the parties with respect to the matters specifically set forth herein, and supercede and terminate any prior agreement, arrangement or understanding.

(d)     **Not an Employment Agreement.** This Agreement is not an agreement to employ Participant for any fixed or indeterminate period of time. Unless Participant has a separate written employment agreement specifying otherwise, Participant is an at-will employee and either FCG or Participant may terminate Participant's employment at any time with or without cause, and without any advance notice.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first set forth above.

PARTICIPANT                                          FIRST CONSULTING GROUP, INC.

Signed: _____          By: _____
        Melanie Swenson                              Tom Watford
                                                     Chief Financial Officer

Exhibit D     Peter Smith Transition agreement



February 6, 2007


Pete C. Smith
2233 W. School St
Chicago, IL 60618

Dear Pete:

The following information will outline your compensation and responsibilities as a member of our temporary per diem staffing program:

- You will be on per diem status effective on February 9, 2007.

- Additionally, you should understand that FCG maintains an "at will" employment relationship with all of its associates and your employment will be subject to that policy at all times, including during any assigned projects. You understand and agree that when your position ends, or is terminated by you or FCG, you will not be due any additional compensation or benefits.

- Your title will be PD Consultant NX. You will be assigned to the HD Consulting Department.

- Your hourly rate will be $300.00 for work currently contemplated (40 hours of transition activities per agreement with Don Driscoll and Greg Saffee). Any additional work beyond these transition services would be at a rate mutually agreed upon by you and the President of Health Delivery Services, and as further approved in accordance with any applicable FCG resource management policies. You will be paid in arrears on a semi-monthly basis and will be paid for actual hours worked, including overtime as governed by current state and federal laws. Please see the attached paycheck schedule.

- As a Per Diem Associate, all hours worked over 40 during a week must be approved in advance by your Project Manager/Coach.

- This position is not eligible for benefits.

- FCG is an "at will" employer, meaning that you or FCG can terminate the employment relationship at any time, with or without prior notice, and for any reason not prohibited by statute. All employment is continued on that basis.

- As a condition of your employment, FCG requires that you agree to and sign the enclosed Per Diem Associate Fringe Benefit Waiver.

- The terms of your Vice President Agreement dated December 31, 2000 shall apply to your employment as a per diem associate; provided that, the one year period applicable to the terms of Section 7 of the Vice President Agreement shall be deemed to expire on February 7, 2008. Notwithstanding the foregoing, in the event that your per diem status is extended to include additional assignments beyond the transitional activities described above in this letter, the one year period of client non-solicitation shall apply to the particular client to which you provide services on a per diem basis and such one year period shall be deemed to commence on the last day that you provide services on FCG's behalf to that specific client.

Upon acceptance of this offer, you will need to sign and return this entire original document to FCG Human Resources and keep the enclosed copy for your records. In order to expedite your hiring process, **please fax copies of the signed offer letter <u>and</u> employment agreement directly to HrHelps at (562) 437-1895.**

Yours very truly,

FIRST CONSULTING GROUP

I hereby accept this offer of employment in accordance with the terms stated above. My expected start date is _____2/9/07_____

_____
Signature

Enclosures

cc:    Greg Safee
       HR File

Exhibit E    Andrew Smith Transition Agreement



February 6, 2007

Andy Smith
821 Thornapple Dr
Naperville, IL 60540

Dear Andy:

The following information will outline your compensation and responsibilities as a member of our temporary per diem staffing program:

- You will be on per diem status effective on February 9, 2007.

- Additionally, you should understand that FCG maintains an "at will" employment relationship with all of its associates and your employment will be subject to that policy at all times, including during any assigned projects. You understand and agree that when your position ends, or is terminated by you or FCG, you will not be due any additional compensation or benefits.

- Your title will be PD Consultant NX. You will be assigned to the Health Delivery Account Executives Department.

- Your hourly rate for work currently contemplated (5 to 6 weeks of transition activities per agreement with Don Driscoll and Greg Saffee) will be $225.00. Any additional work beyond these transition services would be at a rate mutually agreed upon by you and the President of Health Delivery Services, as further approved in accordance with any applicable FCG resource management policies. You will be paid in arrears on a semi-monthly basis and will be paid for actual hours worked, including overtime as governed by current state and federal laws. Please see the attached paycheck schedule.

- As a Per Diem Associate, all hours worked over 40 during a week must be approved in advance by your Project Manager/Coach.

- This position is not eligible for benefits.

- FCG is an "at will" employer, meaning that you or FCG can terminate the employment relationship at any time, with or without prior notice, and for any reason not prohibited by statute. All employment is continued on that basis.

- As a condition of your employment, FCG requires that you agree to and sign the enclosed Per Diem Associate Fringe Benefit Waiver.

- The terms of your Vice President Agreement dated July 1, 2003 shall apply to your employment as a per diem associate; provided that, the one year period applicable to the terms of Section 7 of the Vice President Agreement shall be deemed to expire on February 7, 2008. Notwithstanding the foregoing, in the event that your per diem status is extended to include additional assignments beyond the transitional activities described above in this letter, the one year period of client non-solicitation shall apply to the particular client to which you provide services on a per diem basis and such one year period shall be deemed to commence on the last day that you provide services on FCG's behalf to that specific client.

Upon acceptance of this offer, you will need to sign and return this entire original document to FCG Human Resources and keep the enclosed copy for your records. In order to expedite your hiring process, please fax copies of the signed offer letter **and** employment agreement directly to HrHelps at (562) 437-1895.

Yours very truly,

FIRST CONSULTING GROUP

I hereby accept this offer of employment in accordance with the terms stated above.
My expected start date is    2/9/07

_____
Jon Blue
Vice President, Human Resources

_____
Signature

Enclosures

cc:   Don Driscoll
      HR File

Exhibit F        Swenson Transition Agreement



## *Employee Agreement*

### *(Flex. Staff/Per Diem/Temporary Employees Only)*

In consideration and as a condition of my employment by FCG CSI, Inc. (an FCG company) (hereafter "FCG"), contemporaneous with my hiring by FCG, and intending to be legally bound hereby, I agree to the following:

1.   *Acknowledgments.* I acknowledge that:

    a)   FCG is involved in the business of providing consulting, software development, systems integration, outsourcing and applied research services primarily for healthcare, pharmaceutical, and other life sciences organizations throughout the world. References to FCG in this Agreement shall mean FCG (as defined above) and its parent companies, subsidiaries and affiliates.

    b)   During the course of my employment with FCG, I will at various times receive, conceive, develop or otherwise have access to information that is proprietary and confidential to FCG, its clients and/or its partners, including, but not limited to, information regarding current and prospective clients, employee-related materials, marketing and/or financial data, and work-products belonging to FCG, its partners and/or its clients, and that such information, as it may exist from time to time, constitutes valuable, special and unique assets of FCG, its partners and/or its clients.

    c)   Certain personal information included as part of your new-hire package (e.g., emergency contact information, phone numbers and addresses) will be shared with your supervisors or the Vice President of your business unit for emergency and/or valid business purposes. Consequently, you agree that your supervisors and/or business unit Vice President may only use such personal information for emergency or business purposes, unless you otherwise agree.

2.   *Confidentiality.* I will not, during or after my employment, in whole or in part, disclose or use the confidential proprietary information of either FCG or of any third party to which FCG is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or other entity for any reason or purpose whatsoever; nor shall I make use of any confidential proprietary information for my own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of my employment.

These restrictions shall not apply to:

    a)   any information that, at the time of disclosure, is then publicly known, provided that I was not responsible, directly or indirectly, for permitting such information to become publicly known without the consent of its owner(s);

    b)   any information that is received by me from a third party outside of FCG and that was disclosed to me without any confidentiality obligation or any known breach of a confidentiality obligation by such third party;

    c)   any information that is expressly approved for release by written authorization from FCG; or

    d)   any information that may be required by law or an order of any court or agency of competent jurisdiction to be disclosed.

3.   *Proprietary Matter.* I will not, during my employment, take, use or permit to be used by any person, firm, corporation or other entity (other than FCG) notes, memoranda, reports, lists, records, employee information, drawings, sketches, specifications, computer programs, data, documentation or other materials of any nature relating to any matter

within the scope of business of FCG or concerning any of its dealings, personnel or affairs. I further agree that I shall not, after termination of my employment with FCG, use or permit to be used any such notes, memoranda, reports, lists, records, employee information, drawings, sketches, specifications, computer programs, data, documentation or other materials. I agree that all of the foregoing matter shall be and remain the sole and exclusive property of FCG and that immediately upon the termination of my employment, I shall deliver all of the foregoing, as well as any copies I might have or might have made thereof, to FCG.

4.    *Employer's Right of Invention.*   I agree that any inventions or improvements (including, but not limited to, machinery, tools, devices, computer programs, works of authorship, documentation, or processes) that I may make, invent, acquire, or suggest, whether patented or unpatented, and copyrightable material made or conceived by me, solely or jointly, during my employment with FCG relating generally to any matter or thing connected in any way with or relating to the work carried on by FCG or any other company or person with which FCG is doing business, or resulting in any way from the use of premises, property or resources owned, leased or contracted for by FCG (referred to herein as "Developments"), shall (a) be the sole and absolute property of FCG, its assigns and/or its successors without further compensation to me, and (b) be promptly disclosed, along with all materials and data pertaining thereto, to FCG.

I agree, at the request and cost of FCG, to make all reasonable efforts to secure, continue or renew, and/or assist in the securing, continuation, or renewal, of legal protection for a Development in the form of letters patent, copyright or other analogous protection, and to assign to FCG all rights, title and interest in such patent applications, patents, copyrights, or other protection.

In the event FCG is unable, after reasonable effort, to secure my signature on any applications for the stated protections, whether due to my physical or mental incapacity, or for any other reason, I hereby irrevocably designate and appoint FCG, by its duly authorized officers and/or agents, as my agent and attorney-in-fact, to act for and in my behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights or other analogous protections thereupon with the same legal force and effect as if executed by me.

Any provision in this Agreement requiring me to assign my rights in any invention does not apply to an invention, which qualifies under the provisions of Section 2870 of the California Labor Code. That Section provides that the requirement to assign "shall not apply to an invention that I have developed entirely on my own time without using FCG's equipment, supplies, facilities or trade secret information except for those inventions that either 1) relate at the time of conception or reduction to practice of the invention to FCG's business, or actual or demonstrably anticipated research or development of FCG; or 2) result from any work I performed for FCG. If any invention is described in a patent application or disclosed to third parties by me within one year of termination of my employment with FCG, and which relates to the then-existing reasonably anticipated business, research or development of FCG, it is to be presumed that the invention was conceived during my employment with FCG and that the invention shall belong to FCG unless I prove that it was conceived following the termination of my employment with FCG.

5.    *Non-Solicitation Obligations.*   I hereby agree to not, directly or indirectly, solicit, divert or take away any employee of FCG for a period of one year following separation of my employment with FCG.  In the event that FCG is proposing my services for a specific project and I have knowledge of the contents of such proposal or that such proposal is being made, I will not participate in a competitive proposal for the specific project.

6.    *Non-Discrimination/Non Harassment Policy.*   I understand that FCG has a strict policy against illegal discrimination and harassment and has procedures available for investigating and preventing any such discrimination or harassment. I agree that I will abide by the non-discrimination and harassment policies and will use the procedures available to prevent discrimination and harassment and will immediately bring any such behaviors to the attention of Human Resources.

7.    *Employment-at-Will.*   I agree that this Employee Agreement does not constitute in any way a guarantee of employment and that, at any time, with or without cause, I may resign from my employment with FCG or FCG may terminate my employment.

8.      *Remedies.* I acknowledge that the types and periods of restrictions imposed in the provisions of this Agreement are fair and reasonably calculated to protect FCG, its assets and the goodwill associated with its business. No provision of this Agreement shall limit in any way FCG's rights under applicable law to fair and equitable remedy, including monetary damages, specific performance, injunction and other equitable remedies. Should FCG retain counsel in order to enforce or prevent the breach of any provision in Paragraphs 1 through 5 only of this Agreement, FCG shall be entitled to reasonable attorneys' fees and costs for services rendered if it prevails.

9.      *No Right to a Jury Trial.* I agree that both FCG and me expressly waive the right to a jury trial on any issue concerning my employment.

10.     *Non-Waiver.* I agree that any delay or failure by FCG to exercise any right under this Agreement will not constitute a waiver of that or any other right provided for in this Agreement.

11.     *Severability.* I agree that the invalidity or unenforceability of any particular provision of this Agreement for any reason whatsoever shall not affect the other provisions hereof and that such invalid or unenforceable provisions shall be limited and/or reduced by judicial order so as to be enforceable to the maximum extent of applicable law. In the event such judicial limitation or reduction is not possible, this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

12.     *Only Change in Writing.* The terms of this Employment Agreement can only be changed in writing. In order for it to be effective against me, I must sign any written change to the Agreement; in order for the change to be effective against FCG, it must be signed by the authorized representative of FCG Human Resources.

13.     *Binding Effect.* My obligations under this Agreement shall survive the termination of my employment with FCG and shall be binding upon my heirs, administrators, personal representatives, successors, and assigns. In addition, this Agreement will be for the benefit of FCG, its successors, and its assigns.

14.     *Governing Law.* This Agreement shall be interpreted and enforced in accordance with the internal laws of Montana. The provisions of this Agreement shall be interpreted in accordance with their plain meaning. No provision of this Agreement shall be interpreted against a party as a consequence of that party having drafted said provision.


_____
Signature

_____
Print Name

_____
Date Signed