**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **FIRST CONSULTING GROUP, INC. and FCG CSI, INC.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **No. 07 C 6577** |
| **v.** | ) ) | **Judge James B. Zagel** |
| **IMPACT ADVISORS, LLC, ANDREW SMITH, PETER SMITH and MELANIE SWENSON,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' COMPLAINT**

Defendants Impact Advisors, LLC ("Impact Advisors"), Andrew M. Smith, Peter C. Smith, and Melanie Swenson (collectively, "Individual Defendants"), by its undersigned attorneys, state as follows for its answers and affirmative defenses to the Complaint of Plaintiffs First Consulting Group, Inc., and FCG CSI, Inc. (collectively "FCG"):

1.      The Individual Defendants are former FCG executives who agreed for a limited period of time following their terminations from FCG not to solicit FCG employees and FCG clients.  As described more fully below, the Individual Defendants have breached their contractual obligations by (1) directly and indirectly soliciting and hiring during the prohibited period numerous FCG employees to work for Impact Advisors, a new entity recently formed by the Individual Defendants to compete against FCG, and (2) directly and indirectly soliciting and providing services during the prohibited period to known FCG clients.  FCG seeks damages and injunctive relief against Defendants based upon its claims for breach of contract, tortious interference with contract and tortious interference with prospective economic disadvantage.

**ANSWER:**  Defendants lack sufficient information to admit or deny the allegations in paragraph 1.

## II.  THE PARTIES

2.     Plaintiff First Consulting Group, Inc. ("FCG, Inc.") is a Delaware corporation with its principal place of business in Long Beach, California.

**ANSWER:**  Defendants lack sufficient information to admit or deny the allegations in paragraph 2.

3.     Plaintiff FCG CSI, Inc. ("FCG CSI") is a Delaware corporation with its principal place of business in Long Beach, California.  FCG CSI is a wholly-owned operating subsidiary of FCG, Inc. FCG CSI does business as First Consulting Group, and FCG CSI and FCG, Inc. are consolidated entities for financial reporting purposes.

**ANSWER:**  Defendants lack sufficient information to admit or deny the allegations in paragraph 3.

4.     Upon information and belief, defendant Impact Advisors, LLC ("Impact Advisors") is an Illinois limited liability company with its principal place of business in Illinois.

**ANSWER:**  Defendants admit the allegations in paragraph 4.

5.     Upon information and belief, defendant Andrew M. Smith ("Andrew Smith") is a resident of Naperville, Illinois.

**ANSWER:**  Defendants admit the allegations in paragraph 5.

6.     Upon information and belief, defendant Peter C. Smith ("Peter Smith") is a resident of Chicago, Illinois.  Andrew Smith and Peter Smith (collectively, the "Smiths") are brothers.

**ANSWER:**  Defendants admit the allegations in paragraph 6.

7.     Upon information and belief, defendant Melanie Swenson ("Swenson") is a resident of Montana.

**ANSWER:**  Defendants admit the allegations in paragraph 7.

### III.  JURISDICTION AND VENUE

8.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

**ANSWER:**     Paragraph 8 contains a legal conclusion for which no response is required.

9.     This Court has personal jurisdiction over defendant Impact Advisors because, upon information and belief, Impact Advisors is incorporated in Illinois and has its principal place of business in Illinois.

**ANSWER:**     Paragraph 9 contains a legal conclusion for which no response is required.

10.     This Court has personal jurisdiction over defendant Peter Smith because, upon information and belief, Peter Smith resides in Illinois.

**ANSWER:**     Paragraph 10 contains a legal conclusion for which no response is required.

11.     This Court has personal jurisdiction over defendant Andrew Smith because, upon information and belief, Andrew Smith resides in Illinois.

**ANSWER:**     Paragraph 11 contains a legal conclusion for which no response is required.

12.     Swenson is subject to the personal jurisdiction of the Illinois courts under the Illinois long-arm jurisdiction statute, 735 ILCS 5/2-209 because, upon information and belief, Swenson transacted business and committed acts herein complained of within Illinois.  Accordingly, this Court has personal jurisdiction over Swenson pursuant to Fed. R. Civ. P. 4.

**ANSWER:**     Paragraph 12 contains a legal conclusion for which no response is required.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) (3) because every Defendant is subject to personal jurisdiction in this district and pursuant to 28 U.S.C. § 1391(a) (2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

**ANSWER:**     Paragraph 13 contains a legal conclusion for which no response is required.

## IV.  FACTUAL ALLEGATIONS

### A.     The Individual Defendants' Employment at FCG And Their Post-Separation Obligations

14.     FCG provides consulting, software development, system integration, outsourcing and applied research services to healthcare, pharmaceutical and other life sciences organizations.  Each of the Individual Defendants served as a Vice-President with FCG, and each agreed to certain contractual obligations that would apply after leaving FCG ("post-separation obligations"), as follows.

**ANSWER:**     Defendants admit the allegations in paragraph 14.

15.     Defendant Peter Smith joined FCG on June 16, 1986.  He became a Vice President of FCG on June 1, 2000.  In connection with his role as Vice President, Peter Smith executed a Vice President Agreement on or about December 31, 2000 ("Peter Smith Vice President Agreement," attached hereto as Exhibit A).  The Peter Smith Vice President Agreement bars Peter Smith, for a one-year period following his separation from FCG, from directly or indirectly: (i) soliciting, diverting, or taking away any "Known FCG Client"; (ii) providing any services to any Known FCG Client; and (iii) soliciting, diverting, or taking away any employee of FCG:

> 7.     Non-Competition and Non-Solicitation.  In addition to any non-competition and non-solicitation provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:
>
> (a)     No Solicitation of Known FCG Clients.  Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client.  For purposes of these restrictions, "Known FCG Client" shall be any past, present or prospective FCG client

4

> that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.
>
>     (b)     No Solicitation of Employees.  Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

Peter Smith Vice President Agreement (Ex. A) at ¶ 7.

     **ANSWER:**     Defendants admit the allegations in the first two sentences of paragraph 14 and further admit that Peter Smith executed a Vice President Agreement on or about December 31, 2000 which speaks for itself.

     16.     Defendant Andrew Smith joined FCG on June 10, 1991.  He became a Vice President of FCG on July 1, 2003.  In connection with his role as Vice President, Andrew Smith executed a Vice President Agreement on or about July 1, 2003 ("Andrew Smith Vice President Agreement," attached hereto as Exhibit B; the Peter Smith Vice President Agreement and Andrew Smith Vice President Agreement are referred to collectively as the "Smith Vice President Agreements").  The Andrew Smith Vice President Agreement bars Andrew Smith, for a one-year period following his separation from FCG, from directly or indirectly: (i) soliciting, diverting, or taking away any "Known FCG Client"; (ii) providing any services to any Known FCG Client; and (iii) soliciting, diverting, or taking away any employee of FCG:

> 7.     Non-Competition and Non-Solicitation.  In addition to any non-competition and non-solicitation provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:
>
>     (a)     No Solicitation of Known FCG Clients.  Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any.  Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client.  For purposes of these restrictions, "Known FCG Client" shall be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

      (b)    No Solicitation of Employees.  Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

Andrew Smith Vice President Agreement (Ex. B) at ¶ 7.

      **ANSWER:**  Defendants admit the allegations in the first two sentences of

paragraph 16 and further admit that Andrew Smith executed a Vice President

Agreement on or about July 1, 2003 which speaks for itself.


      17.    Defendant Swenson joined FCG on July 29, 1996.  She became a Vice President of FCG on January 1, 2005.  In connection with her role as Vice President, Swenson executed a Vice President Agreement on or about March 6, 2006 ("Swenson Vice President Agreement," attached hereto as Exhibit C).  The Swenson Vice President Agreement bars Swenson, for a one-year period following her separation from FCG, from directly or indirectly:  (i) soliciting, diverting, or taking away any "Known FCG Client"; (ii) providing any services to any Known FCG Client; and (iii) soliciting, diverting, or taking away any employee of FCG:

      7.    Non-Competition and Non-Solicitation.  In addition to any non-competition and non-solicitation provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:

      (a)    No Solicitation of Known FCG Clients.  Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client.  For purposes of these restrictions, "Known FCG Client" shall be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

      (b)    No Solicitation of Employees.  Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

Swenson Vice President Agreement (Ex. C) at ¶ 7.

      **ANSWER:**  Defendants admit the allegations in the first two sentences of

paragraph 17 and further admit that Melanie Swenson executed a Vice President Agreement on or about March 6, 2006 which speaks for itself.

**B.    The Individual Defendants Resign As Vice Presidents From FCG And Expressly Reaffirm Their Non-Solicitation Obligations**

18.    In February 2007, the Smiths resigned from their Vice President positions with FCG.   In connection with their resignations, the Smiths executed transition agreements with FCG, pursuant to which FCG employed the Smiths as members of FCG's temporary per diem staffing program and governed the Smiths' transition activities.  ("Peter Smith Transition Agreement," attached hereto as Exhibit D, and "Andrew Smith Transition Agreement," attached hereto as Exhibit E; the Peter Smith Transition Agreement and the Andrew Smith Transition Agreement are referred to collectively as the "Smith Transition Agreements").   The Smith Transition Agreements each expressly reaffirm the terms of the Smith Vice President Agreements.  *See* Peter Smith Transition Agreement (Ex. D) at 2; Andrew Smith Transition Agreement (Ex. E) at 2.  In addition, the Smith Transition Agreements each provide that the one-year periods set forth in the Smith Vice President Agreements, during which the Smiths are barred from soliciting FCG's clients and employees, and from providing services to its clients, shall end on February 7, 2008, unless the Smiths' per diem statuses are extended to include additional assignments beyond the transitional activities described therein, in which case the prohibited periods are extended.  *See* Peter Smith Transition Agreement (Ex. D) at 2; Andrew Smith Transition Agreement (Ex. E) at 2.

**ANSWER:**    Defendants admit the allegation in the first sentence of paragraph 18 and further admit that Peter and Andrew Smith each executed a Transition Agreement which speaks for itself.

19.    Andrew Smith completed his transition services to FCG on or about March 2, 2007 and ceased having any business relationship with FCG at that time.

**ANSWER:**    Defendants admit the allegations in paragraph 19.

20.    Peter Smith completed his transition services to FCG on or about May 31, 2007 and ceased having any business relationship with FCG at that time.

**ANSWER:**    Defendants admit the allegations in paragraph 20, but clarify that Peter Smith completed his transition services on May 4, 2007.

21.    In April 2007, Swenson resigned from her Vice President position at FCG. In connection with her resignation, Swenson executed an agreement with FCG, which made Swenson a temporary employee of FCG and governed her transition activities ("Swenson Transition Agreement," attached hereto as Exhibit F; the Peter Smith Transition Agreement, the Andrew Smith Transition Agreement, and the Swenson Transition Agreement are referred to collectively as the "Transition Agreements").  Like the Vice President Agreement she had previously signed, the Swenson Transition Agreement provided that Swenson would not:

> ... directly or indirectly, solicit, divert or take away any employee of FCG for a period of one year following separation of my employment with FCG.  In the event that FCG is proposing my services for a specific project and I have knowledge of the contents of such proposal or that such proposal is being made, I will not participate in a competitive proposal for the specific project.

See Swenson Transition Agreement (Ex. F) ¶ 5.

**ANSWER:**    Defendants admit the allegations in the first sentence of paragraph 21 and further admit that Swenson executed a Transition Agreement which speaks for itself.

22.    Swenson completed her transition services to FCG on or about May 22, 2007, and ceased having any business relationship with FCG at that time.

**ANSWER:**    Defendants deny the allegations in paragraph 22.

**C.    After Resigning As Vice Presidents Of FCG, Defendants Peter Smith And Andrew Smith Form Impact Advisors To Compete With FCG, And Solicit And Hire Swenson**

23.    Following their resignations as Vice Presidents of FCG, Peter Smith and Andrew Smith founded Impact Advisors to compete directly against FCG.  According to its website, Impact Advisors provides "high value advisory and technology consulting services to the health care provider industry."   See Impact Advisors web site, http://www.impactadvisors.com (last visited Nov. 15, 2007).  To market Impact Advisors' expertise, the website specifically touts the Smiths' recent Vice President positions at FCG:

> Prior to founding Impact Advisors, Andrew was a Vice President with First Consulting Group and managed the Midwest region.  In that role he was responsible for the delivery of services and relationship development of First

Consulting Group's largest region.  Andrew also led First Consulting Group's Information Services (IS) Assessment Service offering and is a frequent presenter on the subject of information technology benchmarking.

…

Prior to founding Impact Advisors, Peter was a Vice President of First Consulting Group with national responsibility for managing the Advisory Services Practice within the Health Delivery Services Division.  This Practice focused on core consulting services and specialized in IT Assessments, IT Strategic Planning, Clinical Consulting and Process Redesign, System Selections, Vendor Contract Negotiation, Pre-implementation Planning and Digital Imaging.  Peter was part of the Health Delivery Leadership Team and a member of the Operating Committee which defined and executed overall division strategy.

*Id.* at "Our Leaders."

**ANSWER:**    Defendants deny that Peter and Andrew Smith founded Impact Advisors to compete directly against FCG.  Defendants admit that Impact Advisors maintains a website which so states, although Defendants deny that the website "touts" the Smiths' experience at FCG.


24.    Impact Advisors' website similarly touts its consultants' years of experience in the healthcare IT marketplace, emphasizing that "[w]e have helped over twenty clients in the past three years with the development of IT operational Assessments and IT Strategic Plans, and we have assisted the majority of these clients with the implementation of these plans.  *Id.* at "About Us."

**ANSWER:**    Defendants admit that Impact Advisors maintains a website which so states, but deny that the website "touts" its consultants' years of experience.


25.    Impact Advisors' website identifies the Smiths as the firm's only Managing Partners.  Aside from the Smiths, the website identifies only two other partners, both of whom are non-managing partners, and no other employees.  *Id.* at "Our Leaders."

**ANSWER:**    Defendants admit the allegations in paragraph 25.

26. Significantly, Swenson is one of the two non-managing partners identified on Impact Advisor's website. Like the website biographies of the Smiths, Swenson's biography similarly highlights her work at FCG:

> Prior to joining Impact Advisors, Melanie was Vice President of the Epic Implementation Practice for First Consulting Group.... Melanie also served clients as a project/program manager, specializing in project management for multi-hospital, multi-application implementations, including academic medical centers, community hospitals, and large integrated delivery networks.

*Id.* Thus, in violation of their obligations under their respective agreements, it appears on information and belief that the Smiths improperly solicited Swenson to join their new firm, Impact Advisors.

**ANSWER:** Defendants admit that Swenson is one of the two non-managing

partners identified on Impact Advisor's website and that her biography on the website

includes the language quoted above. Defendants deny the remaining allegations in

paragraph 26.

27. The website identifies the remaining non-managing partner of Impact Advisors to be Todd Hollowell, another former FCG employee. Unlike Swenson, however, Hollowell was not working for FCG at the time he joined Impact Advisors. Nevertheless, the website biography of Hollowell touts his professional experience at FCG. *Id.*

**ANSWER:** Defendants admit that the Impact Advisors website identifies Todd

Hollowell as a non-managing partner. Defendants further admit that Hollowell was not

working for FCG at the time he joined Impact Advisors. Defendants deny the remaining

allegations in paragraph 27.

### D. The Individual Defendants Solicit And Hire Numerous FCG Employees In Violation Of Their Post-Separation Obligations

28. After Swenson joined Impact Advisors, all three Individual Defendants began to actively solicit, divert, and take away employees from FCG, in violation of their Vice President Agreements and Transition Agreements. The Individual Defendants have focused their improper solicitation efforts on FCG consultants with whom they had

developed professional relationships at FCG. As a result, Impact Advisors wrongfully took, and FCG lost, the value of these consultants' experience, expertise and client relationships. FCG's consulting business activities were damaged as a result of Defendants' actions.

**ANSWER:**    Defendants deny the allegations in paragraph 28.

### a.    Stephen Egli

29.    The first FCG employee who the Individual Defendants improperly solicited to work for Impact Advisors in violation of their agreements was Stephen Egli. Egli was an FCG employee from approximately January 27, 1997 to August 11, 2007. Upon information and belief, Egli left FCG's employ in August 2007 as a result of improper solicitations by the Individual Defendants to join Impact Advisors, where he worked and continues to work following his separation from FCG.

**ANSWER:**    Defendants lack information sufficient to admit or deny Egli's dates

of employment with FCG. Defendants admit that Egli is currently employed by Impact

Advisors. Defendants deny the remaining allegations in paragraph 29.

30.    Prior to leaving FCG's employ, Egli served as an Implementation Senior Manager in FCG's Epic Implementation Practice. Egli reported to Swenson in that practice before Swenson left FCG. Egli had also been coached by Swenson in FCG's consultant coaching program, beginning in 2006, until Swenson left FCG.

**ANSWER:**    The Defendants admit the allegations in the first two sentences of

paragraph 30, but deny that Egli was ever coached by Swenson at FCG.

31.    After the Individual Defendants improperly poached Egli, FCG lost and continues to lose the revenues and profits it reasonably expected to realize from Egli's continued employment with FCG.

**ANSWER:**    Defendants deny that they "improperly poached" Egli. Defendants

lack information sufficient to admit or deny the remaining allegations in paragraph 31.

### b.    Roberta Riddle

32.    The second FCG employee who the Individual Defendants solicited to work for Impact Advisors in violation of their agreements was Roberta Riddle. Riddle was an FCG employee from approximately March 2, 1998 to August 18, 2007. Upon

information and belief, Riddle left FCG's employ in August 2007 as a result of improper solicitations by the Individual Defendants to join Impact Advisors, where she worked and continues to work following her separation from FCG.

**ANSWER:**    Defendants lack information sufficient to admit or deny Riddle's dates of employment with FCG.  Defendants admit that Riddle is currently employed by Impact Advisors.  Defendants deny the remaining allegations in paragraph 32.

33.    Prior to leaving FCG's employ, Riddle served as a Master III – Implementation in FCG's Epic Implementation Practice.  Riddle reported to Swenson in that practice before Swenson left FCG.  Riddle also had been coached by Swenson in FCG's consultant coaching program from approximately 1999 until Swenson left FCG.

**ANSWER:**    Defendants admit the allegations in paragraph 33.

34.    After the Individual Defendants improperly poached Riddle, FCG lost and continues to lose the revenues and profits it reasonably expected to realize from Riddle's continued employment with FCG.

**ANSWER:**    Defendants deny that they "improperly poached" Riddle. Defendants lack information sufficient to admit or deny the remaining allegations in paragraph 34.

c.    **Sue Kitchen**

35.    Third, the Individual Defendants solicited Sue Kitchen to work for Impact Advisors in violation of their agreements.    Kitchen, an FCG employee since approximately April 1, 1996, is an Implementation Senior Manager in FCG's Epic Implementation Practice.  Kitchen reported to Swenson in that practice before Swenson left FCG.

**ANSWER:**    Defendants deny that Kitchen was solicited in violation of their agreements.  Defendants lack information sufficient to admit or deny Kitchen's hire date or title with FCG.  Defendants admit the remaining allegations in paragraph 34.

36.    On October 24, 2007, Kitchen received a voice mail message on her cellular telephone from Hollowell.  Hollowell said:

Hi, Sue. This is Todd Hollowell. I am a partner at Impact Advisors. Actually, Melanie Swenson is one of my peers, along with Andy Smith and Pete Smith. We've started this new healthcare IT consulting group doing very similar work to what you're doing there at FCG and ***Melanie thought it would be great if I reached out and chatted with you about some opportunities we have and to see if you have any interest in potentially talking to us about those opportunities.*** A lot of Epic work around Clin Doc and HIM have come up and we'd love to run a couple things by you and just let you know what we're up to and see if there may be a fit for us to even work together, whether it be now or down the road.

**ANSWER:**    Defendants lack information sufficient to admit or deny the

allegations in paragraph 36.

37.    Upon information and belief, Swenson instructed Hollowell to contact Sue Kitchen to solicit her interest in joining Impact Advisors. Upon information and belief, Swenson gave Hollowell the instruction to contact Kitchen – even though Swenson personally knew Kitchen, and Hollowell did not – because Swenson did not want to be caught violating the non-solicitation obligations. Notwithstanding her subterfuge, Swenson's direction to Hollowell violates the terms of her agreements with FCG. While Kitchen remains employed at FCG, the solicitation of Kitchen constitutes a breach of the Individual Defendants' non-solicitation agreements.

**ANSWER:**    Defendants admit the allegation in the first sentence of paragraph

37. Defendants lack information sufficient to admit or deny Kitchen's employment

status with FCG. Defendants deny the remaining allegations in paragraph 36.

> d.    **William Faust**

38.    Fourth, the Individual Defendants solicited William Faust to work for Impact Advisors in violation of their agreements. Faust was an FCG employee from approximately January 21, 2002 to October 25, 2007. Upon information and belief, Faust left FCG's employ in October 2007 as a result of improper solicitations by the Individual Defendants to join Impact Advisors, where he worked and continues to work following his separation from FCG.

**ANSWER:**    Defendants lack information sufficient to admit or deny Faust's

dates of employment with FCG.  Defendants admit that Faust is currently employed by

Impact Advisors.  Defendants deny the remaining allegations in paragraph 38.


39.    Prior to leaving FCG's employ, Faust served as an Implementation Manager in FCG's Epic Implementation Practice.  Faust reported to Swenson in that practice before Swenson left FCG.  Faust also worked extensively with Andrew Smith while at FCG.

**ANSWER:**    Defendants admit the allegations in paragraph 39.


40.    After the Defendants improperly poached Faust, FCG lost and continues to lose the revenues and profits it reasonably expected to realize from Faust's continued employment with FCG.

**ANSWER:**    Defendants deny that they improperly poached Faust.  Defendants

lack information sufficient to admit or deny the remaining allegations in paragraph 40.


e.    **Pamela Baylor**

41.    Fifth, the Individual Defendants solicited Pamela Baylor to work for Impact Advisors in violation of their agreements.  Baylor was an FCG employee from approximately April 5, 2004 to November 10, 2007.  Upon information and belief, Baylor left FCG's employ in November 2007 as a result of improper solicitations by the Individual Defendants to join Impact Advisors, where she worked and continues to work following her separation from FCG.

**ANSWER:**    Defendants lack information sufficient to admit or deny Baylor's

dates of employment with FCG.  Defendants admit that Baylor is currently employed by

Impact Advisors.  Defendants deny the remaining allegations in paragraph 41.


42.    Prior to leaving FCG's employ, Baylor served as an Implementation Manager in FCG's Epic Implementation Practice.  Baylor reported to Swenson in that practice before Swenson left FCG.

**ANSWER:**    Defendants admit the allegations in paragraph 42.


43.    After the Individual Defendants improperly poached Baylor, FCG lost and continues to lose the revenues and profits it reasonably expected to realize from Baylor's continued employment with FCG.

**ANSWER:**     Defendants deny that they improperly poached Baylor.  Defendants lack information sufficient to admit or deny the remaining allegations in paragraph 43.

### E.     The Individual Defendants Solicit And Provide Services To Known FCG Clients

44.     Upon information and belief, each of the Individual Defendants, in violation of their respective Vice President Agreements and Transition Agreements, directly or indirectly has solicited entities that are Known FCG Clients under the terms of their respective Vice President Agreements to hire Impact Advisors to provide consulting services.

**ANSWER:**     Defendants deny the allegations in paragraph 44.

45.     Upon information and belief, some of entities solicited by the Individual Defendants in violation of their Vice President Agreements and Transition Agreements have hired Impact Advisors to provide consulting services.

**ANSWER:**     The Defendants deny the allegations in paragraph 45.

46.     Upon information and belief, Impact Advisors has placed consultants, including some of the improperly poached FCG employees, with entities that are Known FCG Clients under the terms of the Individual Defendants' Vice President Agreements. These Impact Advisors consultants are now providing services that FCG would be providing but for the Individual Defendants' violations of their respective Vice President Agreements and Transition Agreements.

**ANSWER:**     Defendants deny the allegations in paragraph 46.

47.     As a result of all of these activities, FCG has been damaged.

**ANSWER:**     Defendants deny the allegations in paragraph 47.

48.     FCG demands a trial by jury.

**ANSWER:**     No response required.

## CLAIM I

## BREACH OF CONTRACT
### (Against Peter Smith)

49.     Paragraphs 1 through 48 are hereby fully incorporated by reference, as if fully set forth herein.

**ANSWER:**     Defendants restate and incorporate by reference their answers to

paragraphs 1 though 48, as if fully set forth herein.

50.     FCG entered into valid and enforceable agreements with Peter Smith which expressly prohibited him from directly or indirectly: (i) soliciting, diverting, or taking away any employee of FCG; (ii) soliciting, diverting, or taking away any Known FCG Client; and (iii) providing any services to any Known FCG Client.   Those agreements are memorialized in the Peter Smith Vice President Agreement and the Peter Smith Transition Agreement.

**ANSWER:**     Defendants deny the allegations in paragraph 50.

51.     Peter Smith has breached his Vice President Agreement and Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking away one or more FCG employees.

**ANSWER:**     Defendants deny the allegations in paragraph 51.

52.     Peter Smith has also breached his Vice President Agreement and Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking away one or more Known FCG Clients, and by directly and/or indirectly providing services to one or more Known FCG Clients.

**ANSWER:**     Defendants deny the allegations in paragraph 52.

53.     As a direct and proximate result of Peter Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, damages.

**ANSWER:**     Defendants deny the allegations in paragraph 53.

54.     As a further direct and proximate result of Peter Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, the loss of its employees' unique experience, expertise, and client

relationships, and the loss of business from its improperly solicited clients. Such damages constitute irreparable harm for which FCG has no adequate remedy at law. In order for FCG to derive the negotiated-for protection intended by the language of the Peter Smith Vice President Agreement and Peter Smith Transition Agreement, Peter Smith must be enjoined from his conduct in breach of such agreements.

**ANSWER:**    Defendants deny the allegations in paragraph 54.


55.    FCG has performed all of its obligations under the Peter Smith Vice President Agreement and the Peter Smith Transition Agreement.

**ANSWER:**    Defendants deny the allegations in paragraph 55.


## CLAIM II

## BREACH OF CONTRACT
## (Against Andrew Smith)

56.    Paragraphs 1 through 55 are hereby fully incorporated by reference, as if fully set forth herein.

**ANSWER:**    The Defendants restate and incorporate by reference their answers

to paragraphs 1 though 55, as if fully set forth herein.


57.    FCG entered into valid and enforceable agreements with Andrew Smith which expressly prohibited him from directly or indirectly: (i) soliciting, diverting, or taking away any employee of FCG; (ii) soliciting, diverting, or taking away any Known FCG Client; and (iii) providing any services to any Known FCG Client. Those agreements are memorialized in the Andrew Smith Vice President Agreement and the Andrew Smith Transition Agreement.

**ANSWER:**    Defendants deny the allegations in paragraph 57.


58.    Andrew Smith has breached his Vice President Agreement and Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking away one or more FCG employees.

**ANSWER:**    Defendants deny the allegations in paragraph 58.


59.    Andrew Smith has also breached his Vice President Agreement and Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking

away one or more Known FCG Clients, and by directly and/or indirectly providing services to one or more Known FCG Clients.

**ANSWER:**    Defendants deny the allegations in paragraph 59.

60.    As a direct and proximate result of Andrew Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, damages.

**ANSWER:**    Defendants deny the allegations in paragraph 60.

61.    As a further direct and proximate result of Andrew Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, the loss of its employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  In order for FCG to derive the negotiated-for protection intended by the language of the Andrew Smith Vice President Agreement and Andrew Smith Transition Agreement, Andrew Smith must be enjoined from his conduct in breach of such agreements.

**ANSWER:**    Defendants deny the allegations in paragraph 61.

62.    FCG has performed all of its obligations under the Andrew Smith Vice President Agreement and the Andrew Smith Transition Agreement.

**ANSWER:**    Defendants deny the allegations in paragraph 62.

## CLAIM III

### BREACH OF CONTRACT
### (Against Melanie Swenson)

63.    Paragraphs 1 through 62 are hereby fully incorporated by reference, as if fully set forth herein.

**ANSWER:**    The Defendants restate and incorporate by reference their answers

to paragraphs 1 though 62, as if fully set forth herein.

64.    FCG entered into valid and enforceable agreements with Melanie Swenson which expressly prohibited her from directly or indirectly: (i) soliciting, diverting, or taking away any employee of FCG; (ii) soliciting, diverting, or taking away any Known FCG Client; and (iii) providing any services to any Known FCG Client.

Those agreements are memorialized in the Swenson Vice President Agreement and the Swenson Transition Agreement.

      **ANSWER:**    Defendants deny the allegations in paragraph 64.


65.    Melanie Swenson has breached her Vice President Agreement and Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking one or more FCG employees.

      **ANSWER:**    Defendants deny the allegations in paragraph 65.


66.    Melanie Swenson has also breached her Vice President Agreement and Transition Agreement by directly and/or indirectly soliciting, diverting, and/or taking away one or more Known FCG Clients, and by directly and/or indirectly providing services to one or more Known FCG Clients.

      **ANSWER:**    Defendants deny the allegations in paragraph 66.


67.    As a direct and proximate result of Melanie Swenson's breaches of her Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, damages.

      **ANSWER:**    Defendants deny the allegations in paragraph 67.


68.    As a further direct and proximate result of Melanie Swenson's breaches of her Vice President Agreement and Transition Agreement, FCG has suffered, and will continue to suffer, the loss of its employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients. Such damages constitute irreparable harm for which FCG has no adequate remedy at law. In order for FCG to derive the negotiated-for protection intended by the language of the Melanie Swenson Vice President Agreement and Melanie Swenson Transition Agreement, Melanie Swenson must be enjoined from her conduct in breach of such agreements.

      **ANSWER:**    Defendants deny the allegations in paragraph 68.


69.    FCG has performed all of its obligations under the Swenson Vice President Agreement and the Swenson Transition Agreement.

      **ANSWER:**    Defendants deny the allegations in paragraph 69.

## CLAIM IV

## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Impact Advisors)

70.    Paragraphs 1 through 69 are hereby fully incorporated by reference, as if fully set forth herein.

**ANSWER:**    Defendants restate and incorporate by reference their answers to

paragraphs 1 though 69, as if fully set forth herein.


71.    The Individual Defendants' Vice President and Transition Agreements are valid and enforceable contracts.

**ANSWER:**    Defendants deny the allegations in paragraph 71.


72.    Impact Advisors was at all relevant times aware of the Individual Defendants' Vice President and Transition Agreements, and of the Individual Defendants' post-separation obligations to FCG that are imposed by those agreements.

**ANSWER:**    Defendants admit that Impact Advisors was aware of the Vice

President and Transition Agreements executed by Peter and Andrew Smith, but deny

the remaining allegations in paragraph 72.


73.    Impact Advisors intentionally and without justification induced the Individual Defendants to breach their employee non-solicitation obligations to FCG by encouraging the Individual Defendants to solicit FCG employees and to offer FCG employees employment opportunities at Impact Advisors.

**ANSWER:**    Defendants deny the allegations in paragraph 73.


74.    Impact Advisors intentionally and without justification induced the Individual Defendants to breach their client non-solicitation obligations to FCG by encouraging the Individual Defendants to solicit Known FCG Clients and to provide services to Known FCG Clients.

**ANSWER:**    Defendants deny the allegation in paragraph 74.


75.    As a direct and proximate result of Impact Advisors' conduct, FCG has suffered, and will continue to suffer, damages.

**ANSWER:**    Defendants deny the allegations in paragraph 74.


76.    As a further direct and proximate result of Impact Advisors' conduct, FCG has suffered, and will continue to suffer, the loss of its improperly poached employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  Accordingly, Impact Advisors must be enjoined from further interference with the Individual Defendants' non-solicitation obligations to FCG.

**ANSWER:**    Defendants deny the allegations in paragraph 76.


## CLAIM V

### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE
### (Against Impact Advisors)

77.    Paragraphs 1 through 76 are hereby fully incorporated by reference, as if fully set forth herein.

**ANSWER:**    Defendants restate and incorporate by reference their answers to

paragraphs 1 though 76, as if fully set forth herein.


78.    FCG had a reasonable expectancy of continuing, free from employment solicitations by the Individual Defendants, its valid employment relationships with Stephen Egli, Roberta Riddle, William Faust, and Pamela Baylor, and of realizing economic advantages therefrom.

**ANSWER:**    Defendants deny the allegations in paragraph 78.


79.    FCG had a reasonable expectancy of continuing its relations with certain clients, and of realizing economic advantages therefrom.

**ANSWER:**    Defendants deny the allegations in paragraph 79.


80.    Impact Advisors was at all relevant times aware of FCG's expectancies.

**ANSWER:**    Defendants deny the allegations in paragraph 80.


81.    Impact Advisors intentionally and without justification interfered with such expectancies by inducing the Individual Defendants to solicit and hire Egli, Riddle,

Faust, and Baylor on behalf of Impact Advisors, and by inducing the Individual Defendants to solicit and provide services to Known FCG Clients.

**ANSWER:**    Defendants deny the allegations in paragraph 81.


82.    Impact Advisors' induced or caused the termination of FCG's expectancies of continuing certain employment relationships and of continuing its relations with certain clients.

**ANSWER:**    Defendants deny the allegations in paragraph 82.


83.    As a direct and proximate result of Impact Advisor's conduct, FCG has suffered, and will continue to suffer, damages.

**ANSWER:**    Defendants deny the allegations in paragraph 83.


84.    As a further direct and proximate result of Impact Advisors' conduct, FCG has suffered, and will continue to suffer, the loss of its improperly poached employee's unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  Accordingly, Impact Advisors must be enjoined from further interference with FCG's expectancies of prospective economic advantage.

**ANSWER:**    Defendants deny the allegations in paragraph 84.


## AFFIRMATIVE DEFENSES

Plaintiffs' claims are barred by the doctrine of laches.

Plaintiffs' claims are barred by the doctrine of unclean hands.

Dated:  December 18, 2007


**IMPACT ADIVSORS, LLC
ANDREW SMITH
PETER SMITH
MELANIE SWENSON**

By:  s/ Laurie A. Holmes
        One of Their Attorneys
Laurie A. Holmes, Esq. (ARDC #6282262)
DRINKER BIDDLE GARDNER CARTON
191 North Wacker Drive, Suite 3700

Chicago, Illinois 60606-1698
Telephone:  (312) 569-1000
Fax:  (312) 569-3000
E-mail:  laurie.holmes@dbr.com

CH02/ 22506224.3