**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| FIRST CONSULTING GROUP, INC. and FCG CSI, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| IMPACT ADVISORS, LLC, ANDREW SMITH, PETER SMITH, MELANIE SWENSON, PAULA ELLIOTT, and STEPHEN EGLI, | ) ) ) ) ) ) |
| Defendants. | ) |

No. 07-C-6577

Hon. James. B. Zagel

**AMENDED COMPLAINT**

Plaintiffs First Consulting Group, Inc. and FCG CSI, Inc. (collectively, "FCG"),

for their Amended Complaint against Andrew M. Smith ("Andrew Smith"), Peter C. Smith

("Peter Smith"), Melanie Swenson ("Swenson"), Paula A. Elliott ("Elliott"), and Stephen P. Egli

("Egli") (collectively, the "Individual Defendants"), and Impact Advisors, LLC ("IA")

(collectively with the Individual Defendants, "Defendants") state as follows:

## I.  OVERVIEW

1.     This lawsuit arises out of the Defendants' contractual, common law and

statutory violations stemming from the unlawful acts the Individual Defendants took against their

former employer, FCG.  As described more fully below, defendants Andrew Smith and Peter

Smith (collectively, the "Smiths"), while still employed as the Vice Presidents of FCG, formed

IA as a rival IT consulting business to compete against their employer, FCG.  Even before

terminating their employment relationship with FCG, the Smiths began, on behalf of IA, to

solicit FCG's clients and to usurp FCG's business opportunities in violation of their fiduciary

duties to FCG.

2.     After leaving FCG's employ, the Smiths continued on behalf of IA to solicit, divert and take away FCG's clients and to provide services to FCG's clients.  To staff IA and to service FCG's former clients, the Smiths also solicited, diverted and took away FCG's employees including each of the remaining Individual Defendants.  These acts by the Smiths separately violated their post-separation contractual obligations in favor of IA.

3.     In the months that followed the Smiths' departure, Elliott, a friend of the Smiths and a colleague at FCG, remained behind at FCG.  From her job at FCG, Elliott assisted IA on competitive bids with FCG clients and fed the Smiths and IA competitively sensitive information belonging to FCG to benefit IA and at the expense of FCG.  These acts violated Elliott's fiduciary duties to her employer FCG.  This conduct also constituted violations of the Illinois Uniform Trade Secrets Act by Elliott, the Smiths and IA.

4.     Following her theft of FCG resources and information, Elliott joined IA as an employee.  The Smiths also brought Swenson, another FCG employee, into IA as a partner, and the Smiths hired Egli as an IA employee.

5.     Like the Smiths, Elliott and Swenson helped build IA's business by soliciting, diverting and taking away FCG clients and servicing FCG clients on behalf of IA. Moreover, Elliott, Swenson and Egli all solicited, diverted and took away FCG employees on behalf of IA.  These actions violated the post-separation contractual obligations of Elliott, Swenson and Egli to FCG.

6.     In short, the Individual Defendants have built defendant IA's rival competitive business by cannibalizing FCG's clients and poaching its employees to perform the work.  FCG seeks relief for the Defendants' violations of fiduciary duty, misappropriation of

trade secrets, breaches of contract, and tortious interference with contract and with prospective economic relations.

## II.  THE PARTIES

7.      Plaintiff First Consulting Group, Inc. ("FCG, Inc.") is a Delaware corporation with its principal place of business in Long Beach, California.

8.      Plaintiff FCG CSI, Inc. ("FCG CSI") is a Delaware corporation with its principal place of business in Long Beach, California.  FCG CSI is a wholly-owned operating subsidiary of FCG, Inc.  FCG CSI does business as First Consulting Group, and FCG CSI and FCG, Inc. are consolidated entities for financial reporting purposes.

9.      Upon information and belief, defendant IA is an Illinois limited liability company with its principal place of business in Illinois.

10.      Upon information and belief, defendant Andrew Smith is a resident of Naperville, Illinois.

11.      Upon information and belief, defendant Peter Smith is a resident of Chicago, Illinois.  The Smiths are brothers.

12.      Upon information and belief, defendant Swenson is a resident of Montana.

13.       Upon information and belief, defendant Elliott is a resident of Chicago, Illinois.

14.      Upon information and belief, defendant Egli is a resident of Montana.

## III.  JURISDICTION AND VENUE

15.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and

because the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

16.     This Court has personal jurisdiction over IA because, upon information and belief, IA is incorporated in Illinois and has its principal place of business in Illinois.

17.     This Court has personal jurisdiction over Peter Smith, Andrew Smith and Elliott because, upon information and belief, they reside in Illinois.

18.     Swenson and Egli are subject to the personal jurisdiction of the Illinois courts under the Illinois long-arm jurisdiction statute, 735 ILCS 5/2-209 because, upon information and belief, Swenson and Egli transacted business and committed acts herein complained of within Illinois.  Accordingly, this Court has personal jurisdiction over Swenson and Egli pursuant to Fed. R. Civ. P. 4.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(3) because every Defendant is subject to personal jurisdiction in this district and pursuant to 28 U.S.C. § 1391(a) (2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## IV.  FACTUAL ALLEGATIONS

### A.     The Individual Defendants' Fiduciary And Contractual Obligations To FCG

20.     FCG provides consulting, software development, system integration, outsourcing and applied research services to health care organizations.  FCG's business is based on consulting arrangements with its client hospitals and hospital systems.  FCG's consultants often are staffed on long-term projects for clients that keep them on-site at clients' facilities for several months or even years.  Each of the Individual Defendants was employed by FCG, and each agreed to certain contractual obligations, as follows:

**1.        Peter Smith's Fiduciary And Contractual Obligations**

21.        Defendant Peter Smith joined FCG on June 16, 1986.  He became a Vice President of FCG on June 1, 2000.  As an officer, Peter Smith owed fiduciary duties to FCG. These duties barred him from (among other things) taking advantage of FCG's business opportunities, soliciting fellow employees to join a rival business, misappropriating FCG's resources and confidential information, and exploiting his position for his own personal benefit.

22.        Peter Smith was also bound by certain contractual obligations in favor of FCG.  In connection with his role as Vice President, Peter Smith executed a Vice President Agreement on or about December 31, 2000 ("Peter Smith Vice President Agreement," attached hereto as Exhibit A).  The Peter Smith Vice President Agreement bars Peter Smith, for a one-year period following his separation from FCG, from directly or indirectly:  (i) soliciting, diverting, or taking away any "Known FCG Client"; (ii) providing any services to any Known FCG Client; and (iii) soliciting, diverting, or taking away any employee of FCG:

> 7.        Non-Competition and Non-Solicitation.  In addition to any non-competition and non-solicitation provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:
>
> (a)        No Solicitation of Known FCG Clients.  Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client.  For purposes of these restrictions, "Known FCG Client" shall be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

> (b)    No Solicitation of Employees.  Participant agrees to
> not, directly or indirectly, solicit, divert or take away any employee
> of FCG.

Peter Smith Vice President Agreement (Ex. A) at ¶ 7.

23.    Peter Smith also agreed not to disclose any of FCG's confidential

information, during or after his employment:

> 1.    Confidentiality.  Participant agrees that Participant will not,
> during or after Participant's employment, disclose or use the
> confidential proprietary information of either FCG or any FCG
> subsidiary or affiliate (each, along with FCG, an "FCG
> Company"), or of any third party to which any FCG Company is
> obligated to keep any such information confidential (including, but
> not limited to trade secrets or processes involving inventions,
> products, designs, methods, know-how, techniques, systems,
> processes, computer programs, technical information, customer
> lists, financial data, business and/or marketing plans and proposals)
> to any person, firm, corporation, association or any other entity for
> any reason or person whatsoever.  Participant further agrees not to
> make use of any confidential proprietary information for
> Participant's own purposes or for the benefit of any person, firm,
> corporation or other entity (other than the owner of such
> information) under any circumstances during or after the
> termination of Participant's employment.

Peter Smith Vice President Agreement (Ex. A at ¶ 1).

## 2.    Andrew Smith's Fiduciary And Contractual Obligations

24.    Defendant Andrew Smith joined FCG on June 10, 1991.  He became a

Vice President of FCG on July 1, 2003.  As an officer, Andrew Smith owed fiduciary duties to

FCG.  These duties barred him from (among other things) taking advantage of FCG's business

opportunities, soliciting fellow employees to join a rival business, misappropriating FCG's

resources and confidential information, and exploiting his position for his own personal benefit.

25.    Andrew Smith was also bound by certain contractual obligations in favor

of FCG.  In connection with his role as Vice President, Andrew Smith executed a Vice President

Agreement on or about July 1, 2003 ("Andrew Smith Vice President Agreement," attached

hereto as Exhibit B; the Peter Smith Vice President Agreement and Andrew Smith Vice

President Agreement are referred to collectively as the "Smith Vice President Agreements").

The Andrew Smith Vice President Agreement bars Andrew Smith, for a one-year period

following his separation from FCG, from directly or indirectly:  (i) soliciting, diverting, or taking

away any "Known FCG Client"; (ii) providing any services to any Known FCG Client; and

(iii) soliciting, diverting, or taking away any employee of FCG:

> 7.     Non-Competition and Non-Solicitation.  In addition to any
> non-competition and non-solicitation provisions provided under
> Participant's employee agreement with any FCG Company,
> Participant hereby agrees to the following restrictions for one year
> following separation of Participant's employment with FCG,
> regardless of the reasons for such separation of employment:
>
> (a)     No Solicitation of Known FCG Clients.  Participant
> hereby agrees that, without the prior written consent of FCG,
> Participant (i) shall not provide any services, directly or indirectly,
> and whether as an employee, consultant, independent contractor or
> otherwise, to or on behalf of any Known FCG Client, and (ii) shall
> not, directly or indirectly, solicit, divert or take away any Known
> FCG Client.  For purposes of these restrictions, "Known FCG
> Client" shall be any past, present or prospective FCG client that
> Participant provided services for, participated in preparation or
> delivery of any oral or written proposal for or otherwise had
> contact with during the last 18 months while at FCG.
>
> (b)     No Solicitation of Employees.  Participant agrees to
> not, directly or indirectly, solicit, divert or take away any employee
> of FCG.

Andrew Smith Vice President Agreement (Ex. B) at ¶ 7.

> 26.     Andrew Smith also agreed not to disclose or use any of FCG's

confidential information, during or after his employment:

> 1.     Confidentiality.  Participant agrees that Participant will not,
> during or after Participant's employment, disclose or use the
> confidential proprietary information of either FCG or any FCG
> subsidiary or affiliate (each, along with FCG, an "FCG

Company"), or of any third party to which any FCG Company is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or any other entity for any reason or person whatsoever. Participant further agrees not to make use of any confidential proprietary information for Participant's own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of Participant's employment.

Andrew Smith Vice President Agreement (Ex. B) at ¶ 1.

### 3.    Swenson's Fiduciary And Contractual Obligations

27.    Defendant Swenson joined FCG on July 29, 1996. She became a Vice President of FCG on January 1, 2005. As an officer, Swenson owed fiduciary duties to FCG. These duties barred her from (among other things) taking advantage of FCG's business opportunities, soliciting fellow employees to join a rival business, misappropriating FCG's resources and confidential information, and exploiting his position for her own personal benefit.

28.    Swenson was also bound by certain contractual obligations in favor of FCG. In connection with her role as Vice President, Swenson executed a Vice President Agreement on or about March 6, 2006 ("Swenson Vice President Agreement," attached hereto as Exhibit C). The Swenson Vice President Agreement bars Swenson, for a one-year period following her separation from FCG, from directly or indirectly: (i) soliciting, diverting, or taking away any "Known FCG Client"; (ii) providing any services to any Known FCG Client; and (iii) soliciting, diverting, or taking away any employee of FCG:

7.    Non-Competition and Non-Solicitation. In addition to any non-competition and non-solicitation provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year

following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:

(a)    No Solicitation of Known FCG Clients.  Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client.  For purposes of these restrictions, "Known FCG Client" shall be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

(b)    No Solicitation of Employees.  Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

Swenson Vice President Agreement (Ex. C) at ¶ 7.

29.    Swenson also agreed not to disclose or use any of FCG's confidential

information, during or after her employment:

1.    Confidentiality.  Participant agrees that Participant will not, during or after Participant's employment, disclose or use the confidential proprietary information of either FCG or any FCG subsidiary or affiliate (each, along with FCG, an "FCG Company"), or of any third party to which any FCG Company is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or any other entity for any reason or person whatsoever.  Participant further agrees not to make use of any confidential proprietary information for Participant's own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of Participant's employment.

Swenson Vice President Agreement (Ex. C) at ¶ 1.

## 4.    Elliott's Fiduciary And Contractual Obligations

30.    Defendant Elliott joined FCG on November 1, 2001.  As an employee, Elliott owed fiduciary duties to FCG.  These duties barred Elliott from (among other things) competing with FCG and misappropriating FCG's resources and confidential information.

31.    Elliott was also bound by certain contractual obligations in favor of FCG. In connection with her FCG employment, Elliott executed an Employment Agreement on November 1, 2001 ("Elliott Employment Agreement," attached hereto as Exhibit D).  The Elliott Employment Agreement bars Elliott, for a one-year period following her separation from FCG, from directly or indirectly competing with FCG or soliciting, diverting or taking away any FCG employee or customer:

> 5.    Non-Competition.  If not otherwise enforceable, I agree that I will not, within twelve (12) months from and after the termination of my employment with FCG (in whatever manner termination may occur), directly or indirectly, either as principal, agent, employee or in any other capacity, enter or engage in any employment or contractual relationship which involves any customer of FCG with whom I have had any contact on behalf of FCG within the one (1) year preceding the termination of my employment with FCG.

> 6.    Non-Solicitation.  I agree that I will not, directly or indirectly, solicit, divert or take away any employee, customer, past customer or potential customer of FCG for twelve (12) months following the termination of my employment with FCG.  For purposes of this paragraph, a "potential customer" shall mean any corporation, partnership, individual (or department, unit or affiliate thereof) that has received an oral or written proposal for services from FCG within the one (1) year preceding the termination of my employment with FCG, and a "past customer" shall mean any corporation, partnership, individual (or department, unit or affiliate thereof) which has utilized the services of FCG within the one (1) year preceding the termination of my employment with FCG.

Elliott Employment Agreement (Ex. D) at ¶¶ 5-6.

32.    Elliott also agreed not to disclose or use any of FCG's confidential

information, during or after her employment:

> 2.    Confidentiality.  I will not, during or after my employment,
> in whole or in part, disclose or use the confidential proprietary
> information of either FCG or of any third party to which FCG is
> obligated to keep any such information confidential (including but
> not limited to trade secrets or processes involving inventions,
> products, designs, methods, know-how, techniques, systems,
> processes, computer programs, technical information, customer
> lists, financial data, business and/or marketing plans and proposals)
> to any person, firm, corporation, association or other entity for any
> reason or purpose whatsoever; nor shall I make use of any
> confidential proprietary information for my own purposes or for
> the benefit of any person, firm, corporation or other entity (other
> than the owner of such information) under any circumstances
> during or after the termination of my employment …

Elliott Employment Agreement (Ex. D) at ¶ 2.

## 5.    Egli's Fiduciary And Contractual Obligations

33.    Defendant Egli joined FCG on January 27, 1997.  As an employee, Egli

owed fiduciary duties to FCG.  These duties barred Egli from (among other things) competing

with FCG and misappropriating FCG's resources and confidential information.

34.    Egli was also bound by certain contractual obligations in favor of FCG.  In

connection with his FCG employment, Egli executed an Employee Agreement on March 25,

2007 ("Egli Employee Agreement," attached hereto as Exhibit E).  The Egli Employee

Agreement bars Egli, for a one-year period following his separation from FCG, from directly or

indirectly:  (i) soliciting, diverting, or taking away any "Known FCG Client"; (ii) providing any

services to any Known FCG Client; and (iii) soliciting, diverting, or taking away any employee

of FCG:

> 5.    Non-Solicitation.  I hereby agree to the following
> restrictions for one year following separation of my employment

with FCG, regardless of the reasons for such separation of employment:

> (a)     No Services to or Solicitation Of Known FCG clients.  I hereby agree that, without the prior consent of FCG, I (i) will not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) will not, directly or indirectly, solicit, divert or take away any Known FCG Client.  For purposes of these restrictions, "Known FCG Client" shall be any past, present or prospective FCG client that I provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

> (b)     No Solicitation of Employees.  I agree to not, directly or indirectly, solicit, divert or take away any employee of FCG.

Egli Employee Agreement (Ex. E) at ¶ 5.

> 35.     Egli also agreed not to disclose or use any of FCG's confidential

information, during or after his employment:

> 2.     Confidentiality.  I will not, during or after my employment, in whole or in part, disclose or use the confidential proprietary information of either FCG or of any third party to which FCG is obligated to keep any such information confidential (including but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or other entity for any reason or purpose whatsoever; nor shall I make use of any confidential proprietary information for my own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of my employment …

Egli Employee Agreement (Ex. E) at ¶ 2.

### B.     While Executives Of FCG, The Smiths Form A Competing Business And Begin To Usurp FCG's Business Opportunities

> 36.     No later than the Fall of 2006, the Smiths decided that they would leave

FCG and start a competing firm.  The business plan for their new competitive venture was

simple:  steal FCG's clients, usurp FCG's business opportunities, and hire FCG's employees to

do the work.  As described more fully below, the Smiths began to actively compete against FCG

while still serving as executive employees of FCG.

37.    In violation of their ongoing duties to FCG, the Smiths usurped business

opportunities for themselves, while still FCG executive employees, from at least three of FCG's

clients:  Sutter Health, Northwestern Memorial Hospital ("Northwestern"), and Advocate Health

Care ("Advocate").  These business opportunities belonged to FCG, not to the Smiths or their

new firm.

38.    Additionally, while still executives of FCG, the Smiths identified specific

FCG employees whom they intended to hire at their new competitive venture and began to

establish operations for that competing business, including the purchase of the internet domain

name for their new competitive venture, www.impact-advisors.com.  Among other targeted

employees, the Smiths identified Swenson and Todd Hollowell as prospective IA partners in a

business plan in December 2006.  Swenson was then a Vice President at FCG, and Todd

Hollowell was a former FCG employee.  In the same business plan, the Smiths also identified

Elliott, another FCG employee whom they intended to hire.  E-mails between the Smiths and

Elliott indicate that the Smiths expressed their interest in hiring her at their new competitive

venture during and around this time period.  As discussed below, the Smiths ultimately brought

each of these individuals over to IA, along with numerous other FCG employees, to serve IA in

the same roles they identified while still employed by FCG .

**C.    The Smiths Resign From FCG And Continue, For Their Own Benefit, To
      Serve Known FCG Clients In Breach Of Their Vice President Agreements**

39.    On January 24, 2007, the Smiths announced their resignations from FCG,

effective on February 7, 2007.   In connection with their resignations, they each executed a

Transition Agreement that expressly reaffirmed their post-separation obligations.  *See* Peter Smith Transition Agreement (attached hereto as Exhibit F); Andrew Smith Transition Agreement (attached hereto as Exhibit G).

40.     Following their resignations, the Smiths immediately began operations as IA, which they formed to perform the business opportunities that the Smiths had usurped from FCG while still Vice Presidents and to provide IT consulting services in competition with FCG to Known FCG Clients.  As IA, the Smiths began providing IT consulting services to Advocate, Northwestern and Sutter Health.

41.     Upon their resignations, the Smiths became subject to the post-separation obligations of the Smith Vice President Agreements:  they were barred from soliciting, diverting or taking away "Known FCG Clients" – as defined by their Vice President Agreements – and FCG's employees.  They were also barred from providing services to Known FCG Clients.

42.     Each FCG client that the Smiths solicited, in violation of their fiduciary obligations, before resigning from FCG is a Known FCG Client under their Vice President Agreements.  *See* Smith Vice President Agreements at ¶ 7(a) ("For purposes of these restrictions, 'Known FCG Client' shall be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or *otherwise had contact with* during the last 18 months while at FCG") (emphasis added).  In other words, clients such as Northwestern, Advocate and Sutter Health are "Known FCG Clients" under the Smith Vice President Agreements because they are all past or present FCG clients with whom the Smiths had contact during their last 18 months at FCG.  As such, the Smiths' post-resignation activities – solicitation, diversion, taking away, and provision of

services to the FCG clients they had been courting for their own personal benefit while Vice

Presidents of FCG – separately violated the terms of their Vice President Agreements.

43.    During 2007, the Smiths did not limit their violations to Advocate,

Northwestern and Sutter Health, but further expanded the business opportunities they had

usurped from FCG in violation of their fiduciary and post-separation contractual obligations.

During the following year – while the Smiths' post-separation obligations remained in effect –

IA solicited, diverted, took away and/or provided services to at least three additional Known

FCG Clients:  the University of Chicago Medical Center ("UCMC"), Cleveland Clinic, and Rush

University Medical Center.

44.    The Smiths' theft of FCG's client business – begun before their

resignations and continuing thereafter – has caused FCG substantial damages.  Among other

things, IA placed consultants at Known FCG Clients in positions for which FCG had made bids,

thereby taking such business away from FCG.  In addition, IA has damaged or destroyed FCG's

relationships with several Known FCG Clients – relationships that FCG had developed over

many years, had entrusted the Smiths to service on behalf of FCG, and relationships FCG

reasonably expected to maintain.  The destruction of these relationships – which would have

been protected had the Smiths properly observed their fiduciary and post-separation obligations –

has further damaged FCG.

**D.    Elliott Remains Behind As An FCG Employee To Provide IA
And The Smiths FCG's Confidential Competitive Information**

45.    After the Smiths launched IA and began to service the business

opportunities that they had usurped from FCG, Elliott remained employed by FCG, serving in

the role of FCG's lead consultant on-site at Northwestern.  During this time, Elliott assisted IA

by feeding FCG's confidential competitive information to the Smiths, advising IA on draft

business proposals by IA to Northwestern and, upon information and belief, advocating that Northwestern accept IA's proposals. This conduct violated Elliott's fiduciary obligations as an FCG employee and also her statutory and contractual obligations to FCG.

46.     By assisting IA in preparing its proposals for business at Northwestern, Elliott usurped the business opportunity of her employer, FCG. By divulging FCG's confidential information, communications and pricing and negotiation practices, Elliott misappropriated FCG's confidential competitive information. Elliott's espionage violated her fiduciary duties to FCG. It also violated her contractual duties as an FCG employee and her statutory obligations under Illinois law. *See* Elliott Employment Agreement (Ex. D) at 1-2.

47.     Elliott continued to violate her duties to FCG through her resignation from FCG in August 2007. Elliott's activities caused FCG extensive damages, including the loss of its relationship with Northwestern. In keeping with their 2006 business plan, the Smiths rewarded Elliott for her efforts on behalf of IA and ultimately hired Elliott as an IA employee. The Smiths' Vice President Agreements, however, prohibited them from hiring Elliott directly from FCG. Accordingly, the Smiths and Elliott devised a scheme whereby Elliott would first be hired as in-house employee at Northwestern and, from there, be hired by IA.

48.     Elliott resigned from FCG on August 31, 2007. She subsequently became an employee of IA as previously planned. By employing Elliott at IA and by committing the acts leading thereto, the Smiths violated their contractual obligations to FCG.

49.     Since joining IA, Elliott has provided consulting services to Known FCG Clients including the University of Chicago Medical Center ("UCMC"). Elliott's service to such Known FCG Clients further violates Elliott's contractual obligations to FCG. *See* Elliott Employment Agreement (Ex. D) at ¶¶ 5, 6.

**E.     The Smiths Make Swenson An IA Partner And All Three
Former FCG Vice Presidents Continue To Poach FCG
Employees In Violation Of Their Contractual Obligations To FCG**

50.     While the Smiths improperly obtained engagements on behalf of IA from

Known FCG Clients, they also solicited, diverted and/or took away FCG's employees to perform

the work for those clients.  These activities violated their post-separation obligations to FCG.

51.     Even before IA hired Elliott, the Smiths solicited, diverted and/or took

away defendant Swenson, an FCG Vice President, whom they brought over to IA as a partner on

April 18, 2007.  By adding Swenson as the fourth IA partner, the Smiths filled out the ranks of

IA's partners as planned in December 2006.  In connection with her resignation from FCG,

Swenson, like the Smiths before her, executed a Transition Agreement (attached hereto as

Exhibit H) that expressly reaffirmed her post-separation obligations.  After joining IA, Swenson,

upon information and belief, began providing consulting services to Sutter Health, a Known

FCG Client, thus providing services in violation of all three FCG Vice Presidents Agreements.

52.     While at FCG, Swenson had headed FCG's Epic Implementation practice.

This practice focused on assisting FCG's clients with the installation and implementation of Epic

software.  Swenson's duties for FCG required her to mentor and train many FCG consultants,

thereby enabling her to develop and recognize talent within the FCG consultant ranks.  After she

joined IA, Swenson was able to identify FCG employees whom IA could solicit for hire.  Some

of these FCG employees agreed to join IA.

53.     The Smiths and Swenson sometimes (though not always) used other IA

personnel, such as Todd Hollowell, as go-betweens to FCG employees.  But because their Vice

President Agreements prohibited both direct *and indirect* solicitation, diversion, and taking

away, even indirect solicitations such as these violated the Vice President Agreements.  *See*

Exs. A, B and C.

54.    For example, on October 24, 2007, Todd Hollowell left a voice mail message for Sue Kitchen, another FCG employee, which indicated that Swenson had instructed Hollowell to contact Kitchen:

> Hi, Sue.  This is Todd Hollowell.  I am a partner at IA.  Actually, Melanie Swenson is one of my peers, along with Andy Smith and Pete Smith.  We've started this new healthcare IT consulting group doing very similar work to what you're doing there at FCG and Melanie thought it would be great if I reached out and chatted with you about some opportunities we have and to see if you have any interest in potentially talking to us about those opportunities.  A lot of Epic work around Clin Doc and HIM have come up and we'd love to run a couple things by you and just let you know what we're up to and see if there may be a fit for us to even work together, whether it be now or down the road.

Notwithstanding this subterfuge, Swenson's direction to Hollowell violated the terms of her Vice President Agreement.

55.    In late June 2007, Swenson informed defendant Egli, then an FCG employee, of a possible employment opportunity with IA.  IA used Todd Hollowell, the only IA partner who had not gone to IA directly from FCG, to act as the negotiator of IA's employment terms for Egli.  IA hired Egli on July 30, 2007.  Upon information and belief, IA placed Egli as a consultant at Sutter Health, a Known FCG Client, in violation of the Smiths' and Swenson's post-separation obligations.

56.    At around the same time, Swenson recruited a second FCG employee, Roberta Riddle ("Riddle").  Upon information and belief, Swenson advised Riddle that IA would hire Riddle if she would resign from FCG.  Riddle resigned from FCG and was hired by IA on September 9, 2007.  IA placed Riddle as a consultant at Cleveland Clinic, a Known FCG Client, in violation of the Smiths' and Swenson's post-separation obligations.

57.    Next, IA hired Pamela Baylor ("Baylor"), another FCG employee.  In September 2007, upon information and belief, IA sent Egli to meet with Baylor in person.  On or

about October 13, 2007, Egli sealed the deal with Baylor and she agreed to join Impact Advisors. IA hired Baylor on October 29, 2007.  By soliciting, diverting and/or taking away Baylor, four defendants – Peter Smith, Andrew Smith, Swenson, and Egli – all violated their post-separation contractual obligations.

58.     Upon information and belief, IA placed Baylor as a consultant at Sutter Health, a Known FCG Client, in further violation of the Smiths' and Swenson's post-separation contractual obligations.

59.     Next, IA hired William Faust, another FCG employee, in violation of the post-separation contractual obligation of Swenson and the Smiths.

60.     In their contacts with FCG's employees, the Smiths, Swenson and Egli showed no more respect for those employees' obligations to FCG than they showed for their own.  Indeed, it appears, upon information and belief, that they encouraged the employees they were soliciting to reveal FCG's confidential competitive information, in violation those employees' fiduciary and contractual obligations to FCG.

61.     FCG commenced this litigation on November 20, 2007, promptly after beginning to learn of Defendants' unlawful activities.  In addition to other relief, FCG sought to extend the Smiths' and Swenson's post-separation obligations for an additional period of time as a result of their ongoing violations.

62.     Despite notice and the pendency of this action, it appears, upon information and belief, that the Smiths, Swenson and Egli have continued to raid FCG's employees in violation of their obligations to FCG.  Upon information and belief, they solicited, diverted and/or took away at least two additional FCG employees in February and March 2008: Lary Armentrout and Erin Svarvari.

63.    The poaching of Swenson, Egli, Riddle, Baylor, Faust, Armentrout and Svarvari has caused damage to FCG.  Several of these FCG employees were placed as consultants with FCG's clients and resigned without completing the full terms of FCG's contracts with those clients.  Accordingly, Defendants' actions have caused FCG to lose revenue and profits.

**F.    The Individual Defendants Have Built IA's Business On Violations Of Their Fiduciary And Contractual Obligations To FCG**

64.    In all, the Individual Defendants and IA have solicited, diverted, or taken away at least five Known FCG Clients in violation of the terms of the Smiths' and Swenson's respective agreements.  These entities include Northwestern, Advocate, Sutter Health, UCMC, Rush University Medical Center, and Cleveland Clinic.  Because the Smiths' and Swenson's Vice President Agreements bar them both *directly and indirectly* from soliciting, diverting or taking away any Known FCG Client, each and every solicitation, diversion and/or taking away by IA of a Known FCG Client is a violation of all three Vice President Agreements.  Upon information and belief, Known FCG Clients represent a significant percentage of IA's client base and an even larger percentage of IA's revenues.

65.    Certain of these Known FCG Clients have retained IA to provide consulting services.  These entities include, upon information and belief, Northwestern, Advocate, Sutter Health, UCMC and Cleveland Clinic.  The provision of such services further violates the post-separation contractual obligations of the Smiths, Swenson and Elliott.

66.    IA has also placed consultants, including some of the improperly poached FCG employees, with Known FCG Clients.

67.    As a result of all of the activities complained of herein, FCG has been damaged.  FCG's damages include losses stemming from the poaching of FCG employees;

losses stemming from the poaching of FCG's business with its clients; and losses stemming from the Defendants' systematic destruction of FCG's relationships with certain of its clients.

68.    FCG demands a trial by jury.

## CLAIM I

## BREACH OF FIDUCIARY DUTY
### (Against Andrew Smith and Peter Smith)

69.    Paragraphs 1 through 86 are hereby fully incorporated by reference, as if fully set forth herein.

70.    By virtue of being employees, officers, and agents of FCG, defendants Andrew Smith and Peter Smith owed a fiduciary duty of loyalty to FCG.

71.    During their employment by FCG, the Smiths owed fiduciary duties not to:

        (a)    Take advantage of FCG's business opportunities;

        (b)    Solicit fellow employees to join a rival business;

        (c)    Misappropriate FCG's resources or confidential information, and

        (d)    Exploit their positions for their own personal benefit.

72.    The Smiths owe a continuing fiduciary duty not to disclose or use the confidential information which they acquired while they were acting as employees of FCG.

73.    Upon information and belief, the Smiths breached their fiduciary duties by, among other things, usurping FCG's business opportunities for their own personal benefit, including FCG's opportunities with Advocate, Northwestern, and Sutter Health.  These business opportunities belonged to FCG and had been developed through the use of FCG's corporate assets and with the use of FCG's confidential and proprietary information.

74. Upon information and belief, the Smiths breached their fiduciary duties during and/or after their employment at FCG by, among other things:

    (a)    soliciting at least one FCG employee to join IA;

    (b)    misappropriating FCG's resources and/or confidential information;

    (c)    exploiting their positions with FCG for their own personal benefit; and

    (d)    using FCG's confidential proprietary information for their own purposes and for the benefit of their rival, competing business, IA.

75. The Smiths' breaches of fiduciary duty have caused damage to FCG's goodwill and reputation, customer relationships, and business.

## CLAIM II

### BREACH OF FIDUCIARY DUTY
#### (Against Paula Elliott)

76. Paragraphs 1 through 93 are hereby fully incorporated by reference, as if fully set forth herein.

77. By virtue of being an employee and agent of FCG, defendant Elliott owed a fiduciary duty of loyalty to FCG.

78. During her employment by FCG, defendant Elliott owed fiduciary duties not to compete with FCG or misappropriate FCG's resources or confidential information.

79. Defendant Elliott owes a continuing fiduciary duty not to disclose or use the confidential information which she acquired while she was acting as an employee of FCG.

80. Upon information and belief, defendant Elliott breached her fiduciary duties during and/or after her employment at FCG by, among other things:

(a)  assisting FCG's rival and competitor, IA, in soliciting the business of FCG's client, Northwestern;

(b)  misappropriating FCG's resources and/or confidential information; and

(c)  using FCG's confidential proprietary information for her own purposes and for the benefit of FCG's rival, competing business, IA.

81.  Defendant Elliott's breach of fiduciary duty has caused damage to FCG's goodwill and reputation, customer relationships, and business.

## CLAIM III

### VIOLATION OF ILLINOIS UNIFORM TRADE SECRETS ACT (IUTSA)
**(Against Peter Smith, Andrew Smith, Paula Elliott And Impact Advisors)**

82.  Paragraphs 1 through 99 are hereby fully incorporated by reference, as if fully set forth herein.

83.  FCG's customer information, pricing structures, contract terms, and business and negotiation strategies are trade secrets under the Illinois Uniform Trade Secrets Act ("IUTSA").

84.  FCG has devoted a substantial amount of time, effort and expense to develop its customer information, pricing structures, contract terms, and business and negotiation strategies.  This information is not readily available from any one public source.

85.  FCG's customer information, pricing structures, contract terms, and business and negotiation strategies are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

86.    FCG has used reasonable efforts to maintain the secrecy and confidentiality of its customer information, pricing structures, contract terms, and business and negotiation strategies.

87.    Defendants Peter Smith, Andrew Smith and Elliott have acquired FCG's trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.

88.    Defendants Peter Smith, Andrew Smith, Elliott and IA have willfully and maliciously misappropriated FCG's trade secrets by using and disclosing FCG's customer information, pricing structures, contract terms, and business and negotiation strategies without FCG's express or implied consent.

89.    The willful and malicious misappropriation of FCG's trade secrets by defendants Peter Smith, Andrew Smith, Elliott and IA has damaged FCG's goodwill and reputation, customer relationships, and business.

## CLAIM IV

## BREACH OF CONTRACT
### (Against Peter Smith)

90.    Paragraphs 1 through 108 are hereby fully incorporated by reference, as if fully set forth herein.

91.    FCG entered into valid and enforceable agreements with Peter Smith which expressly prohibited him from directly or indirectly:  (i) soliciting, diverting, or taking away any employee of FCG; (ii) soliciting, diverting, or taking away any Known FCG Client; and (iii) providing any services to any Known FCG Client.  Those agreements are memorialized in the Peter Smith Vice President Agreement and the Peter Smith Transition Agreement.

92.    FCG further entered into a valid and enforceable agreement with Peter Smith which expressly prohibited him from disclosing or making use of any confidential

proprietary information for his own purposes or for the benefit of any person, firm, corporation or other entity under any circumstances. This agreement is memorialized in the Peter Smith Vice President Agreement and the Peter Smith Transition Agreement.

93.     Peter Smith has breached his Vice President Agreement and Transition Agreement by, among other things:

(a)     directly and/or indirectly soliciting, diverting, and/or taking away one or more FCG employees;

(b)     directly and/or indirectly, soliciting, diverting, and/or taking away one or more Known FCG Clients;

(c)     directly and/or indirectly providing services to one or more Known FCG Clients; and

(d)     disclosing or making use of FCG's confidential proprietary information for his own purposes or for the benefit of another person, firm, corporation or other entity.

94.     As a direct and proximate result of Peter Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered and will continue to suffer damages.

95.     As a further direct and proximate result of Peter Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered and will continue to suffer the loss of its employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  In order for FCG to derive the negotiated-for protection intended by the language of the Peter Smith Vice President Agreement and Peter

Smith Transition Agreement, Peter Smith must be enjoined from his conduct in breach of such agreements.

96.     FCG has performed all of its obligations under the Peter Smith Vice President Agreement and the Peter Smith Transition Agreement.

## CLAIM V

### BREACH OF CONTRACT
**(Against Andrew Smith)**

97.     Paragraphs 1 through 114 are hereby fully incorporated by reference, as if fully set forth herein.

98.     FCG entered into valid and enforceable agreements with Andrew Smith which expressly prohibited him from directly or indirectly:  (i) soliciting, diverting, or taking away any employee of FCG; (ii) soliciting, diverting, or taking away any Known FCG Client; and (iii) providing any services to any Known FCG Client.  Those agreements are memorialized in the Andrew Smith Vice President Agreement and the Andrew Smith Transition Agreement.

99.     FCG further entered into a valid and enforceable agreement with Andrew Smith which expressly prohibited him from disclosing or making use of any confidential proprietary information for his own purposes or for the benefit of any person, firm, corporation or other entity under any circumstances. This agreement is memorialized in the Andrew Smith Vice President Agreement and the Andrew Smith Transition Agreement.

100.     Andrew Smith has breached his Vice President Agreement and Transition Agreement by, among other things:

(a)     directly and/or indirectly soliciting, diverting, and/or taking away one or more FCG employees;

26

      (b)      directly and/or indirectly soliciting, diverting, and/or taking away one or more Known FCG Clients;

      (c)      directly and/or indirectly providing services to one or more Known FCG Clients; and

      (d)      disclosing or making use of  FCG's confidential proprietary information for his own purposes or for the benefit of another person, firm, corporation or other entity.

101.    As a direct and proximate result of Andrew Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered and will continue to suffer damages.

102.    As a further direct and proximate result of Andrew Smith's breaches of his Vice President Agreement and Transition Agreement, FCG has suffered and will continue to suffer the loss of its employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  In order for FCG to derive the negotiated-for protection intended by the language of the Andrew Smith Vice President Agreement and Andrew Smith Transition Agreement, Andrew Smith must be enjoined from his conduct in breach of such agreements.

103.    FCG has performed all of its obligations under the Andrew Smith Vice President Agreement and the Andrew Smith Transition Agreement.

## CLAIM VI

## BREACH OF CONTRACT
### (Against Paula Elliott)

104.    Paragraphs 1 through 122 are hereby fully incorporated by reference, as if fully set forth herein.

105.    FCG entered into a valid and enforceable agreement with Elliott which expressly prohibited her from directly or indirectly:  (i) soliciting, diverting, or taking away any employee of FCG; (ii) soliciting, diverting, or taking away any current, past, or potential customer of FCG; and (iii) entering or engaging in any employment or contractual relationship which involved any customer of FCG with whom she had contact on behalf of FCG in the year period prior to her separation from FCG.  That agreement is memorialized in the Elliott Employment Agreement.

106.    The Elliott Employment Agreement also prohibited Elliot from disclosing or using, in whole or in part, any confidential proprietary information of FCG for her own purposes or for the benefit of any person, firm, corporation or other entity.

107.    Elliott has breached her Employment Agreement by, among other things:

(a)    directly and/or indirectly soliciting, diverting, and/or taking away one or more current, past, or potential customer of FCG;

(b)    directly and/or indirectly entering or engaging in employment or contractual relationship which involved a customer of FCG with whom she had contact on behalf of FCG; and

(c)    disclosing or making use of, in whole or in part,  FCG's confidential proprietary information for own purposes or for the benefit of another person, firm, corporation or other entity.

108.    As a direct and proximate result of Elliot's breaches of her Employment Agreement, FCG has suffered and will continue to suffer damages.

109.    As a further direct and proximate result of Elliot's breaches of her Employment Agreement, FCG has suffered and will continue to suffer the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  In order for FCG to derive the negotiated-for protection intended by the language of the Elliott Employment Agreement, Elliott must be enjoined from her conduct in breach of such agreements.

110.    FCG has performed all of its obligations under the Elliott Employment Agreement.

## CLAIM VII

## BREACH OF CONTRACT
### (Against Melanie Swenson)

111.    Paragraphs 1 through 128 are hereby fully incorporated by reference, as if fully set forth herein.

112.    FCG entered into valid and enforceable agreements with Swenson which expressly prohibited her from directly or indirectly:  (i) soliciting, diverting, or taking away any employee of FCG; (ii) soliciting, diverting, or taking away any Known FCG Client; and (iii) providing any services to any Known FCG Client.  Those agreements are memorialized in the Swenson Vice President Agreement and the Swenson Transition Agreement.

113.    Swenson has breached her Vice President Agreement and Transition Agreement by, among other things:

> (a)    directly and/or indirectly soliciting, diverting, and/or taking one or more FCG employees;

29

(b)    directly and/or indirectly soliciting, diverting, and/or taking away one or more Known FCG Clients; and

(c)    directly and/or indirectly providing services to one or more Known FCG Clients.

114.    As a direct and proximate result of Swenson's breaches of her Vice President Agreement and Transition Agreement, FCG has suffered and will continue to suffer damages.

115.    As a further direct and proximate result of Swenson's breaches of her Vice President Agreement and Transition Agreement, FCG has suffered and will continue to suffer the loss of its employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  In order for FCG to derive the negotiated-for protection intended by the language of the Swenson Vice President Agreement and Swenson Transition Agreement, Swenson must be enjoined from her conduct in breach of such agreements.

116.    FCG has performed all of its obligations under the Swenson Vice President Agreement and the Swenson Transition Agreement.

## CLAIM VIII

### BREACH OF CONTRACT
**(Against Stephen Egli)**

117.    Paragraphs 1 through 134 are hereby fully incorporated by reference, as if fully set forth herein.

118.    FCG entered into a valid and enforceable agreement with Egli which expressly prohibited him from directly or indirectly soliciting, diverting, or taking away any employee of FCG.  That agreement is memorialized in the Egli Employee Agreement.

119.    Egli has breached his Employee Agreement by directly and/or indirectly soliciting, diverting, and/or taking away one or more FCG employees.

120.    As a direct and proximate result of Egli's breaches of his Employee Agreement, FCG has suffered and will continue to suffer damages.

121.    As a further direct and proximate result of Egli's breaches of his Employee Agreement, FCG has suffered and will continue to suffer the loss of its employees' unique experience, expertise, and client relationships.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  In order for FCG to derive the negotiated-for protection intended by the language of the Egli Employee Agreement, Egli must be enjoined from his conduct in breach of such agreements.

122.    FCG has performed all of its obligations under the Egli Employment Agreement.

## CLAIM IX

## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against IA)

123.    Paragraphs 1 through 140 are hereby fully incorporated by reference, as if fully set forth herein.

124.    Peter Smith's Vice President and Transition Agreements are valid and enforceable contracts.

125.    Andrew Smith's Vice President and Transition Agreements are valid and enforceable contracts.

31

126.    Elliott's Employment Agreement is a valid and enforceable contract.

127.    Swenson's Vice President and Transition Agreements are valid and enforceable contracts.

128.    Egli's Employee Agreement is a valid and enforceable contract.

129.    Upon information and belief, IA was at all relevant times aware of the Individual Defendants' respective agreements with FCG and of the Individual Defendants' post-separation obligations to FCG that are imposed by those agreements.

130.    IA intentionally and without justification induced Peter Smith to breach his employee non-solicitation obligations to FCG by encouraging Peter Smith to, among other things:

    (a)    solicit FCG employees and offer FCG employees employment opportunities at IA;

    (b)    solicit Known FCG Clients and provide services to Known FCG Clients; and

    (c)    make use of FCG's confidential proprietary information for Peter Smith's own purposes and for the benefit of IA.

131.    IA intentionally and without justification induced Andrew Smith to breach his employee non-solicitation obligations to FCG by encouraging Andrew Smith to, among other things:

    (a)    solicit FCG employees and offer FCG employees employment opportunities at IA;

    (b)    solicit Known FCG Clients and provide services to Known FCG Clients; and

      (c)     make use of FCG's confidential proprietary information for Peter Smith's own purposes and for the benefit of IA.

132.    IA intentionally and without justification induced Elliott to breach her client non-solicitation obligations to FCG by encouraging Elliott to, among other things:

      (a)     solicit customers, past customers, and/or potential customers of FCG and enter into employment or contractual relationships involving customers of FCG; and

      (b)     make use of FCG's confidential proprietary information for Elliott's own purposes and for the benefit of IA.

133.    IA intentionally and without justification induced Swenson to breach her employee non-solicitation obligations to FCG by encouraging Swenson to, among other things:

      (a)     solicit FCG employees and offer FCG employees employment opportunities at IA; and

      (b)     solicit Known FCG Clients and provide services to Known FCG Clients.

134.    IA intentionally and without justification induced Egli to breach his employee non-solicitation obligations to FCG by encouraging Egli to solicit FCG employees and to offer FCG employees employment opportunities at IA.

135.    IA's conduct is willful and malicious.

136.    As a direct and proximate result of IA's conduct, FCG has suffered and will continue to suffer damages.

137.    As a further direct and proximate result of IA'S conduct, FCG has suffered and will continue to suffer the loss of its improperly poached employees' unique

experience, expertise, and client relationships, and the loss of business from its improperly solicited clients. Such damages constitute irreparable harm for which FCG has no adequate remedy at law. Accordingly, IA must be enjoined from further interference with the Individual Defendants' non-solicitation obligations to FCG.

## CLAIM X

### TORTIOUS INTERFERENCE WITH CONTRACT
#### (Against Andrew Smith and Peter Smith)

138.    Paragraphs 1 through 155 are hereby fully incorporated by reference, as if fully set forth herein.

139.    Elliott's Employment Agreement is a valid and enforceable contract.

140.    Swenson's Vice President and Transition Agreements are valid and enforceable contracts.

141.    Egli's Employee Agreement is a valid and enforceable contract.

142.    Upon information and belief, the Smiths were at all relevant times aware of the Elliott's, Swenson's and Egli's respective agreements with FCG and of Elliott's, Swenson's and Egli's post-separation obligations to FCG that are imposed by those agreements.

143.    The Smiths intentionally and without justification induced Elliott to breach her client non-solicitation obligations to FCG by encouraging Elliott to, among other things:

(a)     solicit customers, past customers, and/or potential customers of FCG and enter into employment or contractual relationships involving customers of FCG; and

(b)     make use of FCG's confidential proprietary information for Elliott's own purposes and for the benefit of IA.

144. The Smiths intentionally and without justification induced Swenson to breach her employee non-solicitation obligations to FCG by encouraging Swenson to, among other things:

        (a)    solicit FCG employees and offer FCG employees employment opportunities at IA; and

        (b)    solicit Known FCG Clients and provide services to Known FCG Clients.

145. The Smiths intentionally and without justification induced Egli to breach his employee non-solicitation obligations to FCG by encouraging Egli to solicit FCG employees and to offer FCG employees employment opportunities at IA.

146. The Smiths' conduct is willful and malicious.

147. As a direct and proximate result of the Smiths' conduct, FCG has suffered and will continue to suffer damages.

148. As a further direct and proximate result of the Smiths' conduct, FCG has suffered and will continue to suffer the loss of its improperly poached employees' unique experience, expertise, and client relationships, and the loss of business from its improperly solicited clients. Such damages constitute irreparable harm for which FCG has no adequate remedy at law. Accordingly, the Smiths must be enjoined from further interference with the non-solicitation obligations to FCG of Elliott, Swenson and Egli.

## CLAIM XI

### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE
**(Against IA, Peter Smith, Andrew Smith, Melanie Swenson and Paula Elliott)**

149.    Paragraphs 1 through 166 are hereby fully incorporated by reference, as if fully set forth herein.

150.    FCG had a reasonable expectancy of continuing, free from interference by the Defendants, valid business relationships with certain clients, including Northwestern, Advocate, Sutter Health, UCMC, Rush University Medical Center and Cleveland Clinic, and of realizing economic advantages therefrom.

151.    Upon information and belief, IA, Peter Smith, Andrew Smith, Swenson and Elliott were at all relevant times aware of FCG's expectancies.

152.    IA, Peter Smith, Andrew Smith, Swenson and Elliott intentionally and without justification interfered with such expectancies by soliciting and/or providing services to Northwestern, Advocate, Sutter Health, UCMC, Rush University Medical Center and Cleveland Clinic.

153.    The interference of IA, Peter Smith, Andrew Smith, Swenson and Elliott induced or caused the termination of FCG's expectancies of continuing valid business relationships with certain clients, including Northwestern, Advocate, Sutter Health, UCMC, Rush University Medical Center and Cleveland Clinic.

154.    The conduct of IA, Peter Smith, Andrew Smith, Swenson and Elliott was willful and malicious.

155.    As a direct and proximate result of the conduct of IA, Peter Smith, Andrew Smith, Swenson and Elliott, FCG has suffered and will continue to suffer damages.

156.    As a further direct and proximate result of the conduct of IA, Peter Smith, Andrew Smith, Swenson and Elliott, FCG has suffered and will continue to suffer the loss of its client relationships and the loss of business from its improperly solicited clients.  Such damages constitute irreparable harm for which FCG has no adequate remedy at law.  Accordingly, IA, Peter Smith, Andrew Smith, Swenson and Elliott must be enjoined from further interference with FCG's expectancies of prospective economic advantage.

## PRAYER FOR RELIEF

WHEREFORE, FCG respectfully requests that the Court enter a judgment in its favor and against Defendants as follows:

A.    Enjoining each Individual Defendant from his or her breaches of contract;

B.    Extending the employee non-solicitation, client non-solicitation, and non-compete provisions of each Individual Defendant's Vice President, Termination, Employment and/or Employee Agreements for an additional period of time equivalent to the period of time during which the Individual Defendant has been in breach;

C.    Enjoining IA and the Smiths from further intentional interference with FCG's contracts;

D.    Enjoining Peter Smith, Andrew Smith, Swenson and Elliott from further intentional interference with FCG's prospective economic advantage;

E.    For compensatory damages in excess of $75,000 against Defendants, exclusive of interests and costs;

F.    For punitive damages against Defendants, in amounts to be determined at trial;

G.    For attorneys' fees, costs, and expenses;

H.    For prejudgment interest; and

I.    For such other and further relief as the Court deems just and proper.


Dated:  April 9, 2008                    Respectfully submitted,


                                   _____/s/ Hudson T. Hollister_____
                                   One of the Attorneys for Plaintiffs
                                   First Consulting Group, Inc. and FCG CSI, Inc.

                                   Timothy B. Hardwicke
                                   Hudson T. Hollister
                                   LATHAM & WATKINS LLP
                                   Sears Tower, Suite 5800
                                   233 South Wacker Drive
                                   Chicago, Illinois  60606
                                   (312) 876-7700

## Index of Exhibits

Exhibit A.    Peter Smith Vice President Agreement
Exhibit B.    Andrew Smith Vice President Agreement
Exhibit C.    Swenson Vice President Agreement
Exhibit D.    Elliott Employment Agreement
Exhibit E.    Egli Employee Agreement
Exhibit F.    Peter Smith Transition Agreement
Exhibit G.    Andrew Smith Transition Agreement
Exhibit H.    Swenson Transition Agreement

**Exhibit A.     Peter Smith Vice President Agreement**

## VICE PRESIDENT AGREEMENT

This Vice President Agreement (the "**Agreement**") is entered into as of December 31, 2000, between First Consulting Group, Inc. ("**FCG**") and Peter C Smith ("**Participant**").

WHEREAS, Participant is a Vice President with FCG CSI, Inc., a subsidiary of FCG;

WHEREAS, in connection with Participant's position as Vice President of FCG, Participant is required to agree to certain matters, and is entitled to certain benefits, all as set forth in this Agreement; and

WHEREAS, the parties to this Agreement believe it to be in the best interests of FCG and Participant to enter into this Agreement and to fulfill each party's respective obligations and covenants hereunder;

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     **Confidentiality.**  Participant agrees that Participant will not, during or after Participant's employment, disclose or use the confidential proprietary information of either FCG or any FCG subsidiary or affiliate (each, along with FCG, an "**FCG Company**"), or of any third party to which any FCG Company is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or other entity for any reason or purpose whatsoever.  Participant further agrees not to make use of any confidential proprietary information for Participant's own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of Participant's employment.

2.     **Limitations.**  The restrictions set forth in Section 1 shall not apply to the following: (a) any information that, at the time of disclosure, is then publicly known, provided that Participant was not responsible, directly or indirectly, for permitting such information to become publicly known without the consent of its owner(s); (b) any information that is received by Participant from a third party outside of Participant's employment relationship with any FCG Company and that was disclosed to Participant without any confidentiality obligation or any known breach of a confidentiality obligation by such third party; (c) use of such information in the scope and course of Participant's duties for the FCG Companies; or (d) any information that may be required by law or an order of any court or agency of competent jurisdiction to be disclosed.  In the case of subclause (d) above, Participant agrees to notify FCG in advance if Participant is required by law or court order to disclose any such information, and Participant shall cooperate with any efforts that FCG may take to limit the disclosure of such information or seek confidential treatment over the disclosure of such information.

3.     **Proprietary Matter.**  Participant shall not, during the term of Participant's employment with any FCG Company, take, use or permit to be used by any person, firm, corporation or other entity (other than the FCG Companies) notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer programs, data, documentation or other materials of any nature relating to any matter within the scope of business of the FCG Companies or concerning any of their dealings, clients, personnel or affairs.

FCG00000467
CONFIDENTIAL

Participant further agrees that Participant shall not, after termination of Participant's employment with the FCG Companies, use or permit to be used any such notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer programs, data, documentation or other materials. Participant agrees that all of the foregoing matter shall be and remain the sole and exclusive property of the FCG Companies and that immediately upon the termination of Participant's employment, Participant shall deliver all of the foregoing, as well as any copies Participant may have or may have made thereof, to FCG.

4. **Employer's Right of Invention.** Participant agrees that any inventions or improvements (including, but not limited to, machinery, tools, devices, computer programs, works of authorship, documentation, or processes) that Participant may make, invent, acquire, or suggest, whether patented or unpatented, and copyrightable material made or conceived by Participant, solely or jointly, during Participant's employment with the FCG Companies relating generally to any matter or thing connected in any way with or relating to the work carried on by any FCG Company, or resulting in any way from the use of premises, property or resources owned, leased or contracted for by the FCG Companies (referred to herein as "Developments"), shall (a) be the sole and absolute property of FCG, its assigns and/or its successors without further compensation to me, and (b) be promptly disclosed, along with all materials and data pertaining thereto, to FCG.

5. **Limitation on Assignment.** Any provision in this Agreement requiring Participant to assign rights in any invention does not apply to any invention (a) which was made, invented or acquired by Participant prior to the commencement of Participant's employment with any FCG Company, or (b) where assignment to FCG is prohibited by law.

6. **Grant of Assistance.** Participant agrees, at the request and cost of FCG, to make all reasonable efforts to secure, continue or renew, and/or assist in the securing, continuation, or renewal, of legal protection for a Development in the form of letters patent, copyright or other analogous protection, and to assign to FCG all rights, title and interest in such patent applications, patents, copyrights, or other protection. If FCG is unable, after reasonable effort, to secure Participant's signature on any applications for the stated protections, whether due to Participant's physical or mental incapacity, or for any other reason, Participant hereby irrevocably designates and appoints FCG, by its duly authorized officers and/or agents, as Participant's agent and attorney-in-fact, to act for and in Participant's behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights or other analogous protections thereupon with the same legal force and effect as if executed by Participant.

7. **Non-Competition and Non-Solicitation.** In addition to any non-competition and non-solicitation provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:

(a) **No Solicitation of Known FCG Clients.** Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client. For purposes of these restrictions, a "**Known FCG Client**" shall be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

FCG00000468
CONFIDENTIAL

- 2 -

**(b)     No Solicitation of Employees.** Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

**(c)     Modification of Provisions.** If any non-competition or non-solicitation provision in this Agreement is held to be unreasonable, arbitrary or against public policy, the provision shall be deemed modified as required to be reasonable, non-arbitrary and not against public policy, and may be enforced against Participant as so modified.

**8.     Rescission of Restricted Stock Agreement.** The parties agree and acknowledge that the [not applicable] dated [not applicable] (the "**RSA**") is hereby rescinded and terminated. If, in connection with this Agreement, Participant has entered into an Affirmation Agreement with FCG, then the parties agree and acknowledge that all shares of FCG common stock previously subject to the RSA shall be subject to the terms of **Exhibit A** attached hereto and incorporated herein by this reference.

**9.     Governing Law and Disputes.**

**(a)     Governing Law and Interpretation.** This Agreement shall be interpreted and enforced in accordance with the internal laws of Illinois. The provisions of this Agreement shall be interpreted in accordance with their plain meaning. No provision of this Agreement shall be interpreted against a party as a consequence of that party having drafted said provision.

**(b)     Jury Trial Waivers.** TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED-FOR CONSIDERATION, EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH PARTY HEREBY EXPRESSLY ACKNOWLEDGES THE INCLUSION OF THIS JURY TRIAL WAIVER BY ITS OR HIS INITIALS SET FORTH BELOW.

"Participant"                          FCG

_____          _____
Initials                                    Initials

**(c)     Specific Performance.** Participant acknowledges that the breach of any non-competition or non-solicitation provision contained in this Agreement will result in immediate and irreparable damage to FCG and that money damages alone would be inadequate to compensate FCG. Therefore, Participant agrees that in the event of a breach or threatened breach of any of such provisions, FCG may, in addition to other remedies, immediately obtain and enforce injunctive relief, including but not limited to obtaining and enforcing a temporary restraining order, without bond, prohibiting the breach of such provision(s) and compelling performance hereunder, consent to which is hereby specifically given by Participant.

**(d)     Severability.** Should any provision or portion of this Agreement be held unenforceable or invalid for any reason, the remaining provisions and portions of this Agreement shall be unaffected by such holding.

FCG00000469
CONFIDENTIAL

10.    **General Provisions.**

(a)    **Amendments and Waivers.**  No amendment or waiver of any provision of this Agreement shall be effective unless and until an instrument reflecting the amendment or waiver has been executed by the party or parties charged with such amendment or waiver.

(b)    **Notices.**  Any notices to be given hereunder shall be deemed given upon personal delivery or three business days after mailing, if mailed by certified mail, return receipt requested, postage prepaid.  Notices to FCG shall be addressed to First Consulting Group, Inc., 111 West Ocean Boulevard, Suite 1000, Long Beach, California 90802, Attention: Corporate Secretary or to any subsequent address of FCG's headquarters which Participant could be reasonably expected to be aware of.  Notices to Participant shall be addressed to Participant at his or her last known address shown on the books and records of FCG.  Either party may change his or its address for notices by giving notice of change of address in accordance herewith.

(c)    **Entire Agreement.**  This Agreement, along with any employee agreement signed by Participant with FCG or any subsidiary, represents the entire agreement, arrangement and understanding of the parties with respect to the matters specifically set forth herein, and supercede and terminate any prior agreement, arrangement or understanding.

(d)    **Not an Employment Agreement.**  This Agreement is not an agreement to employ Participant for any fixed or indeterminate period of time. Unless Participant has a separate written employment agreement specifying otherwise, Participant is an at-will employee and either FCG or Participant may terminate Participant's employment at any time with or without cause, and without any advance notice.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first set forth above.

PARTICIPANT

Signed: _____

Peter C Smith

FIRST CONSULTING GROUP, INC.

By: _____

Robert R Holmen
Vice President, General Counsel

FCG00000470
CONFIDENTIAL

**Exhibit A**

**Stock Provisions**

Participant and FCG have entered into the following agreements:

1.      Secured Promissory Note dated [not applicable] (the "**Secured Note**"); and

2.      Loan and Pledge Agreement dated [not applicable] (the "**Loan Agreement**").

Pursuant to that certain Affirmation Agreement of even date herewith, Participant has affirmed the continuing enforceability of the Secured Note and Loan Agreement.  The parties hereto agree and acknowledge that the stock purchase by Participant pursuant to the Secured Note and Loan Agreement (the "**FCG Stock**") shall be subject to the following terms and conditions.

**A.      Secured Note Repayment Obligation.**  The parties agree that Participant shall, each year while any amounts remain due under the Secured Note, pay the greater of the following two amounts in repayment of amounts owed under the Secured Note:  (i) one-half of the after-tax amount of Participant's quarterly or annual bonuses awarded under the bonus plan generally available to similarly situated vice presidents of FCG (but specifically not including any discretionary bonuses that may be awarded from time to time), and (ii) ten percent (10%) of the original principal balance of the Promissory Note.

**B.      Repurchase Right.**

1.      **FCG Repurchase.**  Participant acknowledges and agrees that FCG shall have the right, but not the obligation, to repurchase from Participant all or part of the FCG Stock purchased by Participant prior to FCG's initial public offering on February 13, 1998 (the "**Repurchase Right**").  Such Repurchase Right shall lapse in accordance with the following table, based on the number of Service Years (as defined in subclause 2 below) that Participant has served as a vice president of FCG:

| Service Years | % of Shares Available for Repurchase Right | % of Shares Not Subject to Repurchase Right |
|---|---|---|
| 0 to 2 | 100% | None |
| 3 | 70% | 30% |
| 4 | 60% | 40% |
| 5 | 50% | 50% |
| 6 | 40% | 60% |
| 7 or more | 0% | 100% |

2.      **Service Year.**  "**Service Year**" shall mean a calendar year of service (or in the case of the calendar year in which Participant becomes a vice president of FCG, the remaining portion of such year from the time Participant becomes a vice president) in which Participant completes at least 1,000 hours of continuous service (to be interpreted in the same fashion as the term "hours of service" is determined under the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder) as a vice president of FCG.  In addition, the following interpretations shall apply:

- 5 -

FCG00000471
CONFIDENTIAL

(a)    The FCG Board of Directors (the "**Board**"), in its sole discretion, may determine that a Board approved part-time schedule be deemed a Service Year notwithstanding that Participant does not provide 1,000 hours of continuous service.

(b)    To the extent Participant maintains a continuing relationship with FCG (as determined by the Board in the Board's sole discretion), but does not complete at least 1,000 hours of continuous service during a calendar year, then such Participant shall be credited with a fractional Service Year, such fraction having a numerator equaling the number of hours of continuous service performed by Participant during the relevant calendar year and a denominator equaling 1,000.

(c)    If a break in service occurs, the Board, in its sole discretion, may grant credit for prior Service Years and/or establish a different vesting schedule.

3.    **Additional Lapse or Termination of Repurchase Right.**  In addition to the lapse of FCG's Repurchase Right under subclause (1) above, the following shall apply to the Repurchase Right:

(a)    The Repurchase Right shall lapse so that the first-purchased shares of FCG Stock are the first to shares to no longer be subject to the Repurchase Right. For example, if Participant purchased 10,000 shares of FCG Stock on January 1, 1996, and 15,000 shares on July 1, 1996, and had 5 years of service, FCG's Repurchase Right would lapse with respect to all 10,000 shares purchased on January 1, 1996, and with respect to 2,500 shares purchased on July 1, 1996, with the remaining 12,500 shares purchased July 1, 1996 remaining subject to the Repurchase Right.

(b)    To the extent the Repurchase Right does not terminate or lapse pursuant to another provision of this Section 3, the Repurchase Right shall terminate in its entirety at the later of (A) the end of the calendar year in which Participant attains age 59, and (B) the date that Participant has owned such shares of FCG Stock for at least three years, so long as Participant is serving as a vice president of FCG at such time.

(c)    In the event of the death or permanent disability of Participant while serving as a vice president of FCG, FCG's Repurchase Right shall at that time terminate regardless of Participant's number of Service Years.  Participant shall be deemed to be permanently disabled when a medical doctor, reasonably acceptable to FCG, certifies in writing that Participant is permanently disabled and unable to carry on his or her normal duties at FCG.

(d)    In the event of a "Change in Control," FCG's Repurchase Right shall terminate in its entirety if Participant's employment with FCG is separated based on a "Voluntary Termination with Good Reason" or an "Involuntary Termination without Cause," as each of the foregoing terms in quotation marks is defined in **Section D** below.

FCG00000472
CONFIDENTIAL

4.   **Calculation of Repurchase Amount in Certain Circumstances.** If any payment of benefit received or to be received by Participant under this Transition Agreement would result in all or a portion of such payment to be subject to the excise tax on "golden parachute payments" under Section 4999 of the Code, then Participant's payment shall be either (i) the full payment or (ii) such lesser amount which would result in no portion of the payment being subject to excise tax under Section 4999 of the Code, whichever of the foregoing amounts, taking into account the applicable Federal, state and local employment taxes, income taxes and the excise tax imposed by Section 4999 of the Code, results in the receipt by Participant on an after-tax basis of the greatest amount of the payment notwithstanding that all or some portion of the payment may be taxable under Section 4999 of the Code.

5.   **Sale and Purchase of Shares Subject to FCG's Repurchase Right.**

  (a)   Upon separation of Participant's employment from FCG for any reason (excluding death, permanent disability or Change in Control), FCG may, but is not required to, purchase all or any portion of Participant's FCG Stock which remains subject to the Repurchase Right at the price Participant paid for the shares of FCG Stock plus the Growth Factor (as defined in subclause (ii) below) from the date Participant purchased the FCG Stock, compounded quarterly. The decision whether to exercise FCG's Repurchase Right shall be made by FCG in its sole discretion, and in all events must be communicated to Participant within sixty (60) days following Participant's separation of employment.

  (b)   "**Growth Factor**" shall mean (A) for quarters ended on or before June 30, 2000, the rate set forth in **Section C** below and (B) for quarters ending after July 1, 2000, the average interest rate FCG pays to a commercial lending institution in a calendar quarter or, if FCG has no borrowings for a particular quarter, then the prime rate on the first day of the quarter, as announced in the Wall Street Journal or if the Wall Street Journal discontinues such announcements, then the reference lending rate as announced by Bank of America. The Growth Factor for all shares shall commence accruing on the later of (X) January 1, 1994 or (Y) the date that the shares were purchased from FCG.

  (c)   FCG Stock which remains subject to FCG's Repurchase Right may not be sold by Participant to anyone other than FCG under any circumstances unless and until FCG waives (in writing) its Repurchase Right or the sixty (60)-day period set forth in subclause (i) above lapses without FCG having properly notified Participant.

6.   **Cost Basis of Certain Shares of FCG Stock.** The Growth Factor for shares purchased prior to December 31, 1993 shall commence accruing on January 1, 1994. All FCG Stock purchased by a Participant on or before December 31, 1993 shall be deemed to have a cost basis of $1.765 per share for purposes of FCG's Repurchase Right.

7.   **Legends.** In addition to any other legends required by FCG, Participant acknowledges and agrees that certificates for shares of FCG Stock subject to this Section 3 shall bear the following legend:

FCG00000473
CONFIDENTIAL

"The sale, transfer, assignment or hypothecation of the shares represented by this certificate are subject to substantial restrictions as set forth in that certain Affirmation Agreement and any amendments thereto ("Agreement") dated [not applicable], between the Issuer of these shares and the owner of these shares. All of the provisions of said Agreement are incorporated herein by this reference."

**C.     Growth Factor.**

| Year | Quarter | Rate (Annual) |
|------|---------|---------------|
| 1994 | First   | 6.52%         |
|      | Second  | 7.40          |
|      | Third   | 8.00          |
|      | Fourth  | 7.75          |
| 1995 | First   | 8.50          |
|      | Second  | 9.00          |
|      | Third   | 9.00          |
|      | Fourth  | 8.75          |
| 1996 | First   | 8.50          |
|      | Second  | 8.25          |
|      | Third   | 8.25          |
|      | Fourth  | 8.25          |
| 1997 | First   | 9.00          |
|      | Second  | 9.00          |
|      | Third   | 9.00          |
|      | Fourth  | 9.00          |
| 1998 | First   | 8.50          |
|      | Second  | 8.50          |
|      | Third   | 8.50          |
|      | Fourth  | 8.25          |
| 1999 | First   | 7.75          |
|      | Second  | 7.75          |
|      | Third   | 8.00          |
|      | Fourth  | 8.25          |
| 2000 | First   | 8.25          |
|      | Second  | 9.00          |
|      | Third   | 9.00          |

**D.     Certain Definitions.**

1.     **Change in Control.**  A "**Change in Control**" shall mean:  (i) a dissolution, liquidation, or sale of all or substantially all of the assets of FCG; (ii) a merger or consolidation in which FCG is not the surviving corporation; (iii) a reverse merger in which FCG is the surviving corporation but the shares of FCG Stock outstanding immediately preceding the merger are converted by virtue of the merger into other property, whether in the form of securities, cash or otherwise; or (iv) the individuals who, as of the date of this Agreement, are members of the Board (the "**Incumbent Board**"), cease for any reason to constitute at least 50% of the Board, provided, however, that if the election, or nomination for election, by FCG's stockholders of any new director was approved by a vote of at least 50% of the Incumbent Board, such new director shall, for purposes of this subsection 11(a), be considered as a member of the Incumbent Board.

FCG00000474
CONFIDENTIAL

2. **Voluntary Termination with Good Reason.** The term "**Voluntary Termination with Good Reason**" means (i) the Participant's resignation, with Good Reason, as an employee of FCG within one month prior to a Change in Control or (ii) the Participant's resignation, with Good Reason, as an employee of the surviving or acquiring corporation within thirty-six (36) months after a Change in Control. "**Good Reason**" means any of the following:

    (a)    reduction by more than 5% of the Participant's rate of compensation as in effect one month prior to the Change in Control;

    (b)    failure to provide a package of welfare benefit plans which, taken as a whole, provide substantially similar benefits to those in which the Participant was entitled to participate one month prior to the Change in Control (except that employee contributions may be raised to the extent of any cost increases imposed by third parties);

    (c)    to the extent Participant's regular place of performing services for FCG is an office owned or leased by FCG, if Participant is required to either (A) relocate to an FCG office that is more than thirty-five (35) miles from the Participant's FCG office one month prior to the Change in Control, or (B) permanently change Participant's regular place of performing services from an FCG office to client locations greater than fifty (50) miles from Participant's FCG office as of one month prior to the Change in Control, in each case unless Participant accepts such relocation opportunity, and for purposes of this subclause (3), a Participant shall be deemed to have a "regular place of performing services" in an FCG office if Participant is required or expected to spend at least two days per week on average over the prior six month period in that specific FCG office; or

    (d)    material breach by FCG or any successor to FCG of any of the material provisions of this Agreement.

3. **Involuntary Termination without Cause.** Under this Agreement, the term "**Involuntary Termination without Cause**" means (i) the involuntary termination, without Cause, of the Participant's employment by FCG within one month prior to a Change in Control or (ii) the involuntary termination, without Cause, of the Participant's employment with the surviving or acquiring corporation within thirty-six (36) months after a Change in Control. "**Cause**" means any of the following:

    (a)    Participant's theft, dishonesty, or falsification of FCG documents or records;

    (b)    Participant's intentional improper use or disclosure of FCG's confidential or proprietary information;

    (c)    Participant's intentional failure to perform any reasonable assigned duties after written notice from FCG of, and a reasonable opportunity to cure, such failure; or

    (d)    Participant's conviction (including any plea of guilty or nolo contendere) of any criminal act that is a felony or involves moral turpitude.

FCG00000475
CONFIDENTIAL

**Exhibit B.**    **Andrew Smith Vice President Agreement**

Andrew M Smith

## VICE PRESIDENT AGREEMENT

This Vice President Agreement (the "**Agreement**") is entered into as of July 1, 2003, between First Consulting Group, Inc. ("**FCG**") and Andrew M Smith ("**Participant**").

WHEREAS, Participant is a Vice President with First Consulting Group, a subsidiary of FCG, Inc.;

WHEREAS, in connection with Participant's position as Vice President of FCG, Participant is required to agree to certain matters, and is entitled to certain benefits, all as set forth in this Agreement; and

WHEREAS, the parties to this Agreement believe it to be in the best interests of FCG and Participant to enter into this Agreement and to fulfill each party's respective obligations and covenants hereunder;

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      **Confidentiality.**  Participant agrees that Participant will not, during or after Participant's employment, disclose or use the confidential proprietary information of either FCG or any FCG subsidiary or affiliate (each, along with FCG, an "**FCG Company**"), or of any third party to which any FCG Company is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or other entity for any reason or purpose whatsoever. Participant further agrees not to make use of any confidential proprietary information for Participant's own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of Participant's employment.

2.      **Limitations.**  The restrictions set forth in Section 1 shall not apply to the following:  (a) any information that, at the time of disclosure, is then publicly known, provided that Participant was not responsible, directly or indirectly, for permitting such information to become publicly known without the consent of its owner(s); (b) any information that is received by Participant from a third party outside of Participant's employment relationship with any FCG Company and that was disclosed to Participant without any confidentiality obligation or any known breach of a confidentiality obligation by such third party; (c) use of such information in the scope and course of Participant's duties for the FCG Companies; or (d) any information that may be required by law or an order of any court or agency of competent jurisdiction to be disclosed.  In the case of subclause (d) above, Participant agrees to notify FCG in advance if Participant is required by law or court order to disclose any such information, and Participant shall cooperate with any efforts that FCG may take to limit the disclosure of such information or seek confidential treatment over the disclosure of such information.

3.      **Proprietary Matter.**  Participant shall not, during the term of Participant's employment with any FCG Company, take, use or permit to be used by any person, firm, corporation or other entity (other than the FCG Companies) notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer

FCG00000005
**CONFIDENTIAL**

Andrew M Smith

programs, data, documentation or other materials of any nature relating to any matter within the scope of business of the FCG Companies or concerning any of their dealings, clients, personnel or affairs. Participant further agrees that Participant shall not, after termination of Participant's employment with the FCG Companies, use or permit to be used any such notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer programs, data, documentation or other materials. Participant agrees that all of the foregoing matter shall be and remain the sole and exclusive property of the FCG Companies and that immediately upon the termination of Participant's employment, Participant shall deliver all of the foregoing, as well as any copies Participant may have or may have made thereof, to FCG.

4.    **Employer's Right of Invention.**  Participant agrees that any inventions or improvements (including, but not limited to, machinery, tools, devices, computer programs, works of authorship, documentation, or processes) that Participant may make, invent, acquire, or suggest, whether patented or unpatented, and copyrightable material made or conceived by Participant, solely or jointly, during Participant's employment with the FCG Companies relating generally to any matter or thing connected in any way with or relating to the work carried on by any FCG Company, or resulting in any way from the use of premises, property or resources owned, leased or contracted for by the FCG Companies (referred to herein as "Developments"), shall (a) be the sole and absolute property of FCG, its assigns and/or its successors without further compensation to me, and (b) be promptly disclosed, along with all materials and data pertaining thereto, to FCG.

5.    **Limitation on Assignment.**  Any provision in this Agreement requiring Participant to assign rights in any invention does not apply to any invention (a) which was made, invented or acquired by Participant prior to the commencement of Participant's employment with any FCG Company, or (b) where assignment to FCG is prohibited by law.

6.    **Grant of Assistance.**  Participant agrees, at the request and cost of FCG, to make all reasonable efforts to secure, continue or renew, and/or assist in the securing, continuation, or renewal, of legal protection for a Development in the form of letters patent, copyright or other analogous protection, and to assign to FCG all rights, title and interest in such patent applications, patents, copyrights, or other protection.  If FCG is unable, after reasonable effort, to secure Participant's signature on any applications for the stated protections, whether due to Participant's physical or mental incapacity, or for any other reason, Participant hereby irrevocably designates and appoints FCG, by its duly authorized officers and/or agents, as Participant's agent and attorney-in-fact, to act for and in Participant's behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights or other analogous protections thereupon with the same legal force and effect as if executed by Participant.

7.    **Non-Competition and Non-Solicitation.**  In addition to any non-competition and non-solicitation  provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:

(a)    **No Solicitation of Known FCG Clients.**  Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client.  For purposes of these restrictions, a **"Known FCG Client"** shall

FCG00000006
CONFIDENTIAL

Andrew M Smith

be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

**(b)    No Solicitation of Employees.**  Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

**(c)    Modification of Provisions.**  If any non-competition or non-solicitation provision in this Agreement is held to be unreasonable, arbitrary or against public policy, the provision shall be deemed modified as required to be reasonable, non-arbitrary and not against public policy, and may be enforced against Participant as so modified.

8.    **Governing Law and Disputes.**

**(a)    Governing Law and Interpretation.**  This Agreement shall be interpreted and enforced in accordance with the internal laws of Illinois. The provisions of this Agreement shall be interpreted in accordance with their plain meaning. No provision of this Agreement shall be interpreted against a party as a consequence of that party having drafted said provision.

**(b)    Jury Trial Waivers.**  TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED-FOR CONSIDERATION, EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH PARTY HEREBY EXPRESSLY ACKNOWLEDGES THE INCLUSION OF THIS JURY TRIAL WAIVER BY ITS OR HIS INITIALS SET FORTH BELOW.

"Participant"                    FCG



Initials                         Initials

**(c)    Specific Performance.**  Participant acknowledges that the breach of any non-competition or non-solicitation provision contained in this Agreement will result in immediate and irreparable damage to FCG and that money damages alone would be inadequate to compensate FCG. Therefore, Participant agrees that in the event of a breach or threatened breach of any of such provisions, FCG may, in addition to other remedies, immediately obtain and enforce injunctive relief, including but not limited to obtaining and enforcing a temporary restraining order, without bond, prohibiting the breach of such provision(s) and compelling performance hereunder, consent to which is hereby specifically given by Participant.

**(d)    Severability.**  Should any provision or portion of this Agreement be held unenforceable or invalid for any reason, the remaining provisions and portions of this Agreement shall be unaffected by such holding.

9.    **General Provisions.**

**(a)    Amendments and Waivers.**  No amendment or waiver of any provision of this Agreement shall be effective unless and until an instrument reflecting the amendment or waiver has been executed by the party or parties charged with such amendment or waiver.

FCG00000007
CONFIDENTIAL



Andrew M Smith

    **(b)**    **Notices.**  Any notices to be given hereunder shall be deemed given upon personal delivery or three business days after mailing, if mailed by certified mail, return receipt requested, postage prepaid.  Notices to FCG shall be addressed to First Consulting Group, Inc., 111 West Ocean Boulevard, Suite 1000, Long Beach, California 90802, Attention: Corporate Secretary or to any subsequent address of FCG's headquarters which Participant could be reasonably expected to be aware of.  Notices to Participant shall be addressed to Participant at his or her last known address shown on the books and records of FCG.  Either party may change his or its address for notices by giving notice of change of address in accordance herewith.

    **(c)**    **Entire Agreement.**  This Agreement, along with any employee agreement signed by Participant with FCG or any subsidiary, represents the entire agreement, arrangement and understanding of the parties with respect to the matters specifically set forth herein, and supercede and terminate any prior agreement, arrangement or understanding.

    **(d)**    **Not an Employment Agreement.**  This Agreement is not an agreement to employ Participant for any fixed or indeterminate period of time. Unless Participant has a separate written employment agreement specifying otherwise, Participant is an at-will employee and either FCG or Participant may terminate Participant's employment at any time with or without cause, and without any advance notice.

    **IN WITNESS WHEREOF,** the parties have signed this Agreement as of the date first set forth above.

**PARTICIPANT**                         **FIRST CONSULTING GROUP, INC.**

Signed: _Andrew M Smith_ _____    By: _Michael Zuercher_ _____
        Andrew M Smith                        Michael Zuercher
                                       Vice President, General Counsel

**FCG00000008**
**CONFIDENTIAL**

**Exhibit C.**    **Swenson Vice President Agreement**

Mar '03 06 09:07p                                                                                      p.1

## VICE PRESIDENT AGREEMENT

This Vice President Agreement (the "**Agreement**") is entered into as of March 6, 2006, between First Consulting Group, Inc. ("**FCG**") and Melanie Swenson ("**Participant**").

WHEREAS, Participant is a Vice President with FCG CSI, Inc. dba First Consulting Group, a subsidiary of FCG;

WHEREAS, in connection with Participant's position as Vice President of FCG, Participant is required to agree to certain matters, and is entitled to certain benefits, all as set forth in this Agreement; and

WHEREAS, the parties to this Agreement believe it to be in the best interests of FCG and Participant to enter into this Agreement and to fulfill each party's respective obligations and covenants hereunder;

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     **Confidentiality.** Participant agrees that Participant will not, during or after Participant's employment, disclose or use the confidential proprietary information of either FCG or any FCG subsidiary or affiliate (each, along with FCG, an "**FCG Company**"), or of any third party to which any FCG Company is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or other entity for any reason or purpose whatsoever. Participant further agrees not to make use of any confidential proprietary information for Participant's own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of Participant's employment.

2.     **Limitations.** The restrictions set forth in Section 1 shall not apply to the following: (a) any information that, at the time of disclosure, is then publicly known, provided that Participant was not responsible, directly or indirectly, for permitting such information to become publicly known without the consent of its owner(s); (b) any information that is received by Participant from a third party outside of Participant's employment relationship with any FCG Company and that was disclosed to Participant without any confidentiality obligation or any known breach of a confidentiality obligation by such third party; (c) use of such information in the scope and course of Participant's duties for the FCG Companies; or (d) any information that may be required by law or an order of any court or agency of competent jurisdiction to be disclosed. In the case of subclause (d) above, Participant agrees to notify FCG in advance if Participant is required by law or court order to disclose any such information, and Participant shall cooperate with any efforts that FCG may take to limit the disclosure of such information or seek confidential treatment over the disclosure of such information.

3.     **Proprietary Matter.** Participant shall not, during the term of Participant's employment with any FCG Company, take, use or permit to be used by any person, firm, corporation or other entity (other than the FCG Companies) notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer programs, data, documentation or other materials of any nature relating to any matter within the scope of business of the FCG Companies or concerning any

FCG00001000
CONFIDENTIAL

of their dealings, clients, personnel or affairs. Participant further agrees that Participant shall not, after termination of Participant's employment with the FCG Companies, use or permit to be used any such notes, memoranda, reports, lists, records, employee information, client data, drawings, sketches, specifications, computer programs, data, documentation or other materials. Participant agrees that all of the foregoing matter shall be and remain the sole and exclusive property of the FCG Companies and that immediately upon the termination of Participant's employment, Participant shall deliver all of the foregoing, as well as any copies Participant may have or may have made thereof, to FCG.

4.    **Employer's Right of Invention.** Participant agrees that any inventions or improvements (including, but not limited to, machinery, tools, devices, computer programs, works of authorship, documentation, or processes) that Participant may make, invent, acquire, or suggest, whether patented or unpatented, and copyrightable material made or conceived by Participant, solely or jointly, during Participant's employment with the FCG Companies relating generally to any matter or thing connected in any way with or relating to the work carried on by any FCG Company, or resulting in any way from the use of premises, property or resources owned, leased or contracted for by the FCG Companies (referred to herein as "Developments"), shall (a) be the sole and absolute property of FCG, its assigns and/or its successors without further compensation to me, and (b) be promptly disclosed, along with all materials and data pertaining thereto, to FCG.

5.    **Limitation on Assignment.** Any provision in this Agreement requiring Participant to assign rights in any invention does not apply to any invention (a) which was made, invented or acquired by Participant prior to the commencement of Participant's employment with any FCG Company, or (b) where assignment to FCG is prohibited by law.

6.    **Grant of Assistance.** Participant agrees, at the request and cost of FCG, to make all reasonable efforts to secure, continue or renew, and/or assist in the securing, continuation, or renewal, of legal protection for a Development in the form of letters patent, copyright or other analogous protection, and to assign to FCG all rights, title and interest in such patent applications, patents, copyrights, or other protection. If FCG is unable, after reasonable effort, to secure Participant's signature on any applications for the stated protections, whether due to Participant's physical or mental incapacity, or for any other reason, Participant hereby irrevocably designates and appoints FCG, by its duly authorized officers and/or agents, as Participant's agent and attorney-in-fact, to act for and in Participant's behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights or other analogous protections thereupon with the same legal force and effect as if executed by Participant.

7.    **Non-Competition and Non-Solicitation.** In addition to any non-competition and non-solicitation provisions provided under Participant's employee agreement with any FCG Company, Participant hereby agrees to the following restrictions for one year following separation of Participant's employment with FCG, regardless of the reasons for such separation of employment:

(a)    **No Solicitation of Known FCG Clients.** Participant hereby agrees that, without the prior written consent of FCG, Participant (i) shall not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) shall not, directly or indirectly, solicit, divert or take away any Known FCG Client. For purposes of these restrictions, a "Known FCG Client" shall be any past, present or prospective FCG client that Participant provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

(b)    **No Solicitation of Employees.** Participant agrees to not, directly or indirectly, solicit, divert or take away any employee of FCG.

**FCG00001001**
**CONFIDENTIAL**

(c)    **Modification of Provisions.**  If any non-competition or non-solicitation provision in this Agreement is held to be unreasonable, arbitrary or against public policy, the provision shall be deemed modified as required to be reasonable, non-arbitrary and not against public policy, and may be enforced against Participant as so modified.

8.    **Governing Law and Disputes.**

(a)    **Governing Law and Interpretation.**  This Agreement shall be interpreted and enforced in accordance with the internal laws of Montana.  The provisions of this Agreement shall be interpreted in accordance with their plain meaning.  No provision of this Agreement shall be interpreted against a party as a consequence of that party having drafted said provision.

(b)    **Jury Trial Waivers.**  TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED-FOR CONSIDERATION, EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATING TO THIS AGREEMENT.  EACH PARTY HEREBY EXPRESSLY ACKNOWLEDGES THE INCLUSION OF THIS JURY TRIAL WAIVER BY ITS OR HIS INITIALS SET FORTH BELOW.

"Participant"                                    FCG


_MS_____                    _____
Initials                                         Initials

(c)    **Specific Performance.**  Participant acknowledges that the breach of any non-competition or non-solicitation provision contained in this Agreement will result in immediate and irreparable damage to FCG and that money damages alone would be inadequate to compensate FCG.  Therefore, Participant agrees that in the event of a breach or threatened breach of any of such provisions, FCG may, in addition to other remedies, immediately obtain and enforce injunctive relief, including but not limited to obtaining and enforcing a temporary restraining order, without bond, prohibiting the breach of such provision(s) and compelling performance hereunder, consent to which is hereby specifically given by Participant.

(d)    **Severability.**  Should any provision or portion of this Agreement be held unenforceable or invalid for any reason, the remaining provisions and portions of this Agreement shall be unaffected by such holding.

9.    **General Provisions.**

(a)    **Amendments and Waivers.**  No amendment or waiver of any provision of this Agreement shall be effective unless and until an instrument reflecting the amendment or waiver has been executed by the party or parties charged with such amendment or waiver.

(b)    **Notices.**  Any notices to be given hereunder shall be deemed given upon personal delivery or three business days after mailing, if mailed by certified mail, return receipt requested, postage prepaid.  Notices to FCG shall be addressed to First Consulting Group, Inc., 111 West Ocean Boulevard, Suite 1000, Long Beach, California 90802, Attention: Corporate Secretary or to any subsequent address of FCG's headquarters which Participant could be reasonably expected to be aware of.  Notices to Participant shall be addressed to Participant at his or her last known address shown on the books and

FCG00001002
CONFIDENTIAL

records of FCG. Either party may change his or its address for notices by giving notice of change of address in accordance herewith.

        **(c)     Entire Agreement.**  This Agreement, along with any employee agreement signed by Participant with FCG or any subsidiary, represents the entire agreement, arrangement and understanding of the parties with respect to the matters specifically set forth herein, and supercede and terminate any prior agreement, arrangement or understanding.

        **(d)     Not an Employment Agreement.**  This Agreement is not an agreement to employ Participant for any fixed or indeterminate period of time. Unless Participant has a separate written employment agreement specifying otherwise, Participant is an at-will employee and either FCG or Participant may terminate Participant's employment at any time with or without cause, and without any advance notice.

        IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first set forth above.

**PARTICIPANT**                                                    **FIRST CONSULTING GROUP, INC.**

Signed: _____                      By: _____
       Melanie Swenson                                              Tom Watford
                                 Chief Financial Officer

FCG00001003
CONFIDENTIAL

**Exhibit D.**    **Elliott Employment Agreement**



# *Employment Agreement*

In consideration and as a condition of my employment by First Consulting Group, Inc. (hereafter "FCG"), contemporaneous with my hiring by FCG, and intending to be legally bound hereby, I agree to the following:

1. *Acknowledgments.* I acknowledge that:

a) FCG is involved in the business of providing computer-related consulting services to clients throughout the United States, Canada, Honduras and Europe.

b) During the course of my employment with FCG, I will at various times receive, conceive, develop or otherwise have access to information that is proprietary and confidential to FCG, its clients and/or its partners, including, but not limited to, information regarding current and prospective clients, employee-related materials, marketing and/or financial data, and work-products belonging to FCG, its partners and/or its clients, and that such information, as it may exist from time to time, constitutes valuable, special and unique assets of FCG, its partners and/or its clients.

2. *Confidentiality.* I will not, during or after my employment, in whole or in part, disclose or use the confidential proprietary information of either FCG or of any third party to which FCG is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or other entity for any reason or purpose whatsoever; nor shall I make use of any confidential proprietary information for my own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of my employment.

These restrictions shall not apply to:

a) any information that, at the time of disclosure, is then publicly known, provided that I was not responsible, directly or indirectly, for permitting such information to become publicly known without the consent of its owner(s);

b) any information that is received by me from a third party outside of FCG and that was disclosed to me without any confidentiality obligation or any known breach of a confidentiality obligation by such third party;

c) any information that is expressly approved for release by written authorization from FCG; or

d) any information that may be required by law or an order of any court or agency of competent jurisdiction to be disclosed.

3. *Proprietary Matter.* I will not, during my employment, take, use or permit to be used by any person, firm, corporation or other entity (other than FCG) notes, memoranda, reports, lists, records, employee information, drawings, sketches, specifications, computer programs, data, documentation or other materials of any nature relating to any matter within the scope of business of FCG or concerning any of its dealings, personnel or affairs. I further agree that I shall not, after termination of my employment with FCG, use or permit to be used any such notes, memoranda, reports, lists, records, employee information, drawings, sketches, specifications, computer programs, data, documentation or other materials. I agree that all of the foregoing matter shall be and remain the sole and exclusive property of FCG and that immediately upon the termination of my employment, I shall deliver all of the foregoing, as well as any copies I might have or might have made thereof, to FCG.

4. *Employer's Right of Invention.* I agree that any inventions or improvements (including, but not limited to, machinery, tools, devices, computer programs, works of authorship, documentation, or processes) that I may make, invent, acquire, or suggest, whether patented or unpatented, and copyrightable material made or conceived by me, solely or jointly, during my employment with FCG relating generally to any matter or thing connected in any way with or relating to the work carried on by FCG or any other company or person with which FCG is doing business, or resulting in any way from the use of premises, property or resources owned, leased or contracted for by FCG (referred to herein as "Developments"), shall (a) be the sole and absolute property of FCG, its assigns and/or its successors without further compensation to me, and (b) be promptly disclosed, along with all materials and data pertaining thereto, to FCG.

I agree, at the request and cost of FCG, to make all reasonable efforts to secure, continue or renew, and/or assist in the securing, continuation, or renewal, of legal protection for a Development in the form of letters patent, copyright or other analogous protection, and to assign to FCG all rights, title and interest in such patent applications, patents, copyrights, or other protection.

FCG00004082
CONFIDENTIAL

In the event FCG is unable, after reasonable effort, to secure my signature on any applications for the stated protections, whether due to my physical or mental incapacity, or for any other reason, I hereby irrevocably designate and appoint FCG, by its duly authorized officers and/or agents, as my agent and attorney-in-fact, to act for and in my behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights or other analogous protections thereupon with the same legal force and effect as if executed by me.

Any provision in this Agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provisions of Section 2870 of the California Labor Code. That Section provides that the requirement to assign "shall not apply to an invention that I have developed entirely on my own time without using FCG's equipment, supplies, facilities or trade secret information except for those inventions that either 1) relate at the time of conception or reduction to practice of the invention to FCG's business, or actual or demonstrably anticipated research or development of FCG; or 2) result from any work I performed for FCG. If any invention is described in a patent application or disclosed to third parties by me within one year of termination of my employment with FCG, and which relates to the then-existing reasonably anticipated business, research or development of FCG, it is to be presumed that the invention was conceived during my employment with FCG and that the invention shall belong to FCG unless I prove that it was conceived following the termination of my employment with FCG.

5. *Non-Competition.* If not otherwise enforceable, I agree that I will not, within twelve (12) months from and after the termination of my employment with FCG (in whatever manner termination may occur), directly or indirectly, either as principal, agent, employee or in any other capacity, enter or engage in any employment or contractual relationship which involves any customer of FCG with whom I have had any contact on behalf of FCG within the one (1) year preceding the termination of my employment with FCG.

6. *Non-Solicitation.* I agree that I will not, directly or indirectly, solicit, divert or take away any employee, customer, past customer or potential customer of FCG for twelve (12) months following the termination of my employment with FCG. For purposes of this paragraph, a "potential customer" shall mean any corporation, partnership, individual (or department, unit or affiliate thereof) that has received an oral or written proposal for services from FCG within the one (1) year preceding the termination of my employment with FCG, and a "past customer" shall mean any corporation, partnership, individual (or department, unit or affiliate thereof) which has utilized the services of FCG within the one (1) year preceding the termination of my employment with FCG.

7. *Associate Handbook.* I agree that I will read and follow the procedures and requirements set forth in FCG's *Associate Handbook*, and will follow any future changes to the Handbook.

8. *Non-Discrimination/Non Harassment Policy.* I understand that FCG has a strict policy against illegal discrimination and harassment and has procedures available for investigating and preventing any such discrimination or harassment. I agree that I will abide by the non-discrimination and harassment policies and will use the procedures available to prevent discrimination and harassment and will immediately bring any such behaviors to the attention of Human Resources.

9. *Employment-at-Will.* I agree that this Employee Agreement does not constitute in any way a guarantee of employment and that, at any time, with or without cause, I may resign from my employment with FCG or FCG may terminate my employment.

10. *Remedies.* I acknowledge that the types and periods of restrictions imposed in the provisions of this Agreement are fair and reasonably calculated to protect FCG, its assets and the goodwill associated with its business. No provision of this Agreement shall limit in any way FCG's rights under applicable law to fair and equitable remedy, including monetary damages, specific performance, injunction and other equitable remedies. Should FCG retain counsel in order to enforce or prevent the breach of any provision in Paragraphs 1-6 only of this Agreement, FCG shall be entitled to reasonable attorneys' fees and costs for services rendered if it prevails.

11. *No Right to a Jury Trial.* I agree that I and FCG expressly waive the right to a jury trial on any issue concerning my employment.

FCG00004083
CONFIDENTIAL

**12.Non-Waiver.** I agree that any delay or failure by FCG to exercise any right under this Agreement will not constitute a waiver of that or any other right provided for in this Agreement.

**13.Severability.** I agree that the invalidity or unenforceability of any particular provision of this Agreement for any reason whatsoever shall not affect the other provisions hereof and that such invalid or unenforceable provisions shall be limited and/or reduced by judicial order so as to be enforceable to the maximum extent of applicable law. In the event such judicial limitation or reduction is not possible, this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

**14.Only Change in Writing.** The terms of this Employment Agreement can only be changed in writing. In order for it to be effective against me, I must sign any written change to the Agreement; in order for the change to be effective against FCG, it must be signed by the authorized representative of FCG Human Resources.

**15.Binding Effect.** My obligations under this Agreement shall survive the termination of my employment with FCG and shall be binding upon my heirs, administrators, personal representatives, successors, and assigns. In addition, this Agreement will be for the benefit of FCG, its successors, and its assigns.

_____
Signature

_____
Print Name

_____
Date Signed

3

FCG00004084
CONFIDENTIAL

**Exhibit E.**      **Egli Employee Agreement**



## Employee Agreement

In consideration and as a condition of my employment by FCG CSI, Inc. or any of its affiliated companies (hereafter "FCG"), and intending to be legally bound hereby, I agree to the following:

1.  *Acknowledgments.* I acknowledge that:

    a)  FCG is involved in the business of providing consulting, software development, systems integration, outsourcing and applied research services primarily for healthcare, pharmaceutical, and other life sciences organizations throughout the world.  References to FCG in this Agreement shall mean FCG (as defined above) and its parent companies, subsidiaries and affiliates.

    b)  During the course of my employment with FCG, I will at various times receive, conceive, develop or otherwise have access to information that is proprietary and confidential to FCG, its clients and/or its partners, including, but not limited to, information regarding current and prospective clients, employee-related materials, marketing and/or financial data, and work-products belonging to FCG, its partners and/or its clients, and that such information, as it may exist from time to time, constitutes valuable, special and unique assets of FCG, its partners and/or its clients.

    c)  Certain personal information included as part of your new-hire package (e.g., emergency contact information, phone numbers and addresses) will be shared with your supervisors or the Vice President of your business unit for emergency and/or valid business purposes.  Consequently, you agree that your supervisors and/or business unit Vice President may only use such personal information for emergency or business purposes, unless you otherwise agree.

2.  *Confidentiality.* I will not, during or after my employment, in whole or in part, disclose or use the confidential proprietary information of either FCG or of any third party to which FCG is obligated to keep any such information confidential (including, but not limited to trade secrets or processes involving inventions, products, designs, methods, know-how, techniques, systems, processes, computer programs, technical information, customer lists, financial data, business and/or marketing plans and proposals) to any person, firm, corporation, association or other entity for any reason or purpose whatsoever; nor shall I make use of any confidential proprietary information for my own purposes or for the benefit of any person, firm, corporation or other entity (other than the owner of such information) under any circumstances during or after the termination of my employment.

These restrictions shall not apply to:

    a)  any information that, at the time of disclosure, is then publicly known, provided that I was not responsible, directly or indirectly, for permitting such information to become publicly known without the consent of its owner(s);

    b)  any information that is received by me from a third party outside of FCG and that was disclosed to me without any confidentiality obligation or any known breach of a confidentiality obligation by such third party;

    c)  any information that is expressly approved for release by written authorization from FCG; or

    d)  any information that may be required by law or an order of any court or agency of competent jurisdiction to be disclosed.

3.  *Proprietary Matter.* I will not, during my employment, take, use or permit to be used by any person, firm, corporation or other entity (other than FCG) notes, memoranda, reports, lists, records, employee information, drawings, sketches, specifications, computer programs, data, documentation or other materials of any nature relating to any matter within the scope of business of FCG or concerning any of its dealings, personnel or affairs. I further agree that I shall not, after termination of my employment with FCG, use or permit to be used any such notes, memoranda, reports, lists, records, employee information,

FCG00001604
CONFIDENTIAL

drawings, sketches, specifications, computer programs, data, documentation or other materials. I agree that all of the foregoing matter shall be and remain the sole and exclusive property of FCG and that immediately upon the termination of my employment, I shall deliver all of the foregoing, as well as any copies I might have or might have made thereof, to FCG.

4.    *Employer's Right of Invention.* I agree that any inventions or improvements (including, but not limited to, machinery, tools, devices, computer programs, works of authorship, documentation, or processes) that I may make, invent, acquire, or suggest, whether patented or unpatented, and copyrightable material made or conceived by me, solely or jointly, during my employment with FCG relating generally to any matter or thing connected in any way with or relating to the work carried on by FCG or any other company or person with which FCG is doing business, or resulting in any way from the use of premises, property or resources owned, leased or contracted for by FCG (referred to herein as "Developments"), shall (a) be the sole and absolute property of FCG, its assigns and/or its successors without further compensation to me, and (b) be promptly disclosed, along with all materials and data pertaining thereto, to FCG.

I agree, at the request and cost of FCG, to make all reasonable efforts to secure, continue or renew, and/or assist in the securing, continuation, or renewal, of legal protection for a Development in the form of letters patent, copyright or other analogous protection, and to assign to FCG all rights, title and interest in such patent applications, patents, copyrights, or other protection.

In the event FCG is unable, after reasonable effort, to secure my signature on any applications for the stated protections, whether due to my physical or mental incapacity, or for any other reason, I hereby irrevocably designate and appoint FCG, by its duly authorized officers and/or agents, as my agent and attorney-in-fact, to act for and in my behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights or other analogous protections thereupon with the same legal force and effect as if executed by me.

Any provision in this Agreement requiring me to assign my rights in any invention does not apply to an invention, which qualifies under the provisions of Section 2870 of the California Labor Code. That Section provides that the requirement to assign "shall not apply to an invention that I have developed entirely on my own time without using FCG's equipment, supplies, facilities or trade secret information except for those inventions that either 1) relate at the time of conception or reduction to practice of the invention to FCG's business, or actual or demonstrably anticipated research or development of FCG; or 2) result from any work I performed for FCG. If any invention is described in a patent application or disclosed to third parties by me within one year of termination of my employment with FCG, and which relates to the then-existing reasonably anticipated business, research or development of FCG, it is to be presumed that the invention was conceived during my employment with FCG and that the invention shall belong to FCG unless I prove that it was conceived following the termination of my employment with FCG.

5.    *Non-Solicitation.* I hereby agree to the following restrictions for one year following separation of my employment with FCG, regardless of the reasons for such separation of employment:

a)    **No Services to or Solicitation of Known FCG Clients.** I hereby agree that, without the prior written consent of FCG, I (i) will not provide any services, directly or indirectly, and whether as an employee, consultant, independent contractor or otherwise, to or on behalf of any Known FCG Client, and (ii) will not, directly or indirectly, solicit, divert or take away any Known FCG Client. For purposes of these restrictions, a **"Known FCG Client"** shall be any past, present or prospective FCG client that I provided services for, participated in preparation or delivery of any oral or written proposal for or otherwise had contact with during the last 18 months while at FCG.

b)    **No Solicitation of Employees.** I agree to not, directly or indirectly, solicit, divert or take away any employee of FCG.

6.    *Non-Discrimination/Non Harassment Policy.* I understand that FCG has a strict policy against illegal discrimination and harassment and has procedures available for investigating and preventing any such discrimination or harassment. I agree that I will abide by the non-discrimination and harassment policies and will use the procedures available to prevent discrimination and harassment and will immediately bring any such behaviors to the attention of Human Resources.

7.    *Employment-at-Will.* I agree that this Employee Agreement does not constitute in any way a guarantee of employment and that, at any time, with or without cause, I may resign from my employment with FCG or FCG may terminate my employment.

**FCG00001605**
**CONFIDENTIAL**

8.     *Remedies.* I acknowledge that the types and periods of restrictions imposed in the provisions of this Agreement are fair and reasonably calculated to protect FCG, its assets and the goodwill associated with its business. No provision of this Agreement shall limit in any way FCG's rights under applicable law to fair and equitable remedy, including monetary damages, specific performance, injunction and other equitable remedies. Should FCG retain counsel in order to enforce or prevent the breach of any provision in Paragraphs 1 through 5 only of this Agreement, FCG shall be entitled to reasonable attorneys' fees and costs for services rendered if it prevails.

9.     *No Right to a Jury Trial.* I agree that both FCG and I expressly waive the right to a jury trial on any issue concerning my employment.

10.     *Non-Waiver.* I agree that any delay or failure by FCG to exercise any right under this Agreement will not constitute a waiver of that or any other right provided for in this Agreement.

11.     *Severability.* I agree that the invalidity or unenforceability of any particular provision of this Agreement for any reason whatsoever shall not affect the other provisions hereof and that such invalid or unenforceable provisions shall be limited and/or reduced by judicial order so as to be enforceable to the maximum extent of applicable law. In the event such judicial limitation or reduction is not possible, this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

12.     *Only Change in Writing.* The terms of this Agreement can only be changed in writing. In order for it to be effective against me, I must sign any written change to the Agreement; in order for the change to be effective against FCG, it must be signed by the authorized representative of FCG Human Resources.

13.     *Binding Effect.* My obligations under this Agreement shall survive the termination of my employment with FCG and shall be binding upon my heirs, administrators, personal representatives, successors, and assigns. In addition, this Agreement will be for the benefit of FCG, its successors, and its assigns.

14.     *Governing Law.* This Agreement shall be interpreted and enforced in accordance with the internal laws of the State of <<STATE OF WORK>>. The provisions of this Agreement shall be interpreted in accordance with their plain meaning. No provision of this Agreement shall be interpreted against a party as a consequence of that party having drafted said provision.

15.     *Effective Date.* This Agreement shall be deemed to be effective as of the date of my commencement of employment with FCG.

_____
Signature

~~Mary Kae Manley~~     Stephen P Egli
Print Name

3/25/2007
_____
Date Signed

FCG00001606
CONFIDENTIAL

**Exhibit F.     Peter Smith Transition Agreement**



February 6, 2007

Pete C. Smith
2233 W. School St
Chicago, IL 60618

Dear Pete:

The following information will outline your compensation and responsibilities as a member of our temporary per diem staffing program:

- You will be on per diem status effective on February 9, 2007.

- Additionally, you should understand that FCG maintains an "at will" employment relationship with all of its associates and your employment will be subject to that policy at all times, including during any assigned projects. You understand and agree that when your position ends, or is terminated by you or FCG, you will not be due any additional compensation or benefits.

- Your title will be PD Consultant NX. You will be assigned to the HD Consulting Department.

- Your hourly rate will be $300.00 for work currently contemplated (40 hours of transition activities per agreement with Don Driscoll and Greg Saffee). Any additional work beyond these transition services would be at a rate mutually agreed upon by you and the President of Health Delivery Services, and as further approved in accordance with any applicable FCG resource management policies. You will be paid in arrears on a semi-monthly basis and will be paid for actual hours worked, including overtime as governed by current state and federal laws. Please see the attached paycheck schedule.

- As a Per Diem Associate, all hours worked over 40 during a week must be approved in advance by your Project Manager/Coach.

- This position is not eligible for benefits.

- FCG is an "at will" employer, meaning that you or FCG can terminate the employment relationship at any time, with or without prior notice, and for any reason not prohibited by statute. All employment is continued on that basis.

- As a condition of your employment, FCG requires that you agree to and sign the enclosed Per Diem Associate Fringe Benefit Waiver.

FCG00000464
CONFIDENTIAL

Feb 09 07 01:58p        corfig                    773 296 4659                    p.2

- The terms of your Vice President Agreement dated December 31, 2000 shall apply to your employment as a per diem associate; provided that, the one year period applicable to the terms of Section 7 of the Vice President Agreement shall be deemed to expire on February 7, 2008. Notwithstanding the foregoing, in the event that your per diem status is extended to include additional assignments beyond the transitional activities described above in this letter, the one year period of client non-solicitation shall apply to the particular client to which you provide services on a per diem basis and such one year period shall be deemed to commence on the last day that you provide services on FCG's behalf to that specific client.

Upon acceptance of this offer, you will need to sign and return this entire original document to FCG Human Resources and keep the enclosed copy for your records.  In order to expedite your hiring process, **please fax copies of the signed offer letter <u>and</u> employment agreement directly to HrHelps at (562) 437-1895.**

Yours very truly,

FIRST CONSULTING GROUP

I hereby accept this offer of employment in accordance with the terms stated above.
My expected start date is     2/3/07

_____
Signature

Enclosures

cc:   Greg Safee
      HR File

FCG00000465
CONFIDENTIAL



## PER DIEM ASSOCIATE FRINGE BENEFIT WAIVER

This is to acknowledge that I am employed by First Consulting Group, Inc. (the "Company") as a per diem employee, and, in consideration of my special rate of compensation, I hereby waive any and all fringe benefits that the Company or any related or affiliated organization provides to any employees, except as specifically provided below. The benefits that I hereby waive and will not be eligible to participate in or receive include, but are not necessarily limited to, any and all paid time off, vacation, holiday, sickness, severance, health insurance, life and AD&D insurance, medical, dental and vision benefits. You will also not be eligible to participate in other firm programs including, but not limited to, professional development and training classes, bonus programs and recognition programs. The only benefits that I have not waived consist of those legislated benefits that are required by law for all employees and that cannot be waived under the law.

I also understand and agree that if, as a result in any change in my status or classification from per diem status to any other status or classification, I become eligible for any or all of the benefits I have waived, no portion of my service of a per diem employee shall be credited or considered in any way for purposes of determining my eligibility for any benefits or the amount of any benefits to which I am or may become entitled. The sole exception is that, in compliance with FCG 401(k) plan, service credit will be given for purposes of 401(k) vesting if other eligibility criteria are met and there is no break in service.

I acknowledge that I have read this document, fully understand it, and that I am signing it freely and voluntarily.

DATED: ___2/9/07___

SIGNATURE: ___Peter C. Smith___

PRINTED NAME: ___Peter C. Smith___

WITNESS: ___Sue Smith___

FCG00000466
CONFIDENTIAL

**Exhibit G.     Andrew Smith Transition Agreement**



February 6, 2007


Andy Smith
821 Thornapple Dr
Naperville, IL 60540

Dear Andy:

The following information will outline your compensation and responsibilities as a member of our temporary per diem staffing program:

- You will be on per diem status effective on February 9, 2007.

- Additionally, you should understand that FCG maintains an "at will" employment relationship with all of its associates and your employment will be subject to that policy at all times, including during any assigned projects. You understand and agree that when your position ends, or is terminated by you or FCG, you will not be due any additional compensation or benefits.

- Your title will be PD Consultant NX. You will be assigned to the Health Delivery Account Executives Department.

- Your hourly rate for work currently contemplated (5 to 6 weeks of transition activities per agreement with Don Driscoll and Greg Saffee) will be $225.00. Any additional work beyond these transition services would be at a rate mutually agreed upon by you and the President of Health Delivery Services, as further approved in accordance with any applicable FCG resource management policies. You will be paid in arrears on a semi-monthly basis and will be paid for actual hours worked, including overtime as governed by current state and federal laws. Please see the attached paycheck schedule.

- As a Per Diem Associate, all hours worked over 40 during a week must be approved in advance by your Project Manager/Coach.

- This position is not eligible for benefits.

- FCG is an "at will" employer, meaning that you or FCG can terminate the employment relationship at any time, with or without prior notice, and for any reason not prohibited by statute. All employment is continued on that basis.

- As a condition of your employment, FCG requires that you agree to and sign the enclosed Per Diem Associate Fringe Benefit Waiver.


FCG00000002
CONFIDENTIAL

Feb 07 07 06:16p    630-717-9679    630-717-9679    p.2

- The terms of your Vice President Agreement dated July 1, 2003 shall apply to your employment as a per diem associate; provided that, the one year period applicable to the terms of Section 7 of the Vice President Agreement shall be deemed to expire on February 7, 2008. Notwithstanding the foregoing, in the event that your per diem status is extended to include additional assignments beyond the transitional activities described above in this letter, the one year period of client non-solicitation shall apply to the particular client to which you provide services on a per diem basis and such one year period shall be deemed to commence on the last day that you provide services on FCG's behalf to that specific client.

Upon acceptance of this offer, you will need to sign and return this entire original document to FCG Human Resources and keep the enclosed copy for your records. In order to expedite your hiring process, please fax copies of the signed offer letter **and** employment agreement directly to HrHelps at (562) 437-1895.

Yours very truly,

FIRST CONSULTING GROUP

Jon Blue
Vice President, Human Resources

Enclosures

cc:   Don Driscoll
      HR File

---

I hereby accept this offer of employment in accordance with the terms stated above. My expected start date is _2/9/07_

Signature

Feb 07 07 06:16p    630-717-9679    630-717-9679    p.3



## PER DIEM ASSOCIATE FRINGE BENEFIT WAIVER

This is to acknowledge that I am employed by First Consulting Group, Inc. (the "Company") as a per diem employee, and, in consideration of my special rate of compensation, I hereby waive any and all fringe benefits that the Company or any related or affiliated organization provides to any employees, except as specifically provided below. The benefits that I hereby waive and will not be eligible to participate in or receive include, but are not necessarily limited to, any and all paid time off, vacation, holiday, sickness, severance, health insurance, life and AD&D insurance, service, medical, dental and vision benefits. You will also not be eligible to participate in other firm programs including, but not limited to, professional development and training classes, bonus programs and recognition programs. The only benefits that I have not waived consist of those legislated benefits that are required by law for all employees and that cannot be waived under the law.

I also understand and agree that if, as a result in any change in my status or classification from per diem status to any other status or classification, I become eligible for any or all of the benefits I have waived, no portion of my service of a per diem employee shall be credited or considered in any way for purposes of determining my eligibility for any benefits or the amount of any benefits to which I am or may become entitled. The sole exception is that, in compliance with FCG 401(k) plan, service credit will be given for purposes of 401(k) vesting if other eligibility criteria are met and there is no break in service.

I acknowledge that I have read this document, fully understand it, and that I am signing it freely and voluntarily.

DATED: 2-7-07

SIGNATURE: *Andrew M. Smith*

PRINTED NAME: Andrew M. Smith

WITNESS: *P.T. Elliott*

FCG00000004
CONFIDENTIAL

**Exhibit H.    Swenson Transition Agreement**

April 17, 2007


Melanie Swenson
432 E. Idaho, Suite C
Kalispell, MT 59901


Dear Melanie:

The following information will outline your compensation and responsibilities as a member of our temporary per diem staffing program:

- You will be on per diem status effective on April 20, 2007.

- Additionally, you should understand that FCG maintains an "at will" employment relationship with all of its associates and your employment will be subject to that policy at all times, including during any assigned projects. You understand and agree that when your position ends, or is terminated by you or FCG, you will not be due any additional compensation or benefits.

- Your title will be PD Consultant EX. You will be assigned to HD Implementation Department.

- Your business unit-specific responsibilities have already been reviewed with you during the recruiting process.

- Your hourly rate will be $200. This is based on a standard schedule of 40 hours per week. You will be paid in arrears on a semi-monthly basis and your salary will be adjusted for variations in your standard schedule. Please see the attached paycheck schedule.

- As a Per Diem Associate, all hours worked over 40 during a week must be approved in advance by your Project Manager/Coach.

- This position is not eligible for benefits.

- FCG is an "at will" employer, meaning that you or FCG can terminate the employment relationship at any time, with or without prior notice, and for any reason not prohibited by statute. All employment is continued on that basis.

- As a condition of your employment, FCG requires that you agree to and sign the enclosed Employment Agreement and Per Diem Associate Fringe Benefit Waiver.

FCG00001169
CONFIDENTIAL

Due to the nature of our business, travel and the use of rental cars may be part of your job. The Firm's non-owned automobile liability insurance carrier requires that the driving record (personal or rented automobile) of all Associates be checked prior to hire.

Upon acceptance of this offer, you will need to sign and return this entire original document to FCG Human Resources and keep the enclosed copy for your records. In order to expedite your hiring process, **please fax copies of the signed offer letter and employment agreement directly to HrHelps at (562) 437-1895.**

Yours very truly,

FIRST CONSULTING GROUP

I hereby accept this offer of employment in accordance with the terms stated above. My expected start date is ___4 | 20 | 07___

_____                 _____
Jan Blue                                     Signature
Vice President, Human Resources

Enclosures

cc:   Greg Saffee
      Briggs Pille
      HR File

**FCG00001170**
**CONFIDENTIAL**

Due to the nature of our business, travel and the use of rental cars may be part of your job.  The Firm's non-owned automobile liability insurance carrier requires that the driving record (personal or rented automobile) of all Associates be checked prior to hire.

Upon acceptance of this offer, you will need to sign and return this entire original document to FCG Human Resources and keep the enclosed copy for your records.  In order to expedite your hiring process, **please fax copies of the signed offer letter <u>and</u> employment agreement directly to HrHelps at (562) 437-1895.**

Yours very truly,

FIRST CONSULTING GROUP

I hereby accept this offer of employment in accordance with the terms stated above.
My expected start date is      4|20|07

Signature

Jan Blue
Vice President, Human Resources

Enclosures

cc:    Greg Saffee
       Briggs Pille
       HR File

FCG00001171
CONFIDENTIAL



## PER DIEM ASSOCIATE FRINGE BENEFIT WAIVER

This is to acknowledge that I am employed by First Consulting Group, Inc. (the "Company") as a per diem employee, and, in consideration of my special rate of compensation, I hereby waive any and all fringe benefits that the Company or any related or affiliated organization provides to any employees, except as specifically provided below. The benefits that I hereby waive and will not be eligible to participate in or receive include, but are not necessarily limited to, any and all paid time off, vacation, holiday, sickness, severance, health insurance, life and AD&D insurance, medical, dental and vision benefits. You will also not be eligible to participate in other firm programs including, but not limited to, professional development and training classes, bonus programs and recognition programs. The only benefits that I have not waived consist of those legislated benefits that are required by law for all employees and that cannot be waived under the law.

I also understand and agree that if, as a result in any change in my status or classification from per diem status to any other status or classification, I become eligible for any or all of the benefits I have waived, no portion of my service of a per diem employee shall be credited or considered in any way for purposes of determining my eligibility for any benefits or the amount of any benefits to which I am or may become entitled. The sole exception is that, in compliance with FCG 401(k) plan, service credit will be given for purposes of 401(k) vesting if other eligibility criteria are met and there is no break in service.

I acknowledge that I have read this document, fully understand it, and that I am signing it freely and voluntarily.

DATED: 4/20/07

SIGNATURE: _Maureen Swenson_

PRINTED NAME: Maureen Swenson

WITNESS: _____

FCG00001172
CONFIDENTIAL



## PER DIEM ASSOCIATE FRINGE BENEFIT WAIVER

This is to acknowledge that I am employed by First Consulting Group, Inc. (the "Company") as a per diem employee, and, in consideration of my special rate of compensation, I hereby waive any and all fringe benefits that the Company or any related or affiliated organization provides to any employees, except as specifically provided below. The benefits that I hereby waive and will not be eligible to participate in or receive include, but are not necessarily limited to, any and all paid time off, vacation, holiday, sickness, severance, health insurance, life and AD&D insurance, medical, dental and vision benefits. You will also not be eligible to participate in other firm programs including, but not limited to, professional development and training classes, bonus programs and recognition programs. The only benefits that I have not waived consist of those legislated benefits that are required by law for all employees and that cannot be waived under the law.

I also understand and agree that if, as a result in any change in my status or classification from per diem status to any other status or classification, I become eligible for any or all of the benefits I have waived, no portion of my service of a per diem employee shall be credited or considered in any way for purposes of determining my eligibility for any benefits or the amount of any benefits to which I am or may become entitled. The sole exception is that, in compliance with FCG 401(k) plan, service credit will be given for purposes of 401(k) vesting if other eligibility criteria are met and there is no break in service.

I acknowledge that I have read this document, fully understand it, and that I am signing it freely and voluntarily.

DATED: _____4|17|07_____

SIGNATURE: _____

PRINTED NAME: _Melanie Swenson_

WITNESS: _____

FCG00001173
CONFIDENTIAL

## <u>CERTIFICATE OF SERVICE</u>

I, Hudson T. Hollister, an attorney, hereby certify that on April 9, 2008, I electronically filed this AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Laurie A. Holmes     lholmes@gcd.com

Alan Sterling King     aking@gcd.com

/s/ Hudson T. Hollister
One of the Attorneys for Plaintiffs
First Consulting Group, Inc. and FCG CSI, Inc.

Timothy B. Hardwicke (#6201352)
Hudson T. Hollister (#6286422)
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
tel: (312) 876-7700
fax: (312) 993-9767